IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

> *Plaintiffs*,

v.

WILLIAM CROUCH, *et al.*,

CIVIL ACTION NO. 3:20-cv-00740

HON. ROBERT C. CHAMBERS, JUDGE

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## THE HEALTH PLAN OF WEST VIRGINIA, INC.'S MOTION TO DISMISS

### INTRODUCTION

Defendant The Health Plan of West Virginia, Inc. ("The Health Plan" or "Defendant") contracts with the state of West Virginia to provide health insurance for eligible state employees and dependents.  This health insurance covers medically necessary counseling, hormone therapy, and surgical care—unless the individual is transgender.  While cisgender[1] enrollees can receive that care as a matter of course, transgender enrollees face a sweeping exclusion because they require the same treatments and/or procedures for gender-confirming care (the "Exclusion").  Transgender enrollees are thus targeted for discrimination by the Exclusion in The Health Plan.

Plaintiff Brian McNemar ("Mr. McNemar"), a current state employee, and Plaintiff Zachary Martell ("Mr. Martell"), his dependent spouse (collectively, "Plaintiffs"), sued The Health Plan to challenge the Exclusion under the Affordable Care Act's ("ACA") nondiscrimination guarantees.  (Compl. ¶¶ 135-148.)  While health plans may draw coverage

---

[1] A cisgender person is one whose "'deeply felt, inherent sense' of their gender—aligns with their sex-assigned-at-birth."  *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), as amended (Aug. 28, 2020).

lines, those guarantees ensure that they may not do so on the basis of sex.  42 U.S.C. § 18116.

But this is what The Health Plan does by writing into its plans an Exclusion that expressly

singles out transgender people for discriminatory treatment.  The Health Plan moves to dismiss

Plaintiffs' ACA claim (ECF Nos. 20, 21), but its motion must be denied.  The Health Plan's

motion asks this Court to ignore the plain language of the ACA, and to rely instead on a

regulation that defies the clear terms of ACA.  Neither principles of statutory interpretation nor

agency deference permit this result.  Plaintiffs' claims must be allowed to proceed.

## STATEMENT OF FACTS

### A.     Plaintiffs Zachary Martell and Brian McNemar

Plaintiff Zachary Martell is a transgender man.  (Compl. ¶¶ 9-10.)  Mr. Martell is married

to state employee Brian McNemar, and they reside together in Barboursville.  (*Id.*)  Mr. Martell

is a student at Mountwest Community and Technical College, which does not offer health

insurance to its students.  (*Id.* ¶ 89.)  Mr. McNemar works at the Mildred Mitchell Bateman

Hospital as an Accountant Auditor.  (*Id.* ¶ 10.)  As the spouse of Mr. McNemar, Mr. Martell is

an eligible dependent and has at all relevant times been enrolled for state employee health

coverage through Mr. McNemar.  (*Id.* ¶ 90.)  Both Mr. Martell and Mr. McNemar are enrolled in

the HMO Plan A, which is approved by Defendant Ted Cheatham as a coverage option for state

employees and their dependents, and is offered by Defendant The Health Plan.  (*Id.* ¶¶ 9-10, 90.)

### B.     Medically Necessary Care for Transgender People

Gender identity is a person's internal sense of their sex, and it is innate, immutable, and

has biological underpinnings.  (*Id.* ¶ 23.)  The ability to live consistent with one's gender identity

is vital to the health and wellbeing of all people, including transgender people, and the scientific

consensus recognizes that attempts to force transgender people to ignore their gender identity are

2

profoundly harmful.  (*Id.* ¶¶ 28-30.)  For most people, their sex-related characteristics are all aligned.  (*Id.* ¶ 26.)  But transgender people experience an incongruence between their gender identity and other sex-related characteristics that can result in clinically significant distress known as gender dysphoria.  (*Id.* ¶ 31.)

 Mr. Martell has been diagnosed with gender dysphoria, which is recognized as a serious medical condition by leading medical and behavioral health groups such as the American Medical Association, the American Psychiatric Association, and the American Psychological Association.  (*Id.* ¶¶ 31, 93.)  Untreated gender dysphoria can result in severe anxiety, depression, and even suicidality.  (*Id.* ¶ 32.)  Gender dysphoria is highly treatable, however, under standards of care that are widely accepted as the best practices for treatment.  (*Id.* ¶¶ 34, 36.)

