IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| CHRISTOPHER FAIN, *et al.*, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>WILLIAM CROUCH, *et al.*,<br><br>*Defendants*. | CIVIL ACTION NO. 3:20-cv-00740<br><br>HON. ROBERT C. CHAMBERS, JUDGE |

**PLAINTIFFS' OPPOSITION TO DEFENDANT TED CHEATHAM'S
MOTION TO DISMISS THE COMPLAINT**

**<u>INTRODUCTION</u>**

This case is about discrimination in employment and health care. Plaintiff Brian McNemar ("Mr. McNemar") is a state employee, and both he and his husband, Zachary Martell ("Mr. Martell"), receive health coverage through the Public Employees Insurance Agency ("PEIA"), of which Defendant Cheatham is the Director. Access to PEIA coverage is an important part of compensation for state employment. But because Mr. Martell is transgender, he is denied essential medical care because all plans offered to state employees through PEIA contain a sweeping exclusion barring gender-confirming care, including but not limited to counseling, hormone therapy, and surgical care (the "Exclusion"). And Mr. Martell is denied care even though the same kinds of care are covered for cisgender[1] people as a matter of course. In other words, Defendant Cheatham denies equal compensation for equal work to employees

---

[1] A cisgender person is one whose "'deeply felt, inherent sense' of their gender—aligns with their sex-assigned-at-birth." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), as amended (Aug. 28, 2020).

who are transgender or who have transgender dependents, and harms employees' transgender family members who depend on them for health care. Mr. McNemar and Mr. Martell (together, "Plaintiffs") challenge the Exclusion, and name Defendant Cheatham in his official capacity as an *Ex Parte Young* defendant under the Equal Protection Clause.[2]

For his part, Defendant Cheatham argues that Plaintiffs' claims do not meet Article III standards of traceability and redressability. But as Director and Chief Administrative Officer of PEIA, Defendant Cheatham is statutorily charged with direct and ultimate control over the health plan options offered to state employees. Enjoining his discriminatory conduct will redress Plaintiffs' harms—making clear that Article III standards are amply satisfied. Defendant Cheatham also argues that the state has governmental interests that are substantially related to the Exclusion, but he articulates no adequate justification for the Exclusion, much less one that can be credited at the pleading stage. Accordingly, the Court must deny Defendant Cheatham's motion.

## STATEMENT OF FACTS

### A. Plaintiffs Zachary Martell and Brian McNemar

Plaintiff Zachary Martell is a transgender man. (Compl. ¶ 9.) Mr. Martell is married to state employee Brian McNemar, and they reside together in Barboursville. (*Id.* ¶¶ 9-10.) Mr. Martell is a student at Mountwest Community and Technical College, which does not offer health insurance to its students. (*Id.* ¶ 89.) Mr. McNemar works at the Mildred Mitchell

---

[2] Plaintiffs also named Mr. Cheatham as a defendant pursuant to Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"). In the interest of streamlining the case, Plaintiffs do not intend to pursue their Section 1557 claim against Defendant Cheatham, and the parties have jointly moved the Court to dismiss that claim against him. ECF No. 38. Accordingly, the only remaining dispute before the Court on Defendant Cheatham's motion to dismiss is whether Plaintiffs have stated a valid Equal Protection claim.

2

Bateman Hospital as an Accountant Auditor. (*Id.* ¶ 10.) As Mr. McNemar's spouse, Mr. Martell is an eligible dependent enrolled for state employee health coverage through Mr. McNemar. (*Id.* ¶ 90.) Both Mr. Martell and Mr. McNemar are enrolled in the HMO Plan A, which is approved by Defendant Ted Cheatham as a coverage option for state employees and their dependents and is offered by Defendant The Health Plan. (*Id.* ¶¶ 9-10, 90.)

      **B.**      **Medically Necessary Care for Transgender People**

Gender identity is a person's internal sense of their sex, and it is innate, immutable, and has biological underpinnings. (*Id.* ¶ 23.) The ability to live consistent with one's gender identity is vital to the health and wellbeing of all people, including transgender people, and the scientific consensus recognizes that attempts to force transgender people to ignore their gender identity are profoundly harmful. (*Id.* ¶¶ 28-30.) For most people, their sex-related characteristics are all aligned. (*Id.* ¶ 26.) But transgender people experience an incongruence between their gender identity and other sex-related characteristics that can result in clinically significant distress known as gender dysphoria. (*Id.* ¶ 31.)