 From an early age, Mr. Martell felt different, but it was not until age 30 that he accepted and came to understand himself as transgender.  (*Id.* ¶ 94.)  Mr. Martell changed his legal name and updated the name and gender marker on his West Virginia driver's license and in his Social Security records.  (*Id.* ¶ 95.)  He is recognized as male by his friends, classmates, and professors. (*Id.*)  To avoid being incorrectly identified as female, and to reduce his severe distress over his typically female-appearing breasts, when Mr. Martell leaves the house he often uses a binder to flatten his chest.  (*Id.* ¶ 85.)  But the binder is not sufficient to eliminate his distress, and prolonged use causes intense pain and difficulty breathing.  (*Id.* ¶¶ 97-98.)  Mr. Martell accordingly requires a bilateral mastectomy as medically necessary care, which is widely accepted to treat gender dysphoria.  (*Id.* ¶ 99.)  But he is denied this care under the categorical Exclusion in The Health Plan's HMO Plan A.  (*Id.*)

 Mr. Martell has also been denied coverage for medically necessary testosterone and

related office visits with his doctor.  (*Id.* ¶¶ 100-101.)  At times, the expense of paying out-of-pocket for these prescriptions was too much for Mr. Martell and Mr. McNemar, forcing Mr. Martell to temporarily forego medically necessary health care so the couple could make ends meet.  (*Id.* ¶ 102.)  This lapse in health care coverage suspended an essential part of Mr. Martell's medical transition and exacerbated his anxiety and distress.  (*Id.*)  Mr. McNemar experienced distress having to watch his spouse suffer without medically necessary care, in addition to out-of-pocket expenses and harm related to receiving less compensation in the form of health coverage than other state employees with cisgender spouses.  (*Id.* ¶¶ 102, 104.)

### C.    Defendant The Health Plan

Defendant The Health Plan is West Virginia's largest Health Maintenance Organization ("HMO"), with more than 200,000 members in all 55 counties in West Virginia.  (*Id.* ¶ 15.) Many of The Health Plan's members, including Mr. Martell and Mr. McNemar, are enrolled through their state employers; others are enrolled through state Medicaid and Medicare Advantage plans.  (*Id.*)  The Health Plan is offered through West Virginia's Public Employees Insurance Agency ("PEIA") as a health insurance option for qualifying state employees.  (*Id.*) More than 15,000 of The Health Plan's members are state employees who have obtained coverage through PEIA.  (*Id.*)  The Health Plan receives federal financial assistance from the Centers for Medicare and Medicaid Services ("CMS") for its Medicare Advantage programs. (*Id.* ¶ 139(B).)

Defendant The Health Plan maintains a categorical Exclusion for gender-confirming care, which it invoked to deny Mr. Martell's hormone therapy because "[t]reatments for gender identity issues are excluded from the benefit."  (*Id.* ¶ 101.)  The Exclusion also bars the chest reconstruction surgery that Mr. Martell requires.  (*Id.* ¶ 99.)  Cisgender people receive the same

kinds of hormonal and surgical care denied to transgender people as a matter of course. (*Id.* ¶¶ 1, 3.)

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must "accept as true all of the factual allegations contained in the complaint," and draw "all reasonable inferences" in favor of the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). To survive a Rule 12(b)(6) motion, a plaintiff need only "state a claim to relief that is plausible on its face." *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quote omitted). This requires merely that a plaintiff advance their claim "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A Rule 12(b)(6) motion should be granted only "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Thompson v. W. Virginia Reg'l Jail/Corr. Auth.*, No. 3:13-cv-1897, 2013 WL 3282931, at *3 (S.D.W. Va. June 27, 2013) (internal quotation marks omitted). As explained below, because Plaintiffs' ACA claim amply satisfies this pleading standard, the Court must deny Defendant's motion.