Mr. Martell has been diagnosed with gender dysphoria, which is recognized as a serious medical condition by leading medical and behavioral health groups such as the American Medical Association, the American Psychiatric Association, and the American Psychological Association. (*Id.* ¶¶ 31, 93.) Untreated gender dysphoria can result in severe anxiety, depression, and even suicidality. (*Id.* ¶ 32.) However, gender dysphoria is highly treatable under standards of care that are widely accepted as the best practices for treatment. (*Id.* ¶¶ 34, 36.)

From an early age, Mr. Martell felt different, but it was not until age 30 that he accepted and came to understand himself as transgender. (*Id.* ¶ 94.) Mr. Martell changed his legal name and updated the name and gender marker on his West Virginia driver's license and in his Social

Security records. (*Id.* ¶ 95.) He is recognized as male by his friends, classmates, and professors. (*Id.*) To avoid being incorrectly identified as female and to reduce his severe distress over his typically female-appearing breasts, when Mr. Martell leaves the house he often uses a binder to flatten his chest. (*Id.* ¶ 97) But the binder is not sufficient to eliminate his distress, and prolonged use causes intense pain and difficulty breathing. (*Id.* ¶¶ 97-98.) Mr. Martell accordingly requires a bilateral mastectomy as medically necessary care, which is widely accepted to treat gender dysphoria. (*Id.* ¶ 99.) But he is denied this care under the categorical Exclusion in The Health Plan's HMO Plan A. (*Id.*)

Mr. Martell has also been denied coverage for medically necessary testosterone and related office visits with his doctor. (*Id.* ¶¶ 100-101.) At times, the expense of paying out-of-pocket for these prescriptions was too much for Mr. Martell and Mr. McNemar, forcing Mr. Martell to temporarily forego medically necessary health care so the couple could make ends meet. (*Id.* ¶ 102.) This lapse in health care coverage suspended an essential part of Mr. Martell's medical transition and exacerbated his anxiety and distress. (*Id.*) Mr. McNemar experienced distress having to watch his spouse suffer without medically necessary care, in addition to out-of-pocket expenses and harm related to receiving less compensation in the form of health coverage than other state employees with cisgender spouses. (*Id.* ¶¶ 102, 104.)

      **C.**    **Defendant Ted Cheatham**

Defendant Ted Cheatham is sued in his official capacity as Director of PEIA. (*Id.* ¶ 14.) As Director, Mr. Cheatham is the Chief Administrative Officer of PEIA and is responsible for the "administration and management of the Public Employees Insurance Agency." (*Id.* ¶ 14 (quoting W. Va. Code § 5-16-3(c)).) This responsibility includes, but is not limited to, "manag[ing] on a day-to-day basis the group insurance plans" for state employees through

"administrative contracting, studies, analyses and audits, … provider negotiations, provider contracting and payment, designation of covered and noncovered services, [and] offering of additional coverage options or cost containment incentives." W. Va. Code § 5-16-3(c); (Compl. ¶ 14). State employees can choose from among seven health insurance plans. (Compl. ¶ 64.) These options include (a) four preferred provider benefit plan options through PEIA provided by Defendant Cheatham, and (b) three HMO and point of service plans contracted for by Defendant Cheatham through Defendant The Health Plan. (*Id.*)[3]

## LEGAL STANDARD

"When a defendant makes a facial challenge to subject matter jurisdiction," as Defendant Cheatham does here, the plaintiff "is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quote omitted). To survive a Rule 12(b)(6) motion, a plaintiff need only "state a claim to relief that is plausible on its face." *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quote omitted). This requires merely that a plaintiff advance their claim "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss under Rule 12(b)(6), a court must "accept as true all of the factual allegations contained in the complaint," and draw "all reasonable inferences" in favor of the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

---

[3] Defendant Cheatham attaches to his motion a copy of the "HMO Managed Care Agreement between West Virginia Public Employees Insurance Agency and The Health Plan." ECF No. 22-1; *see also* Mem. of Law in Supp. of Def. Ted Cheatham's Mot. to Dismiss the Compl., ECF No. 24 ("Def.'s Br.") at 2-3. Setting aside the propriety of offering such a document at the pleading stage, that agreement has no bearing on Plaintiffs' claims since parties cannot contract themselves out of liability under the Equal Protection Clause.