## ARGUMENT

### I. PLAINTIFFS HAVE ADEQUATELY PLED AN ACA CLAIM AGAINST DEFENDANT THE HEALTH PLAN.

Congress passed the ACA with the "aim[] to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage" across the nation. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583 (2012). Section 1557 of the ACA ("Section 1557") is essential to that objective and provides a sweeping nondiscrimination guarantee to guard against the profound harms and

serious health disparities that flow from discrimination in health care.  42 U.S.C. § 18116.  To facilitate this important purpose, the plain language of Section 1557 unambiguously applies to all operations of health programs or activities that are in receipt of federal financial assistance—including health insurers and insurance plans.

Despite this, Defendant argues that the HMO Plan A in which Mr. Martell and Mr. McNemar enrolled for coverage must itself receive federal funding, and the receipt of federal funds by any other part of The Health Plan is insufficient to subject it to liability under the ACA. Mem. in Supp. of Def. The Health Plan of West Virginia, Inc.'s Mot. to Dismiss, ECF No 21 ("Def.'s Br.") at 5-7.  Defendant is wrong.

A.    **Under the Plain Language of the ACA, Plaintiffs Need Only Allege That "Any Part" of The Health Plan Receives Federal Assistance.**

The Health Plan's first argument is that Plaintiffs are required to "allege that Mr. Martell's program, [HMO Plan A],[2] receives federal assistance."  Def.'s Br. at 5.  Nothing about Section 1557's broad remedial language requires such an allegation, however, and Section 1557's express language provides the opposite.  Section 1557 prohibits sex discrimination by "any health program or activity, ***any part of which*** is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance …"  42 U.S.C. § 18116(a) (emphasis added); Def.'s Br. at 5 (quoting 42 U.S.C. § 18116(a)); Def.'s Br. at 5 n.4 (same).  As Plaintiffs allege, The Health Plan contracts with CMS, the federal agency that administers the Medicare program, and under this contract, CMS makes a monthly payment to The Health Plan.  (Compl. ¶ 139(B).)  The Health Plan concedes this point.  Def.'s Br. at 7 ("While it may be true that The

---

[2] The Health Plan's brief refers to Mr. Martell and Mr. McNemar's plan as "PEIA PPB Plan A," but the couple is enrolled in HMO Plan A.  (Compl. ¶ 90.)

Health Plan receives federal assistance for its Medicare Advantage plans …").

The Health Plan vaguely asserts that "Plaintiffs have failed to plead the requisite elements of the ACA's nondiscrimination provision," but cites nothing other than Section 1557's provision that receipt of federal funds by "any part" of an entity subjects it to Section 1557's nondiscrimination obligations.  Def.'s Br. at 5.  Plaintiffs have alleged exactly that.  Plaintiffs' Complaint quotes The Health Plan's "Provider Procedural Manual," which states that "CMS makes a monthly payment to The Health Plan for each Medicare beneficiary who enrolls" in a Medicare plan (Compl. 139(B)), and Defendant admits this fact, Def.'s Br. at 7.

Put simply, Section 1557 requires merely that "any part" of the relevant entity receive federal funding, Plaintiffs allege that the Medicare plans are the "part" of The Health Plan receiving funding, and The Health Plan admits this is true.  This more than suffices to nudge Plaintiffs' claim "across the line from conceivable to plausible" at the motion to dismiss stage. *Twombly*, 550 U.S. at 570.

> **B.    The Plain Language of the ACA Controls, and Subjects The Health Plan to Liability Under the Statute.**

The Health Plan's only other argument asks this Court to ignore the plain language of the ACA and defer instead to attempts to unwind the ACA through regulations aimed at subverting its basic guarantees.  Indeed, the ongoing validity of the regulation itself remains in question, with other portions enjoined by multiple courts, and a January 28, 2021 Executive Order requiring the Secretary of Health and Human Services to review and rescind regulations inconsistent with the ACA's purpose.  *See Walker v. Azar*, No. 20-cv-2834, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-1630, 2020 WL 5232076, at *45 (D.D.C. Sept. 2, 2020); Exec. Order No. 14009, 86 FR 7793, 2021 WL 325501 (Jan. 28, 2021).  But the Court need not even consider the

regulation because the clear text of the statute forecloses The Health Plan's argument.