**ARGUMENT**

I. **PLAINTIFFS' CLAIMS SATISFY ARTICLE III STANDING REQUIREMENTS.**

"[T]o satisfy Article III's standing requirements, the plaintiff must show that: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). Defendant Cheatham concedes Plaintiffs have demonstrated injury in fact, arguing only that they "fail[] to demonstrate elements two and three." Def.'s Br. at 7. Plaintiffs, however, have more than sufficiently alleged that their injuries are "fairly traceable" to Defendant Cheatham as Director of the PEIA and that such injuries would be redressed by enjoining Defendant Cheatham's discriminatory conduct.

    A. **Plaintiffs' Injuries are Fairly Traceable to Defendant Cheatham.**

The showing required for traceability at the pleading stage "is relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). "[T]raceability merely requires a causal connection between the defendant's conduct and the plaintiff's injury, such that 'there is a genuine nexus' between the two.'" *Kadel v. Folwell*, 446 F. Supp. 3d 1, 10 (M.D.N.C. 2020) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000)). A more demanding proximate causation showing "is ***not*** a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (emphasis added). Instead, Plaintiffs must merely "show that the challenged action is 'at least in part responsible for frustrating' their constitutional rights." *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 524 (W.D. Va. 2018) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315 (4th Cir. 2013)).

Plaintiffs' well-pleaded allegations must be accepted as true and construed most favorably for Plaintiffs; regardless, Defendant Cheatham does not seriously contest them. As Plaintiffs alleged, Defendant Cheatham "is responsible for the 'administration and management of'" the PEIA. (Compl. ¶ 14 (quoting W. Va. Code § 5-16-3(c)).) Defendant Cheatham has statutory responsibility for "offering additional coverage options" such as The Health Plan, for "administrative contracting" to secure those coverage options, and for "designation of covered and noncovered services" in the various plans offered to state employees. (*Id.*) Plaintiffs allege that Defendant Cheatham "exercises this authority to ensure that gender-confirming care is designated as a noncovered service in each and every health plan available to state employees and their dependents" (Compl. ¶ 14), including all PEIA plans, and the plans for which Defendant Cheatham contracted with The Health Plan. (*Id.* ¶¶ 64-65.)

Defendant Cheatham further concedes that PEIA and The Health Plan have a "business relationship in which The Health Plan offers multiple health insurance options to state employees through PEIA," that participants in The Health Plan are "regarded as PEIA members," and that PEIA "facilitates the relationship between the insureds and The Health Plan" and "permits entities like [T]he Health Plan to offer insurance." Def.'s Br. at 2, 7, 8. Stated simply, Defendant Cheatham has the power to contract for health plans for state employees. He exercises that power to secure discriminatory plans, while ensuring that all other PEIA plans available to employees discriminate based on sex and transgender status, too. Plaintiffs have suffered injury because of the discriminatory plan Defendant Cheatham secured. This more than suffices to demonstrate traceability.

Defendant Cheatham nonetheless argues that because The Health Plan drafted the discriminatory policy, there is no causal connection to his conduct. Defs'. Br. at 8. But

7

regardless of who drafted it, the plan is only offered to PEIA members because Defendant Cheatham exercised his statutory authority to secure it as an option for PEIA members—and indeed, selected this specific plan from among other choices through a competitive bidding process. Def.'s Br. at 8. That should satisfy any standard of traceability, but particularly the modest showing required at this stage. *Bennett*, 520 U.S. at 171. Although a defendant's actions need not be "the very last step in the chain of causation" to satisfy the minimal traceability requirement, Defendant Cheatham's conduct is the last step here because he makes the ultimate decision to contract for the discriminatory plan and offer it to PEIA members. *Bennett*, 520 U.S. at 168-69.

Defendant Cheatham further claims that there is no traceability to his conduct because his competitive bidding process focuses on cost. Def.'s Br. at 8. But traceability is evident in his selection of the plan through this bidding process regardless of whether he claims to focus on cost or any other aspect of the plan. The Fourteenth Amendment does not permit deprivations of equal protection merely because a state official claims to be more focused on other aspects of the discriminatory plan, and one could never justify purchasing a plan that denies coverage to people of a particular race or gender merely because it might be less expensive. Defendant Cheatham must "do more than show" that denying equal coverage to transgender people "saves money." *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969). Otherwise, he does nothing "more than justify [the] classification with a concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982). Despite Defendant Cheatham's claim that he "does not control the language" of the policy, Def.'s Br. at 8, he certainly controls the decision to select plans with the discriminatory Exclusion. That is more than sufficient to establish traceability at the pleading stage.