The Health Plan argues that it is "untenable" to conclude that "the receipt of federal dollars for any program renders The Health Plan's entire portfolio subject to the nondiscrimination provision of the ACA." Def.'s Br. at 6 (emphasis omitted). But that is precisely what the plain text of Section 1557 requires. *See* 42 U.S.C. § 18116(a) (prohibiting discrimination by "any health program or activity, ***any part of which*** is receiving Federal financial assistance") (emphasis added).[3] Courts are not empowered to ignore, or read out of a statute, the plain language Congress wrote into the law. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008) ("We are not permitted to ignore the statute's plain language."). Nor does any agency have any greater leeway to defy clear statutory language. *Bracamontes v. Holder*, 675 F.3d 380, 387 (4th Cir. 2012) (holding that an agency "may not make its own administrative amendments, and as a court, ..., we are obliged to give effect to the statutes as they are written and enacted") (internal quotation marks and brackets omitted); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("[O]nly Congress can rewrite [a] statute.").

Nonetheless, The Health Plan asks this Court to disregard the statute's plain language by

---

[3] Following this broad command, federal courts have consistently applied Section 1557 to health insurers. *See Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 951 (9th Cir. 2020) (holding that Section 1557 "prohibits discrimination … in the health care system—as relevant here, in health insurance contracts"); *Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017) (reversing dismissal of Section 1557 claims against insurer); *Ferrer v. CareFirst, Inc.*, 265 F. Supp. 3d 50, 53 (D.D.C. 2017) (allowing ACA claim to proceed against insurer); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015) ("[A]s long as part of an organization or entity receives federal funding or subsidies of some sort, the entire organization is subject to the anti-discrimination requirements of Section 1557.").

deferring to the new regulation, which purports to define the unambiguous statutory phrase "***any***

***health program or activity,*** any part of which is receiving Federal financial assistance," 42

U.S.C. § 18116(a) (emphasis added), as limited only to "entities principally engaged in the

business of providing healthcare," and not including HMOs such as The Health Plan.  85 Fed.

Reg. at 37244 (§ 92.3(b)).  According to The Health Plan's line of reasoning, only entities

principally engaged in providing health care are liable for discrimination in all of their operations

if any part receives federal funding.  Def.'s Br. at 6-7.

But if Congress had intended to dramatically circumscribe the statute's reach only to

entities that provide health care, it would have said so.  Instead, it expressly extended the

statutory reach to "any health program or activity."  42 U.S.C. § 18116(a).  An agency cannot

hobble the broad scope of a remedial statute by grafting an invented requirement onto it.  *See*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The

judiciary is the final authority on issues of statutory construction and must reject administrative

constructions which are contrary to clear congressional intent.").  To accept The Health Plan's

arguments, the Court would either have to effectively strike through the law with a pen,

eliminating Congress's clear provision that if "***any part***" of "***any*** health program or activity"

receives federal financial assistance the entity is covered—or, the Court would need to write

words into the law that are not there, by holding that "any health program or activity" actually

must be read as "any health program or activity ***principally engaged in providing healthcare***."

Neither is permitted under the most basic principles of statutory construction and agency

deference.  The Court must reject The Health Plan's argument because it is founded neither on

what Congress said nor what Congress intended.  *See Chevron*, 467 U.S. at 843 n.9 ("If a court,

employing traditional tools of statutory construction, ascertains that Congress had an intention on

the precise question at issue, that intention is the law and must be given effect."); *see also Ohio Valley Env. Coalition v. Marfork Coal Co.*, 966 F. Supp. 2d 667, 678 (S.D.W. Va. 2013) ("If the Legislature's intent is clear, 'that is the end of the matter,' and the Court must give effect to the expressed intent of the Legislature.") (internal citations omitted).

Moreover, even if the plain language of the statute were not enough to answer this question—and it is—in determining "whether the language is plain, [courts] must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal citations, quotation marks, and modifications omitted). It is the duty of the court "to construe statutes, not isolated provisions." *Burwell*, 576 U.S. at 486 (quoting *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal quotation marks omitted)). Examined as a whole, the structure and context of the ACA make clear that Section 1557 applies to health insurers like Defendant. The ACA itself explicitly refers elsewhere to both "health programs" and "health care entities" as including health insurers and insurance plans. *See, e.g.*, Section 1331, 42 U.S.C. § 18051(a)(1) (permitting states flexibility to provide a "basic health program" by offering "1 or more standard health plans providing at least the essential health benefits described in section 1302(b) to eligible individuals in lieu of offering such individuals coverage through an Exchange"); Section 1553, 42 U.S.C. § 18113(b) (defining "health care entity" to include "a health maintenance organization, a health insurance plan").