8

### B. Enjoining Defendant Cheatham From Purchasing and Offering Discriminatory Health Plans Will Redress Plaintiffs' Injuries.

Article III also requires a plaintiff to show a likelihood that their "injury will be redressed by a favorable decision." *Bennett*, 520 U.S. at 167. This showing is a modest one: "Plaintiffs need only demonstrate a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." *City of Charleston, W. Virginia v. Joint Comm'n*, 473 F. Supp. 3d 596, 614 (S.D.W. Va. 2020) (quote omitted). "Courts have recognized that 'complete redressability' is not required. Instead, a plaintiff need only show that a favorable decision would alleviate the plaintiff's problem 'to some extent.'" *S. Envtl. Law Ctr. v. Bernhardt*, 432 F. Supp. 3d 626, 634 (W.D. Va. 2020) (quoting *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012)).

Here, however, enjoining Defendant Cheatham's conduct would alleviate Plaintiffs' harms fully. Plaintiffs seek an order "enjoining any further enforcement or application of the Exclusion[] and directing Defendants and their agents to provide access to coverage for all gender-confirming care without regard to the Exclusion[]." (Compl. at 37 ¶ (C).) Whether an injunction prevents Defendant Cheatham from contracting for private plans with a discriminatory Exclusion, prohibits enforcement of Exclusions in those plans, or affirmatively requires him to provide access to gender-confirming care, Plaintiffs' harms will be redressed. *See, e.g.*, *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1022 (W.D. Wis. 2019) (permanently enjoining defendants "from enforcing the Challenged Exclusion" against the plaintiff class). Defendant Cheatham also argues that if this Court finds the Exclusion "discriminatory and grant[s] an injunction as a result, the PEIA insurance plans will not be affected." Def.'s Br. at 9. Of course, if this Court were to join others across the country in finding the blanket Exclusion of

9

care for transgender people unlawful, and Defendant Cheatham nonetheless chose to maintain Exclusions in PEIA plans, he would simply compound his liability rather than reduce it. That changes nothing about the fact that the injunctive relief Plaintiffs seek against Defendant Cheatham will redress their harms.

## II. PLAINTIFFS HAVE STATED A VALID EQUAL PROTECTION CLAIM.

"To allege a prima facie equal protection violation, it is enough that a plaintiff complains of governmental treatment dissimilar to that received by others similarly situated." *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 953 (4th Cir. 1992). Defendant Cheatham's request to dismiss Plaintiffs' equal protection claim does not even make a pretense of relying on a motion to dismiss standard and certainly does not argue that Plaintiffs fail to plead a prima facie case. Nor could he, as the complaint clearly alleges the essential element of differential treatment:

- The Exclusion "treat[s] Plaintiffs and members of the proposed Classes differently from other persons who are similarly situated" because "transgender … state health plan participants who require gender-confirming care are denied coverage for that medically necessary care, while cisgender … participants can access the same kinds of treatments, including when related to their sex." (Compl. ¶ 125.)

- "Similarly, state health plan enrollees with a transgender dependent are denied coverage for that medically necessary care, while enrollees with a cisgender dependent are not denied coverage for the same kinds of treatments, including when related to their sex." (*Id.*)

- "Other cisgender state employees receive coverage for their spouses' hormone-related therapy and surgical care, while Mr. McNemar is denied that important form of compensation simply because his spouse is transgender." (*Id.* ¶ 104.)

Instead of arguing that Plaintiffs fail to state a plausible claim, Defendant Cheatham offers a pages-long exposition about why he believes that Plaintiffs should not ***prevail*** if the Court ultimately decides their claims on the merits. Def.'s Br. at 10-13 (arguing that under heightened scrutiny, the exclusion serves important governmental interests). But that is not the appropriate test for Plaintiffs' claims at the pleading stage. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Martin*, 980 F.2d at 952. The Court should decline to consider the purely merits-based argument in Section VI(C) of Defendant's brief and deny the motion to dismiss Plaintiffs' equal protection claim.

Defendant asserts that the Exclusion is motivated by a governmental interest in health and safety, but the further Defendant's brief wades into the merits, the more clearly improper his argument at this stage. Def.'s Br. at 11. Although it is indeed Defendant's burden under heightened scrutiny to demonstrate that the "alleged objective is the actual purpose underlying the discriminatory classification," *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982), that evidentiary matter cannot be determined at the pleading stage. *Cf. McGee v. Cole*, 66 F. Supp. 3d 747, 759 (S.D.W. Va. 2014) (on summary judgment, applying strict scrutiny to find that the state had "not cited any legislative history or other evidence indicating that the 'conceivable' interests it proffer[ed] ***actually motivated*** the legislature" to ban marriage for same-sex couples) (emphasis added).