The ACA, at its core, is a statute reforming our nation's ***health insurance*** system; to exclude health insurance plans from the statute's nondiscrimination provisions is contrary to law. The day the ACA passed, Senator Patrick Leahy stated that its "explicit[] prohibit[ion]" of "discrimination on the basis of race, color, national origin, sex, disability or age in any health

program or activity receiving Federal funds" was "necessary to remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and "ensure that all Americans are able to reap *the benefits of health insurance reform* equally without discrimination."  156 Cong. Rec. S1842 (daily ed. Mar. 23, 2010) (emphasis added). Any reasonable reading of Section 1557 covers the provision of health insurance—the only portal by which the overwhelming majority of Americans can access health care—as encompassed within the definition of "any health program or activity" subject to the statute.

For all of these reasons, this Court should honor the plain language of the statute and reject Defendant's invitation to re-write it.  Plaintiffs' claim should be allowed to proceed.

## II.   PLAINTIFF BRIAN MCNEMAR STATES A VALID AND INDEPENDENT ACA CLAIM FOR THE SAME REASONS ABOVE.

The Health Plan also moves to dismiss Mr. McNemar's claim, but tellingly offers no substantive basis for doing so.  Def.'s Br. at 7.  It is not entirely clear what The Health Plan means when it asserts that Mr. McNemar's claim is "derivative" of Mr. Martell's.  Mr. McNemar states his own ACA claim and seeks his own damages.  (Compl. ¶¶ 102, 104 (alleging that Mr. McNemar helped pay out-of-pocket for Mr. Martell's care, has experienced the intense frustration and despair of watching his spouse suffer without coverage for essential medical care, and receives less compensation than other employees who receive coverage for their cisgender spouses' hormone-related therapy and surgical care).)

The ACA incorporates "enforcement mechanisms provided for and available under … [T]itle IX," 42 U.S.C.A. § 18116(a), and courts have recognized that Title IX's "wide purview" allows independent sex discrimination claims by cisgender employees denied coverage for their transgender dependents.  *See Kadel v. Folwell*, 446 F. Supp. 3d 1, 12 (M.D.N.C. 2020) (analyzing Title IX challenge to exclusion of gender-confirming care in state employee health

11

plan by cisgender parents denied care for their transgender children; holding that "[t]he parent plaintiffs, too, are persons who have been denied benefits on the basis of sex—the sex in question just happens to be that of their children, rather than their own," and confirming this falls within Title IX's broad sweep).

Regardless, The Health Plan makes no independent or substantive argument for dismissing Mr. McNemar's claim, seeming to argue only that Mr. McNemar's claim fails for the same reason that Mr. Martell's purportedly does.[4]  Accordingly, The Health Plan's motion to dismiss Mr. McNemar's claim depends on the arguments addressed in Section I above, and should be denied for the same reasons.

## CONCLUSION

For all the reasons above, the Court should deny Defendant The Health Plan's motion to dismiss Count II of Plaintiffs' Complaint.

* * *

---

[4] The sole authority The Health Plan cites does not change the analysis.  *See* Def's. Br. at 7 (citing *Beasley v. Sohio Oil Co., Gulf Prod. Div.*, 931 F.2d 54 (4th Cir. 1991)).  *Beasley*, a 1991 loss of consortium case, does not bear upon the ACA claim here and certainly does not suggest any separate ground for dismissing Mr. McNemar's ACA claim.

Dated: February 16, 2021

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
Phone: 612-256-3200
Facsimile: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245
Facsimile: 202-429-9574
sbuchert@lambdalegal.org

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

Respectfully submitted,

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585
Facsimile: 214-219-4455
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308
Phone: 470-225-5341
Facsimile: 404-897-1884
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA  90010
Phone: 213-382-7600
Facsimile: 213-351-6050
nhuppert@lambdalegal.org