Defendant Cheatham veers entirely off the Rule 12(b)(6) road by offering his own version of the facts surrounding medical necessity. *See* Def.'s Br. at 11 (making assertions about U.S. Food and Drug Administration ("FDA") approval for gender-confirming care and PEIA's standards for approval of care). This ignores Plaintiffs' extensive and well-pleaded factual

11

allegations about the medical necessity of gender-confirming care (Compl. ¶¶ 31-36), and the scientific consensus recognizing the efficacy of this treatment (*id.* ¶¶ 46-47). Defendant Cheatham cannot substitute his own preferred allegations for the well-pleaded ones in the complaint.

Regardless, none of Defendant Cheatham's merits-based arguments hold water. As Defendant Cheatham's brief itself states, "when it comes to policy distinctions based on sex or transgender status, intermediate or 'heightened scrutiny' is used." Def.'s Br. at 10. Indeed, both the Supreme Court and the Fourth Circuit have made clear that claims of discrimination based on transgender status receive heightened scrutiny as sex discrimination because "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020); *see also Grimm*, 972 F.3d at 607-08 (finding exclusion of transgender student from boys' restroom constituted a sex-based classification). *Grimm* also confirms government classifications based on transgender status are "at least … quasi-suspect." 972 F.3d at 610.

Under this standard, a host of similar cases across the country and in this Circuit have ruled for Plaintiffs at the motion to dismiss stage and on the merits. *See, e.g.*, *Kadel*, 446 F. Supp. 3d at 19-20 (finding Plaintiffs stated cognizable Tile IX, ACA, and equal protection claims while challenging exclusion of gender-confirming care in North Carolina state employee health plan); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1031 (D. Alaska 2020) (granting summary judgment to transgender employee challenging exclusion of gender-confirming care in Alaska state employee health plan); *Flack*, 395 F. Supp. 3d at 1003 (striking down exclusion of gender-confirming care in Wisconsin Medicaid plan); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1006 (W.D. Wis. 2018) (striking down exclusion of gender-confirming care in Wisconsin state

employee plan).

Defendant Cheatham's attempt to litigate the science on the merits is particularly problematic because the Fourth Circuit already recognizes the consensus around the standard of care for treatment of gender dysphoria. In fact, the Fourth Circuit has long accepted that the World Professional Association for Transgender Health Standards of Care for treating gender dysphoria are the "consensus approach of the medical and mental health community," and are "the authoritative standards of care." *Grimm*, 972 F.3d at 595; *see also De'lonta v. Johnson*, 708 F.3d 520, 522-23 (4th Cir. 2013) ("[t]he Standards of Care, published by the World Professional Association for Transgender Health, are the generally accepted protocols for the treatment of [gender dysphoria]."); (*see also* Compl. ¶ 34).

Although Defendant Cheatham claims repeatedly that the Exclusion is "substantially related" to its FDA-related interests, Def.'s Br. at 10-11, 13, the Exclusion enforced by Defendant Cheatham sweeps far more broadly than the drugs that are regulated by the FDA. The Exclusion categorically bars all forms of gender-confirming care (Compl. ¶ 64), including mental health and surgical care—neither of which is directly regulated by the FDA.[4] Far from advancing the health and safety of state employees, the Exclusion denies transgender people medically necessary care for a serious medical condition, which **undermines** their health and safety. (*Id.* ¶ 45 ("The consequences of untreated … gender dysphoria are dire."; "Symptoms … include intense emotional suffering, anxiety, depression, suicidality, and other attendant mental health issues. Untreated gender dysphoria is associated with higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to

---

[4] *See* U.S. Food and Drug Administration, "Products we Regulate" (listing "Drugs" and "Medical Devices"), *available at* https://www.fda.gov/.

function effectively in daily life.").) Accordingly, the Exclusion not only lacks adequate tailoring to the government's purported interest in health and safety, but also thwarts that interest.[5]

Finally, Defendant Cheatham asserts a governmental interest in saving "taxpayer dollars." Def.'s Br. at 12. This interest can be rejected as a matter of law based on long-standing constitutional doctrine, and certainly provides no basis to prevent Plaintiffs' well-pleaded claims from being heard on the merits. The Supreme Court settled decades ago that "a State may not protect the public fisc by drawing an invidious distinction between classes of its citizens." *Mem. Hosp. v. Maricopa Ct.*, 415 U.S. 250, 263 (1974); *see also Kadel*, 446 F. Supp. 3d at 18-19 (denying arguments about cost of gender-confirming care for state employees and their defendants as a basis for dismissing plaintiffs' claims at the 12(b)(6) stage). Nor can Defendant prop up his argument by grossly mischaracterizing Plaintiffs' claims as seeking "cover[age] in all scenarios" for "any and all conceivable procedures and treatments," which would allegedly "destroy[]" affordable health care. Def.'s Br. at 12. Plaintiffs seek nothing of the sort because they ask only for equal treatment. While "lines ha[ve] to be drawn" by all insurers, Def.'s Br. at 12, they may not be drawn in a manner that targets transgender people for discrimination on the basis of sex and transgender status.

---

[5] At the appropriate stage of the case, Plaintiffs will produce competent evidence that the FDA has not categorized any treatments for gender dysphoria as unsafe, and that administering medication for uses not yet approved by the FDA is commonplace for a variety of medical diagnoses. Defendant Cheatham will bear the burden of showing that the government's purported interest surrounding FDA approval actually motivated the adoption of the Exclusion. But those are matters appropriate for development in discovery, not at the pleading stage.

### III. PLAINTIFFS ARE NOT REQUIRED TO EXHAUST ADMINISTRATIVE REMEDIES.

Defendant Cheatham next argues that Plaintiffs have failed to avail themselves of ***optional*** administrative procedures to challenge their denials, but offers no authority suggesting that such steps are ***required*** before filing federal claims.[6] Defendant Cheatham points to two voluntary processes an insured may use to challenge a denial of coverage. The first is filing an internal administrative appeal with the health plan. Def.'s Br. at 14 (citing W. Va. Code R. 151-1 Attachment A at pg. 148). The second is a Patient Protection and Affordable Care Act ("ACA") regulation requiring that covered health plans meet certain "requirements for internal claims and appeals processes." 45 C.F.R. § 147.136 (cited by Def.'s Br. at 14). But Plaintiffs are not pursuing their ACA claim against Defendant Cheatham, *see* footnote 2, *supra*, and nothing in that regulation imposes an exhaustion requirement for federal civil rights claims.

With respect to Plaintiffs' equal protection claim, the law is clear: no exhaustion of administrative remedies is required. Blackletter law establishes that, outside the context of people who are incarcerated, no exhaustion is required before bringing an equal protection claim pursuant to 42 U.S.C. §1983. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) ("we conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983"). As the Fourth Circuit has recognized, "courts universally agree that the exhaustion of state administrative remedies is generally not required prior to bringing an action under § 1983 in federal court." *Talbot v. Lucy Corr. Nursing*

---

[6] The sole case Defendant cites does not involve, and says nothing about, claims under the Equal Protection Clause. Def.'s Br. at 14 (citing *Reiter v. Cooper*, 507 U.S. 258, 269 (1993)). Defendant quotes *Reiter*'s general description of the concept of exhausting administrative remedies, but *Reiter* went on to find that requirement "inapplicable" to the dispute at hand— which involved freight charges. 507 U.S. at 269. *Reiter* has no bearing on the issues here.

*Home*, 118 F.3d 215, 219 (4th Cir. 1997); *see also Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 699 n.4 (4th Cir. 2019), cert. denied, 141 S. Ct. 550, 208 L. Ed. 2d 174 (2020) ("a plaintiff bringing a suit pursuant to 42 U.S.C. § 1983 does not have to exhaust state administrative remedies before filing suit in federal court") (quote omitted).

Accordingly, no exhaustion requirement bars Plaintiffs' claims against Defendant Cheatham under the Equal Protection Clause.

## CONCLUSION

For the reasons above, Defendant Cheatham's motion to dismiss Count I of Plaintiffs' complaint should be denied.

\* \* \*

Dated: February 16, 2021

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
Phone: 612-256-3200
Facsimile: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Phone: 202-804-6245
Facsimile: 202-429-9574
sbuchert@lambdalegal.org

Respectfully submitted,

Avatara Smith-Carrington, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: 214-219-8585
Facsimile: 214-219-4455
asmithcarrington@lambdalegal.org

Tara L. Borelli, Visiting Attorney
Carl Charles, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
Phone: 470-225-5341
Facsimile: 404-897-1884
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
Phone: 213-382-7600
Facsimile: 213-351-6050
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*