IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| CHRISTOPHER FAIN; ZACHARY MARTELL; BRIAN MCNEMAR; SHAWN ANDERSON a/k/a SHAUNTAE ANDERSON; and LEANNE JAMES, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES; TED CHEATHAM, in his official capacity as Director of the West Virginia Public Employees Insurance Agency; and THE HEALTH PLAN OF WEST VIRGINIA, INC., <br><br> *Defendants.* | Civil Action No. <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> CIVIL ACTION NO. 3:20-cv-00740 <br><br> HON. ROBERT C. CHAMBERS, JUDGE |

## INTRODUCTION

1.      This case is about discrimination in health care and employment.  Plaintiffs bring

this suit to challenge discrimination under West Virginia state health insurance plans that deprive

transgender people of essential, and sometimes life-saving, health care.  These state health plans

facially, and categorically, exclude coverage for health care that transgender people require.  The

exclusions in the state health plans described in paragraphs 63 and 66 use antiquated and

improper language, but their targeting of transgender people on explicitly sex-based terms is

unmistakable.  The exclusions all categorically deny transgender people coverage for gender-

confirming care.  Gender-confirming care includes, but is not limited to, counseling, hormone replacement therapy, and surgical care.  Accordingly, as used herein, gender-confirming care includes the care denied pursuant to each of those exclusions.  While cisgender people[1] receive coverage for those forms of health care as a matter of course, transgender people are targeted for discrimination by exclusions in the state health plans.  This kind of discrimination is unlawful under federal constitutional and statutory guarantees of freedom from discrimination based on sex and transgender status.  Because these exclusions constitute a sweeping, uniform denial of care for all transgender people, Plaintiffs bring this class action suit on behalf of themselves and those similarly situated.

2.      Defendants violate the law in two ways.  First, Defendants discriminate against low-income transgender people who are Medicaid participants.  Inflicting grave harm on a particularly vulnerable group of people, Defendants deny low-income transgender Medicaid participants the same health coverage others receive, targeting them for discrimination based on their sex and transgender status.  This care is for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth—and is also known as gender-confirming care.  Defendants categorically deny gender-confirming care to transgender Medicaid participants, even though it is medically necessary and can be life-saving, while routinely providing cisgender participants the same treatments.

3.      Second, Defendants discriminate against state employees and their dependents by denying coverage for gender-confirming care, even though cisgender people receive the same kinds of treatments as a matter of course.  As part of compensation for employment, the State of

---

[1] "Cisgender" refers to people who are not transgender.

West Virginia provides health care coverage for employees and their eligible dependents through the Public Employees Insurance Agency ("PEIA"). The health plans offered through PEIA deny coverage for gender-confirming care, and unlawfully discriminate against people who either are transgender or have transgender family members who depend on them for health care coverage. In other words, Defendants deny equal compensation for equal work to employees who are transgender or have transgender dependents, and harm employees' transgender family members who depend on them for health care.

4.      The blanket exclusions of gender-confirming care are stated expressly in the health plans offered to Medicaid participants, and to state employees. While phrased in slightly different terms across the plans, the exclusions all single out transgender people for differential treatment and rely explicitly on sex-based considerations. Plaintiffs challenge the exclusions, and any other source of law, regulation, policy, or practice that denies gender-confirming care to West Virginia Medicaid participants, state employees, and eligible dependents of state employees (references herein to the "Exclusions" refer collectively to all such exclusions for gender-confirming care).

5.      The Exclusions fly in the face of the medical consensus that gender-confirming care is the only safe and effective medical treatment for gender dysphoria, and wholly disregard the harms of denying transgender people access to critical health care. The Exclusions unlawfully deny medically necessary care to Medicaid participants, and state employees and their dependents, who are transgender. The state's coverage of the same treatments to address health conditions other than gender dysphoria underscores that West Virginia treats its transgender Medicaid and state health plan participants in an unfair and discriminatory manner. In doing so, Defendants expose a particularly vulnerable group to significant and avoidable

3

harms to their health and wellbeing, and inflict needless suffering and financial hardship in violation of the U.S. Constitution and federal law.

6.       Plaintiffs bring this lawsuit on behalf of themselves and other similarly situated Medicaid participants, state employees, and eligible dependents of state employees seeking a declaratory judgment that the Exclusions violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Section 1557 ("Section 1557") of the Patient Protection and Affordable Care Act ("ACA" or "Affordable Care Act"), 42 U.S.C. § 18116, and the comparability and availability requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)-(B); preliminary and permanent injunctions barring Defendants from enforcing the Exclusions to deny gender-confirming care; reasonable attorneys' fees and costs; and such other relief as the Court deems just and equitable.

7.       In their individual capacities, the named Plaintiffs also seek compensatory and consequential damages for the injuries they have suffered as a result of Defendants' unlawful conduct.

## PARTIES

8.       Plaintiff Christopher Fain resides in Huntington, West Virginia. Mr. Fain is a 45-year-old transgender man. Mr. Fain has been enrolled for Medicaid coverage at all times material to this complaint.

9.       Plaintiff Shauntae Anderson[2] resides in Charleston, West Virginia. Ms. Anderson is a 45-year-old transgender woman. Ms. Anderson has been enrolled for Medicaid coverage at all times material to this complaint.

---

[2] Ms. Anderson is currently in the process of changing her legal name, which is reflected in the caption, to Shauntae Anderson. Accordingly, the complaint refers to her as Shauntae Anderson throughout.

10.     Plaintiff Leanne James resides in Hurricane, West Virginia. Ms. James is a 43-year-old transgender woman. Ms. James is a public employee who works for the Kanawaha County Board of Education as a Micro Computer Technician. Ms. James has been enrolled for public employee health coverage at all times material to this complaint.

11.     Plaintiff Zachary Martell resides in Barboursville, West Virginia. Mr. Martell is a 34-year-old transgender man. Mr. Martell is married to Brian McNemar, a state employee. As the legal spouse of Mr. McNemar, Mr. Martell is an eligible dependent and has been enrolled for state employee health coverage through Mr. McNemar at all times material to this complaint.

12.     Plaintiff Brian McNemar resides in Barboursville, West Virginia. Mr. McNemar is a 38-year-old cisgender man. Mr. McNemar is a state employee who works at the Mildred Mitchell Bateman Hospital as an Accountant Auditor. Mr. McNemar is married to Mr. Martell.

13.     Defendant William Crouch is sued in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources. As Cabinet Secretary, Mr. Crouch is responsible for "[d]evelop[ing] a managed care system to monitor the services provided by the [M]edicaid program to individual clients." W. Va. Code § 9-2-9(a)(1). Mr. Crouch is authorized to "[p]repare and submit state plans which … meet the requirements of federal laws, rules governing federal-state assistance." W. Va. Code § 9-2-6(12). Additionally, Mr. Crouch is responsible for preparing recommendations "to be submitted to the joint committee on government and finance," and in developing these recommendations Mr. Crouch may "[r]eview … [M]edicaid services which are optional under federal [M]edicaid law and identif[y] … services to be retained, reduced or eliminated." W. Va. Code § 9-2-9(b)(1). Mr. Crouch exercises his authority as Cabinet Secretary to ensure that gender-confirming care is designated as an excluded service in the state Medicaid program—targeting transgender

Medicaid participants for discriminatory treatment on the basis of their sex and transgender status. Defendant Crouch is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

14.     Defendant Cynthia Beane is sued in her official capacity as Commissioner for the Bureau for Medical Services. As Commissioner, Ms. Beane's duties include managing and overseeing project development, implementation of health policies, and assuring compliance with federal laws and regulations. Ms. Beane also led policy implementation for changes to bring West Virginia's Medicaid coverage into compliance with the Affordable Care Act. Despite having the authority to implement health policies to assure compliance with federal law, including the Affordable Care Act, Ms. Beane exercises her authority to ensure that gender-confirming care is designated as a noncovered service for Medicaid participants, thus targeting transgender people for discriminatory treatment on the basis of their sex and transgender status. Defendant Beane is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

15.     Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services ("BMS") is the "single state agency" charged with the responsibility of administering "the [M]edicaid program" in West Virginia. W. Va. Code §§ 9-1-2(n), 9-2-13(a)(3). BMS establishes eligibility standards for Medicaid providers, determines benefits, sets payment rates, and reimburses providers. Additionally, BMS maintains the West Virginia Medicaid State Plan and files amendments to the plan with the appropriate regulatory authorities. West Virginia Medicaid is jointly funded by the state of West Virginia and the federal government. BMS is a recipient of federal funds from the U.S. Department of Health and Human Services ("HHS"), including Medicaid funding. The federal assistance BMS receives

makes BMS a "covered entity" subject to the nondiscrimination requirements of Section 1557 of the ACA, which prohibit discrimination on the basis of sex and other protected characteristics.

16.     Defendant Ted Cheatham is sued in his official capacity as Director of PEIA. As Director, Mr. Cheatham is the Chief Administrative Officer of PEIA and is responsible for the "administration and management of the Public Employees Insurance Agency." W. Va. Code § 5-16-3(c). This responsibility includes, but is not limited to, "manag[ing] on a day-to-day basis the group insurance plans" for state employees through "administrative contracting, studies, analyses and audits, … provider negotiations, provider contracting and payment, *designation of covered and noncovered services*, [and] offering of additional coverage options or cost containment incentives." *Id.* (emphasis added). Mr. Cheatham has authority to "make all rules necessary to effectuate" his responsibilities under the statute. *Id.* Mr. Cheatham exercises this authority to ensure that gender-confirming care is designated as a noncovered service in each and every health plan available to state employees and their dependents, thus targeting them for discriminatory treatment on the basis of their, or their dependent's, sex and transgender status. Defendant Cheatham is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this complaint.

17.     Defendant The Health Plan of West Virginia, Inc. ("The Health Plan") was established in 1979 through provisions under the federal Health Maintenance Organization ("HMO") Act, 42 U.S.C. §300e, et seq. The Health Plan is a federally qualified and state-certified 501(c)(4) not-for-profit HMO. The Health Plan is West Virginia's largest HMO, with more than 200,000 members, and its service area encompasses all 55 counties in West Virginia. Many of The Health Plan's members, including Mr. Martell and Mr. McNemar, are enrolled through their state employers; others are enrolled through state Medicaid and Medicare

Advantage plans.  The Health Plan is offered through PEIA as a health insurance option for

qualifying state employees.  More than 15,000 of The Health Plan's members are state

employees who have obtained coverage through the PEIA.  The Health Plan receives federal

financial assistance and is a "covered entity" for purposes of Section 1557 of the ACA.

18.      Defendants, through their respective duties and obligations, are responsible for the

discriminatory Exclusions of gender-confirming health care to Medicaid participants, state

employees, and dependents who are transgender.  Each Defendant, and those subject to their

direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet

in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged

herein, and has or will continue to injure the plaintiffs irreparably if not enjoined.  Accordingly,

the relief requested herein is sought against each Defendant and their successors, as well as all

persons under their supervision, direction, or control, including, but not limited to, their officers,

employees, and agents.

## JURISDICTION AND VENUE

19.      This action arises under 42 U.S.C. § 1983 to redress the deprivation under color

of state law of rights secured by the United States Constitution; Section 1557 of the ACA, 42

U.S.C. § 18116; and the Medicaid Act's availability and comparability requirements, 42 U.S.C.

§§ 1396a(a)(10)(A), 1396a(a)(10)(B).

20.      The Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331

because the matters in controversy arise under the Constitution and laws of the United States;

and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress

deprivations, under color of state authority, of rights, privileges, and immunities secured by the

U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

21.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

22.    Under 28 U.S.C. § 1391(b)(1) and (2), venue is proper in the Southern District of West Virginia because Defendants reside there and all Defendants are residents of West Virginia in which the district is located; and in this district and division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred herein.

23.    This Court has personal jurisdiction over Defendants because they are all domiciled within the State of West Virginia.

## FACTS

### A.    Sex, Gender Identity, and Gender Dysphoria

24.    Every individual's sex is multifaceted, and comprised of a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and most importantly, gender identity.

25.    Gender identity is a person's internal sense of their sex.  It is an essential element of human identity that everyone possesses, and a well-established concept in medicine.  Gender identity is innate, immutable, and has biological underpinnings, such as the sex differentiation of the brain that takes place during prenatal development.

26.    For everyone, gender identity is the most important determinant of a person's sex and a fundamental component of human identity.

27.     A person's sex is generally assigned at birth based solely on a visual assessment of external genitalia at the time of birth.  External genitalia are only one of several sex-related characteristics and are not always indicative of a person's sex.

28.     For most people, these sex-related characteristics are all aligned, and the visual assessment performed at birth serves as an accurate proxy for that person's gender.

29.     Where a person's gender identity does not match that person's sex assigned at birth, however, gender identity is the critical determinant of that person's sex.

30.     The ability to live in a manner consistent with one's gender identity is vital to the health and wellbeing of transgender people.

31.     Scientific consensus recognizes that attempts to change an individual's gender identity to bring their gender identity into alignment with the sex assigned at birth are ineffective and harmful.

32.     Attempts to force transgender people to live in accordance with their sex assigned at birth, a practice often described as "conversion therapy," is known to cause profound harm. Such efforts are now widely considered unethical and, in many places, are unlawful.

33.     For transgender people, an incongruence between their gender identity and sex assigned at birth can result in a feeling of clinically significant stress and discomfort known as gender dysphoria.  Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

34.     In addition to clinically significant distress, untreated gender dysphoria can result in severe anxiety, depression, or even suicidality.

35.     Untreated gender dysphoria often intensifies with time.  The longer an individual goes without or is denied adequate treatment for gender dysphoria, the greater the risk of severe harms to the individual's health.

36.     Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH").  WPATH is an international, multidisciplinary, professional association whose mission is to promote evidence-based health care protocols for transgender people.  WPATH publishes Standards of Care that are based on the best available science and expert professional consensus, and which are widely accepted as best practices for treating gender dysphoria.

37.     Under the WPATH Standards of Care, medically necessary treatments may include, among other things, "[h]ormone therapy" and "[s]urgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/chest, external and/or internal genitalia, facial features, body contouring)."

38.     The Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have both called for an end to exclusions of gender-confirming care from health insurance plans.

39.     The individualized steps that many transgender people take to live in a manner consistent with their gender, rather than the sex they were assigned at birth, are known as transitioning.

40.     Transitioning is particular to the individual but typically includes social, legal, and medical transition.

41.    Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, social transition can include wearing attire, following grooming practices, and using pronouns consistent with that person's gender identity. The steps a transgender person can take as part of their social transition help align their gender identity with all aspects of everyday life.

42.    Legal transition involves steps to formally align an individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

43.    Medical transition, a critical part of transitioning for many transgender people, includes gender-confirming care that brings the sex-specific characteristics of a transgender person's body into alignment with their sense of their gender. Gender-confirming care can involve counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, surgical care, or other medically necessary treatments for gender dysphoria.

44.    Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender identity. Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing transgender individuals' secondary sex characteristics into alignment with their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

45.     Gender-confirming surgical care might be sought by transgender people to better align primary or secondary sex characteristics with their gender identity.  Surgical care can include, but is not limited to, hysterectomies, gonadectomies, mammoplasties, mastectomies orchiectomies, vaginoplasties, and phalloplasties.  These treatments are for the purpose of treating gender dysphoria.

46.     These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater alignment with the individual's gender identity and lived experience.

47.     The consequences of untreated, or inadequately treated, gender dysphoria are dire. Symptoms of untreated gender dysphoria include intense emotional suffering, anxiety, depression, suicidality, and other attendant mental health issues.  Untreated gender dysphoria is associated with higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to function effectively in daily life.  When transgender people are provided with access to appropriate and individualized gender-confirming care in connection with treatment of gender dysphoria, these symptoms can be alleviated and even prevented.

48.     The AMA, APA, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and other major medical organizations have recognized that gender-confirming care is medically necessary, safe, and effective treatment for gender dysphoria—and that access to such treatment improves the health and well-being of transgender people.  Each of these groups

has publicly opposed exclusions of insurance coverage by private and public health insurers, like the Exclusions at issue here.

49.     WPATH has stated that, like hormone replacement therapy and other gender-confirming treatments, the "medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient," but instead are "medically necessary for the treatment of the diagnosed condition."  Nor are they experimental, because "decades of both clinical research and medical research show that they are essential to achieving well-being for the patient."

**B.      Defendants' Targeted and Discriminatory Exclusion of Gender-Confirming Care**

**1.      Medicaid health coverage**

50.     Authorized under Title XIX of the Social Security Act of 1965, Medicaid is a joint federal-state program that provides access to health care for Medicaid-eligible individuals. 42 U.S.C. § 1396-1396w-5 ("Medicaid Act").  The purpose of Medicaid is to enable states to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42 U.S.C. § 1396-1.

51.     States are not required to participate in the Medicaid program—but all states do. States that choose to participate must comply with the Medicaid Act and its implementing regulations.

52.     The Medicaid Act requires each participating state to establish or designate a single state agency charged with administering or supervising the state's Medicaid program.  42 U.S.C. § 1396a(a)(5).  Additionally, each participating state must maintain a comprehensive state plan ("Medicaid Plan") for medical assistance, approved by the Secretary of the U.S. Department of Health and Human Services.  42 U.S.C. § 1396a.

53.     The Medicaid Plan must describe how the state will administer its Medicaid program and affirm the state's commitment to comply with the Medicaid Act and its implementing regulations.  Additionally, the Medicaid Plan "sets out groups of individuals to be covered, services to be provided, methodologies for providers to be reimbursed and the administrative activities that are underway in the state."

54.     The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance.

55.     Under the Medicaid Act, "the medical assistance made available to any individual … shall not be less in amount, duration or scope than the medical assistance made available to any other such individual."  42 U.S.C. § 1396a(a)(10)(B)(i).

56.     Additionally, a state "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service … to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition."  42 C.F.R. § 440.230(c).

57.     States must ensure that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).  Moreover, state Medicaid programs must provide medical assistance "in a manner consistent with … the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).

58.     The State of West Virginia participates in the federal Medicaid program.

59.     Defendant BMS is the designated single state agency charged with the responsibility of administering the Medicaid program in West Virginia.  W. Va. Code §§ 9-1-2(n); 9-2-13(a)(3).

60.     Defendant BMS maintains the state's Medicaid Plan and files amendments to the Medicaid Plan with the appropriate regulatory authorities.  Additionally, Defendant BMS determines benefits, sets payment rates, and reimburses providers.

61.     Mountain Health Trust is West Virginia's Medicaid managed care program, which is administered by the BMS.  BMS contracts with several managed care organizations ("MCO"), which are health plans that coordinate services to provide health coverage to Medicaid participants.  As part of the Mountain Health Trust program, eligible Medicaid participants may select a primary care provider and one of three MCOs: (1) UniCare Health Plan of West Virginia, Inc., (2) The Health Plan, and (3) Aetna Better Health of West Virginia.

62.     Each MCO provides Medicaid participants with Medicaid-covered health services through their defined network of providers and hospitals.  These MCO networks are monitored by Defendant BMS.

63.     Although Defendant BMS, in its administration of the state's Medicaid program, "strives to assure access to appropriate, medically necessary and quality health care services for all members," the Medicaid Policy Manual provides that the Medicaid Plan does not cover "[t]ranssexual surgery."  Additionally, each MCO contains a similar exclusion of gender-confirming care in each of their managed care plans: (1) UniCare excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures;" (2) The Health Plan provides that "[s]ex change, hormone therapy for sex transformation, and gender transition procedures/expenses will not be paid for by The Health Plan;" and (3) Aetna Better Health excludes coverage for "[s]ex transformation procedures and hormone therapy for sex transformation procedures."

16

64.     At all relevant times, the state's Medicaid Plan and managed care plans have categorically excluded coverage for gender-confirming care, through the exclusions in paragraph 63, even though the same treatments are covered for cisgender people who are Medicaid participants.

### 2.     State employee health coverage

65.     Qualifying state employees and their eligible dependents can choose from multiple health plan options.  Covered services under the state employee health plans generally include coverage of medically necessary prescriptions, counseling, and surgical care at inpatient and outpatient facilities.  These plans are distinguished primarily by coverage ratios, deductible amounts, and general costs to the insured employee and their eligible dependent enrollees.  The health plans offered to state employees do, however, have at least one feature in common.  At all relevant times, all health plans offered to state employees have contained categorical exclusions of coverage for gender-confirming care, even though the same care is covered for cisgender people.

66.     State employees can choose from among seven health insurance plans.  These options include (A) four preferred provider benefit plan options through PEIA provided by Defendant Cheatham, and (B) three HMO and point of service plans provided by Defendants Cheatham and The Health Plan.

A.     **Four preferred provider benefit plan options through PEIA provided by Defendant Cheatham:** State employees can enroll for health coverage through four Preferred Provider Benefit plans: (1) "PEIA PPB Plan A," a comprehensive health plan; (2) "PEIA PPB Plan B," which offers lower premiums but higher deductibles and other costs; (3) "PEIA PPB Plan C," an IRS-qualified high-deductible health plan; and (4) "PEIA PPB Plan D," which offers

no out-of-state benefits with limited exceptions.  All handbooks for these plans contain an identical exclusion for "[s]urgical or pharmaceutical treatments associated with gender dysphoria or any physical, psychiatric, or psychological examinations, testing, treatments or services provided or performed in preparation for, or as a result of, sex transformation surgery."  That exclusion appears in the 2020 and 2021 plan year handbooks.  Member handbooks for plan years 2013 through 2019 similarly excluded "[s]ex transformation operations and associated services and expenses."

      B.     **Three HMO and point of service plans provided by Defendants Cheatham and The Health Plan:**  State employees can also choose from insurance plans approved by Defendant Cheatham and offered through Defendant The Health Plan, which offers three health plans: (a) HMO Plan A; (b) HMO Plan B; and (c) a point of service ("POS") plan. All three plans include a blanket exclusion of coverage for gender-confirming care.

67.     All seven health plans available to West Virginia state employees exclude coverage for gender-confirming care.

68.     Transgender people may require varying forms of gender-confirming care.  The blanket Exclusions, however, unilaterally and uniformly prevent transgender people from receiving coverage for gender-confirming care regardless of their need.  As a result, the Exclusions maintained across all state employee health plans discriminatorily target transgender people, denying coverage for medically necessary gender-confirming care.  Cisgender enrollees receive coverage for medically necessary mental health, prescription drug, and surgical needs; whereas, transgender enrollees do not because of the Exclusions and based on their sex and transgender status.

C.      **The Denial of Care to Plaintiffs**

1.      **Plaintiff Christopher Fain (Medicaid)**

69.      Mr. Fain is 45 years old.  Mr. Fain was born in West Virginia and has resided in West Virginia for the vast majority of his life.

70.      Mr. Fain is an adjunct professor at Mountwest Community and Technical College ("Mountwest College").

71.      Mr. Fain is a man.

72.      Mr. Fain is also transgender.  Although his sex assigned at birth was female, his gender identity is male.

73.      Mr. Fain experiences dysphoria related to the distress arising from the incongruence between his gender identity and his sex assigned at birth.

74.      Mr. Fain has been aware of his gender identity since he was six years old, and since that first awareness has identified as male.  Mr. Fain delayed his transition for many years, however, for fear that discrimination and stigma against transgender people would prevent him from being able to support his family.

75.      Delaying this vital care took an enormous toll on Mr. Fain, and he eventually came out to his family.  Mr. Fain's children are very supportive of Mr. Fain's transition.

76.      Mr. Fain began counseling to help address his gender dysphoria, and was diagnosed with gender dysphoria in or around December 2018.

77.      Mr. Fain obtained a legal name change to reflect his gender identity through a West Virginia court order on April 6, 2018.

78.      Mr. Fain updated his name to reflect his male gender identity on his Social Security account in April 2018 and, updated his West Virginia driver's license with his new name in May 2018 and correct sex designation in August 2021.

79.    Mr. Fain lives in all ways in accordance with his male gender identity and is recognized as male by his family, his friends, his classmates, and his professors.

80.    Mr. Fain has been enrolled as a Medicaid participant for most of his adult life.

81.    Mr. Fain receives coverage through the MCO UniCare Health Plan of West Virginia, Inc., an Anthem Company.

82.    In or around February 2019, Mr. Fain's mental health provider recommended that he begin hormone therapy to alleviate his gender dysphoria by aligning his physical characteristics with his gender identity.  Mr. Fain began hormone care on or around March 2019.

83.    In order to avoid being incorrectly identified as female and to reduce the severe distress and embarrassment over the presence of typically female-appearing breasts on his body, Mr. Fain often wears a "binder," which is a compression garment that flattens or reduces the profile of a person's chest, which is an ongoing source of his gender dysphoria.

84.    Mr. Fain experiences intense discomfort with prolonged use of a binder, which often chafes his skin, and sometimes creates sores and leads to difficulty breathing.  Nonetheless, to help manage his gender dysphoria, he sometimes wears the binder for 16 hours at a time.

85.    Mr. Fain requires a bilateral mastectomy as medically necessary care to treat his gender dysphoria and eliminate the need for the ongoing use of a binder.  This surgical procedure is a widely accepted and effective treatment for gender dysphoria.  However, the blanket exclusion in the Medicaid Plan bars him from receiving this medically necessary care.  Mr. Fain accordingly is forced to delay this urgently-needed procedure as a direct and proximate result of Defendants' continuing refusal to cover medically necessary gender-confirming care.  As a result, Mr. Fain's symptoms of gender dysphoria and related distress have increased.

86.     The Medicaid Plan's exclusion of coverage for Mr. Fain's medically necessary

care has caused Mr. Fain economic hardship, emotional distress, lowered self-esteem,

embarrassment, humiliation, and stigma.

### 2.     Plaintiff Shauntae Anderson (Medicaid)

87.     Ms. Anderson is 45 years old.  Ms. Anderson was born in West Virginia and has

resided in West Virginia for the vast majority of her life.

88.     Ms. Anderson is a woman.

89.     Ms. Anderson is also transgender.  Although her sex assigned at birth was male,

her gender identity is female.

90.     Ms. Anderson experiences gender dysphoria related to the disconnect between her

primary and secondary sex characteristics and her gender identity.

91.     For much of Ms. Anderson's younger years and into early adulthood, Ms.

Anderson was forced to suppress her gender identity due to family disapproval and societal

stigma.  As a child, Ms. Anderson never felt "right" in her body.  Ms. Anderson was incredibly

shy and was uncomfortable being raised and socialized as a boy.

92.     Around the age of six years old, Ms. Anderson started using her mother's makeup

and playing with her sister's toys.  In or around ninth grade, Ms. Anderson attempted to socially

transition at school by dressing in a more typically feminine manner and wearing makeup.

93.     In 2010, Ms. Anderson began to medically transition.  Ms. Anderson lacked

access to health coverage for this care, but her need to transition was so urgent that she was

forced to self-treat.  Ms. Anderson began taking estrogen in the form of birth control pills to help

feminize her appearance.  While birth control pills are not remotely adequate as a substitute for

hormone therapy, Ms. Anderson's gender dysphoria was so severe that even a modest feminizing

effect helped relieve some of her gender dysphoria.

21

94.     Ms. Anderson subsequently served time in federal prison.  While incarcerated, Ms. Anderson continued the process of socially transitioning, and formally began to medically transition in consultation with and under the care of medical professionals.

95.     During her time in the Bureau of Prisons, Ms. Anderson updated her name to not only reflect her gender identity but also ensure that she would be recognized and treated as a transgender woman for the purpose of security checks.  Additionally, Ms. Anderson was evaluated by medical professionals and received approval to wear typically feminine underwear as part of her transition.

96.     Ms. Anderson began counseling to help address her gender dysphoria, and was diagnosed with gender dysphoria.

97.     In or around 2019, Ms. Anderson's health care providers recommended that she begin hormone therapy to alleviate her gender dysphoria by further aligning her physical characteristics with her gender identity.  Ms. Anderson began hormone therapy in or around May 2019.

98.     Ms. Anderson has been enrolled as a Medicaid participant since 2020.

99.     Ms. Anderson receives coverage through the MCO Aetna Better Health of West Virginia.

100.    Surgical treatment is medically necessary for treatment of Ms. Anderson's gender dysphoria.

101.    Ms. Anderson experiences significant distress related to her genitalia and breasts that negatively impact her daily life. She particularly experiences such distress when she gets dressed and when she is using the restroom.  For example, when Ms. Anderson is using the

bathroom, she is often reminded of the fact that there are aspects of her physical body that do not feel right.

102.    In order to avoid being incorrectly identified as male and to reduce the severe distress and embarrassment over the presence of her typically male-appearing features, Ms. Anderson often employs the use of shapewear, like push-up bras, to help with further feminizing her body.  These coping techniques, however, are not adequate to treat her gender dysphoria and do not alleviate her need for medical care.

103.    Ms. Anderson requires gender-confirming surgery, including but not limited to vaginoplasty and breast reconstruction surgery.  These surgical procedures are medically necessary care to treat her gender dysphoria and, are widely accepted and effective treatments for gender dysphoria.

104.    However, the blanket exclusion in the Medicaid Plan bars her from receiving this medically necessary care.  Ms. Anderson, accordingly, is forced to delay this urgently-needed care as a direct and proximate result of Defendants' continuing refusal to cover medically necessary gender-confirming care.  As a result, Ms. Anderson's symptoms of gender dysphoria and related distress have increased.

105.    The Medicaid Plan's exclusion of coverage for Ms. Anderson's medically necessary care has caused Ms. Anderson emotional distress, lowered self-esteem, embarrassment, and stigma.

### 3.    Plaintiff Leanne James (PEIA)

106.    Ms. James is 43 years old.  Ms. James was born in West Virginia and has resided in West Virginia for her entire life.

107.   Ms. James is currently employed as a Programmer at the Information Systems Department for the Kanawha County Board of Education.  She began working for the Kanawha County Board of Education on February 5, 2008.

108.   As part of the terms, conditions, privileges, and status of her employment with the Kanawha County Board of Education, Ms. James is and, at all relevant times, has been enrolled in a health plan through PEIA and relies on that plan for health care coverage.  Ms. James is enrolled in the PPB Plan A approved and offered by Defendant Cheatham.

109.   Ms. James is a woman.

110.   Ms. James is also transgender.  Although her sex assigned at birth was male, her gender identity is female.

111.   Ms. James experiences gender dysphoria related to the disconnect between her primary and secondary sex characteristics and her gender identity.

112.   Ms. James ultimately came to terms with her female gender identity in adulthood after realizing she could no longer ignore or suppress it.

113.   In 2011, Ms. James began her social transition.  However, due to concerns regarding Ms. James' ability to retain employment, which is necessary for ensuring the ongoing care of her daughter, Ms. James delayed certain aspects of her transition.  Ms. James was concerned that transitioning on the job might subject her to stigma and discrimination.

114.   In January 2019, Ms. James was diagnosed with gender dysphoria.

115.   After realizing she could no longer delay her transition, in 2019 Ms. James began hormone therapy to alleviate her gender dysphoria by aligning her physical characteristics with her gender identity.

116.    Ms. James changed her legal name by West Virginia court order on July 23, 2021. She also updated the name on her West Virginia driver's license and birth certificate. Ms. James is recognized as female by her family, friends, and colleagues.

117.    As part of her treatment plan, Ms. James requires routine appointments for bloodwork. Ms. James has been, and continues to be, denied coverage for her bloodwork appointments pursuant to the Exclusion. Because of this, Ms. James is forced to pay out-of-pocket for her bloodwork, which typically costs her $354.00.

118.    Additionally, Ms. James is forced to pay out-of-pocket for her routine visits with her OB-GYN, Dr. Patton, because of Defendant Cheatham's categorical exclusion of such medical care. Ms. James is typically required to pay upwards of $110.00 per visit for her examinations.

119.    Surgical treatment is medically necessary for treatment of Ms. James' gender dysphoria.

120.    Ms. James experiences significant distress related to her genitalia and breasts that negatively impact her daily life.

121.    In order to reduce the severe distress and embarrassment over the presence of her typically male-appearing features, Ms. James often employs the use of breast prosthetics to help feminize her body. This coping technique, however, is not adequate to treat her gender dysphoria and does not alleviate her need for medical care.

122.    Ms. James requires gender-confirming surgery, including but not limited to vaginoplasty and breast reconstruction surgery. These surgical procedures are medically necessary care to treat her gender dysphoria and are widely accepted and effective treatments for gender dysphoria.

123.     However, the categorical exclusion in Defendant Cheatham and PEIA's PPB Plan A bars her from receiving this medically necessary care.  Ms. James is forced to delay this urgently-needed care as a direct and proximate result of Defendant Cheatham and PEIA's continuing refusal to cover medically necessary gender-confirming care.

124.     Ms. James has timely submitted a charge to the Equal Employment Opportunity Commission ("EEOC") for sex discrimination in violation of Title VII.

125.     Ms. James will seek leave to amend her complaint to add a claim under Title VII once her claims has been exhausted before the EEOC.

126.     The blanket exclusion of gender-confirming care sends a deeply stigmatizing message to Ms. James that her worth as a public employee is lesser than others, since the exclusion deprives her of compensation that cisgender employees receive.  Additionally, the exclusion is particularly humiliating and degrading because PEIA provides coverage for the same medically necessary gender-confirming care for state employees and their dependents who are not transgender.

### 4.      Plaintiffs Zachary Martell and Brian McNemar (PEIA)

127.     Mr. McNemar works as an Accountant Auditor in the accounting department of the Mildred-Mitchell Bateman Hospital, a state psychiatric hospital in Huntington, West Virginia, that is operated, supported, and subject to oversight by the state.  Mr. McNemar began working in this position on February 18, 2018.

128.     Mr. Martell is a part-time student at Mountwest Community and Technical College in Huntington, West Virginia.  Mountwest College does not offer health insurance to students.

129.     At all relevant times, both Mr. McNemar and Mr. Martell have been enrolled in a health plan through PEIA and have relied on that plan for health care coverage.  As the spouse

and eligible dependent of Mr. McNemar, Mr. Martell is enrolled in the HMO Plan A approved

by Defendant Cheatham and offered by Defendant The Health Plan.

130.    Mr. Martell is a man.

131.    Mr. Martell is also transgender.  Although his sex assigned at birth was female,

his gender identity is male.

132.    Mr. Martell has been medically diagnosed with gender dysphoria.  He experiences

dysphoria related to the disconnect between his primary and secondary sex characteristics and

his gender identity.

133.    From an early age, Mr. Martell felt different; he understood that he was not

female and felt discomfort with his primary and secondary sex characteristics.  He preferred

masculine clothing from a young age.  However, he did not have the language or conceptual

understanding to describe these feelings.  It was not until age 30, with the support of his husband

and friends, that he accepted and came to understand himself as transgender.

134.    Mr. Martell changed his legal name by West Virginia court order on February 19,

2019.  He also updated the name and gender marker on his West Virginia driver's license and his

Social Security records.  Additionally, Mr. Martell is recognized as male by his friends,

classmates, and professors.

135.    As part of his medical transition, Mr. Martell has received treatment for gender

dysphoria, including hormone replacement therapy in the form of testosterone, to alleviate his

gender dysphoria by aligning his physical characteristics with his gender identity.

136.    In order to avoid being incorrectly identified as female, and to reduce the severe

distress and embarrassment over the presence of typically female-appearing breasts on his body,

when he leaves the house, Mr. Martell often uses a binder, which flattens or reduces the profile

of his chest. However, even with the use of a binder, Mr. Martell experiences distress over the presence of his chest, which is an ongoing source of his gender dysphoria.

137.    Mr. Martell experiences intense discomfort with prolonged use of a binder, which can be painful and cause difficulty breathing, among other health risks. As a result, Mr. Martell must carefully limit the amount of time that he uses a binder. Prior to the current COVID-19 pandemic, Mr. Martell's class schedule required him to be on campus for more than nine hours, forcing him to forego the use of a binder on certain days, and exposing him to increased risk of being incorrectly identified as female, which causes him significant anxiety.

138.    Mr. Martell requires a bilateral mastectomy as medically necessary care to treat his gender dysphoria and eliminate the need for the ongoing use of a binder. This surgical procedure is a widely accepted and effective treatment for gender dysphoria. However, the categorical Exclusion in HMO Plan A bars him from receiving this medically necessary care. Mr. Martell is accordingly forced to delay a medically necessary and urgently-needed procedure as a direct and proximate result of Defendants' continuing refusal to cover gender-confirming care through the Exclusions. As a result, Mr. Martell's symptoms of gender dysphoria and related distress have increased.

139.    On or around April 2018, Mr. Martell began attending counseling as part of his medical transition. On or about November 13, 2018, his mental health provider assessed him as ready to begin hormone replacement therapy and recommended that he do so. When Mr. Martell first sought to begin hormone replacement therapy in the form of testosterone with the guidance of his medical and mental health providers, The Health Plan denied coverage both for the prescriptions and his office visits with the health care provider who managed his hormone replacement therapy.

140.    On or about February 13, 2019, Mr. Martell received a Notice of Adverse Benefit
Determination from Defendant The Health Plan.  The notice informed Mr. Martell that coverage
for his medically necessary hormone replacement therapy would be denied.  The notice stated
that Mr. Martell "asked us to cover testosterone.  After review we are denying the request.
Treatments for gender identity issues are excluded from the benefit."

141.    As a result of this denial of medically necessary health care, Mr. Martell and Mr.
McNemar were forced to pay out-of-pocket for Mr. Martell's testosterone prescriptions.  At
times, this expense was too much for Mr. Martell and Mr. McNemar to meet, forcing Mr. Martell
to temporarily to forego medically necessary health care to make ends meet.  This lapse in health
care coverage exacerbated Mr. Martell's anxiety, and suspended the physical changes that were
an essential part of his medical transition.

142.    Mr. Martell's medical and mental health providers have recommended that he
continue to receive hormone therapy to alleviate his ongoing symptoms of gender dysphoria.
Defendants Cheatham and The Health Plan's categorical exclusion of such medical care,
however, denies coverage for this treatment, forcing Mr. Martell and Mr. McNemar to pay out-
of-pocket for medically necessary health care.  The denials of coverage for this care have caused
Mr. Martell emotional distress, lowered self-esteem, embarrassment, humiliation, and stigma.

143.    Additionally, the denials of coverage for Mr. Martell's care have caused his
spouse, Mr. McNemar, intense frustration, despair, and aggravation.  Mr. McNemar not only
experienced the distress of watching his spouse suffer without coverage for essential medical
care, but also the distress of being discriminated against in his compensation.  Other cisgender
state employees receive coverage for their spouses' hormone-related therapy and surgical care,
while Mr. McNemar is denied that important form of compensation simply because his spouse is

transgender. This harms Mr. McNemar by depriving him of equal compensation for equal work, causes him distress, and stigmatizes both Mr. Martell and Mr. McNemar.

144.    Because of the Exclusions of coverage for gender-confirming health care in the state health plans, the named Plaintiffs have suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of their dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

146.    Plaintiffs assert their claims against all Defendants on behalf of the following Classes and Subclass, collectively, "the Classes").

### Medicaid Class

147.    The proposed Medicaid Class is defined as:  All transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusions.

### State Employee Health Plan Class

148.    The proposed State Employee Health Plan Class is defined as: All people who are enrolled in a State Employee Health Plan and who are either transgender and have sought or will seek gender-confirming care, and/or people whose transgender dependents have sought or will seek gender-confirming care, barred by the Exclusions.

### The Health Plan Subclass

149.    The proposed The Health Plan Subclass is a subclass of the State Employee Health Plan Class and is defined as: All State Employee Health Plan Class Members who are enrolled in The Health Plan.

150.    Plaintiffs and the proposed Classes have been equally affected by Defendants' violations of law.

151.    The persons in the proposed Classes are so numerous that joinder of all members is impracticable.  While the precise number of class members has not been determined at this time, upon information and belief, there are more than 40 individuals in the proposed Classes and/or the class members are so numerous that joinder would be impractical.

152.    The common questions of law and fact include, but are not limited to:

A.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Classes, violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Classes, violate the prohibitions on sex discrimination under Section 1557 of the Affordable Care Act;

C.    Whether Defendants' Exclusions, facially and as applied to members of the proposed Medicaid Class, violate the availability and comparability provisions of the Medicaid Act; and

D.    Whether Defendants should be enjoined from enforcing the Exclusions and denying Plaintiffs coverage for and access to gender-confirming care.

153.    The questions of law and fact listed above will yield common answers for Plaintiffs and the proposed Classes.

154.    Plaintiffs' claims are typical of those members of the proposed Classes.  Mr. Fain

and Ms. Anderson are both transgender, are participants in West Virginia Medicaid, and are

denied coverage for gender-confirming care because of an Exclusion.  Ms. James is transgender,

a public employee, and is denied access to medically necessary gender-confirming care because

of an Exclusion.  Mr. Martell is transgender, an eligible dependent of Mr. McNemar, and has

been denied access to medically necessary gender-confirming care because of an Exclusion.  Mr.

McNemar is a state employee whose dependent has been denied coverage for gender-confirming

care because of an Exclusion.  Mr. Fain and Ms. Anderson, representing the Medicaid Class; Ms.

James representing the State Employee Health Plan Class; and Mr. Martell and Mr. McNemar,

representing the State Employee Health Plan Class and The Health Plan Subclass, and members

of the proposed Classes share the same legal claims under the Equal Protection Clause and

Section 1557 respectively.

155.    Plaintiffs will fairly and adequately represent the interests of the proposed

Classes and have retained counsel experienced in complex class action litigation.  Plaintiffs are

represented by Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), the nation's

oldest and largest legal organization dedicated to the rights of lesbian, gay, bisexual, and

transgender ("LGBT") people and everyone living with HIV.  Lambda Legal has extensive

federal court experience litigating on behalf of LGBT people, including regarding transgender

people's access to health care, and has served as class counsel and putative class counsel in a

number of LGBT-related cases.  Plaintiffs are also represented by Nichols Kaster, PLLP, a

leading law firm with significant expertise representing plaintiffs across the country in

employment and class action matters, and Walt Auvil of The Employment Law Center, PLLC

("The Employment Law Center").  Mr. Auvil is a West Virginia-based litigator with more than

30 years of experience protecting workers' rights, including through complex class action litigation.

156. Class treatment is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds that apply generally to the proposed Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against Defendants Crouch and Beane for Declaratory and Injunctive Relief*

*Plaintiffs Leanne James, Zachary Martell, and Brian McNemar, on Behalf of the State Employee Health Plan Class Against Defendant Cheatham for Declaratory and Injunctive Relief*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of The Health Plan Subclass Against Defendant Cheatham for Declaratory and Injunctive Relief*

157. Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this complaint, as though fully set forth herein.

158. Plaintiffs state this cause of action on behalf of themselves and members of the proposed Classes against Defendant Crouch, Defendant Beane, and Defendant Cheatham in their official capacity, for purposes of seeking declaratory and injunctive relief, and challenge Defendants' enforcement of the discriminatory sex-based classifications in the Exclusions both facially and as applied to Plaintiffs and the proposed Classes.

159. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

160.    Defendant Crouch is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs Fain, Anderson, and the proposed Medicaid Class equal protection of the law.  Through his duties and actions to develop a managed care program that excludes coverage for gender-confirming care, Defendant Crouch has unlawfully discriminated, and continues to discriminate, against Plaintiffs Fain, Anderson, and the members of the proposed Medicaid Class based on sex-related considerations.

161.    Defendant Beane is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs Fain, Anderson, and the proposed Medicaid Class equal protection of the law.  Through her duties and actions to implement health policies for BMS which exclude gender-confirming care, Defendant Beane has unlawfully discriminated, and continues to discriminate, against Plaintiffs Fain, Anderson, and the members of the proposed Medicaid Class based on sex-related considerations.

162.    Defendant Cheatham is a person acting, at all relevant times, under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs James, Martell, and McNemar and the proposed State Employee Health Plan Class and The Health Plan Subclass equal protection of the law.  Through his duties and actions to administer and manage the group insurance plans for state employees and dependents—which includes authority and responsibility for designating noncovered services such as the Exclusions of gender-confirming care, and his actions to ensure that state employees have no nondiscriminatory options—Defendant Cheatham has unlawfully discriminated, and continues to discriminate, against Plaintiffs James, Martell, and McNemar and the members of the proposed State Employee Health Plan Class and The Health Plan Subclass based on sex-related considerations.

163. The Exclusions, on their face and as applied to Plaintiffs and the proposed Classes, impermissibly discriminate on the basis of sex, and on the basis of transgender status, and violate their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

164. The Exclusions treat Plaintiffs and members of the proposed Classes differently from other persons who are similarly situated. Under the Exclusions, transgender Medicaid and state health plan participants who require gender-confirming care are denied coverage for that medically necessary care, while cisgender Medicaid and state health plan participants can access the same kinds of treatments, including when related to their sex. Similarly, state health plan enrollees with a transgender dependent are denied coverage for that medically necessary care, while enrollees with a cisgender dependent are not denied coverage for the same kinds of treatments, including when related to their sex.

## A. Discrimination on the Basis of Sex

165. By maintaining and enforcing the categorical Exclusions of gender-confirming care in the Medicaid and state employee health plans, Defendant Crouch, Defendant Beane, and Defendant Cheatham respectively engage in constitutionally impermissible discrimination on the basis of sex.

166. Discrimination on the basis of transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition constitutes discrimination on the basis of sex.

167. Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

168.     By ensuring that coverage for gender-confirming care is categorically excluded regardless of medical necessity in all health coverage options for Medicaid and state employee health plan participants, Defendants Crouch, Beane, and Cheatham engage in constitutionally impermissible sex-based discrimination against Plaintiffs and members of the proposed Classes, and violate their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**B.      Discrimination on the Basis of Transgender Status**

169.     By maintaining and enforcing the categorical Exclusions of gender-confirming care, Defendants Crouch, Beane, and Cheatham engage in constitutionally impermissible discrimination on the basis of transgender status.

170.     As the Fourth Circuit recently confirmed, under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to "at least" heightened scrutiny. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020).  That is because:

A.      Transgender people have suffered a long history of discrimination and continue to suffer such discrimination to this day.

B.      Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination through the legislative process.

C.      A person's transgender status bears no relation to a person's ability to contribute to society.

D.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment. Gender identity generally is highly resistant to change through intervention.

171.    Because the Exclusions on their face and as applied to Plaintiffs and the proposed Classes deprive transgender Medicaid and state employee health plan enrollees of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as inferior to cisgender health plan enrollees, Defendants Crouch, Beane, and Cheatham deny transgender persons equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment. The categorical Exclusions similarly serve to stigmatize state health plan enrollees whose dependents are transgender, depriving them of their equal treatment and dignity.

172.    Defendants' enforcement of the Exclusions has not, and does not serve even a legitimate state interest, let alone one that is important, or compelling. Nor are the Exclusions adequately tailored to any such state interest. Rather, the Exclusions serve only to prevent Plaintiffs and members of the proposed Classes from obtaining gender-confirming care when cisgender enrollees are able to receive the same care as long as it is not required for purposes of treating gender dysphoria. In effect, the Exclusions punish vulnerable transgender people for being transgender and taking necessary—and sometimes life-saving—steps to live in accordance with their gender identity.

173.    Without injunctive relief from the Exclusions of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**COUNT TWO**
**Violation of Section 1557 of the**
**Patient Protection and Affordable Care Act**
**42 U.S.C. § 18116**

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against Defendant BMS, Defendant Crouch, and Defendant Beane for Declaratory and Injunctive Relief, and Individually Against Defendant BMS for Compensatory Damages*

*Plaintiffs Zachary Martell and Brian McNemar, on Behalf of the State Employee Health Plan Class and on Behalf of The Health Plan Subclass Against Defendant The Health Plan for Declaratory and Injunctive Relief, and Individually Against Defendant The Health Plan for Compensatory Damages*

174.    Plaintiffs re-allege and incorporate each and every foregoing allegation contained in the preceding paragraphs of this complaint, as though fully set forth herein.

175.    Plaintiffs state this cause of action on behalf of themselves and members of the proposed Classes for purposes of seeking declaratory and injunctive relief, and challenge the discriminatory sex-based classifications in the Exclusions both facially and as applied to Plaintiffs and the proposed Classes.  Named Plaintiffs also state this cause of action for compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

176.    Under Section 1557 of the Affordable Care Act, "an individual shall not ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)" on the basis of sex.  42 U.S.C. § 18116.

177.    *"[A]ny health program or activity":*

A.      Defendant BMS, which administers and supervises the state's Medicaid Plan, constitutes a health program or activity within the meaning of the statute.

B.      Defendant The Health Plan, as a health maintenance organization serving more than 200,000 people covered through its health plans, constitutes a health program or activity within the meaning of the statute.

178.    *"[A]ny part of which is receiving Federal financial assistance":*

A.      Defendant BMS receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. The Centers for Medicare & Medicaid Services ("CMS"), operating within HHS, provide federal financial assistance to BMS for the state's participation in the Medicaid Program.

B.      Defendant The Health Plan receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. The Health Plan's "Provider Procedural Manual," which provides guidance to medical providers who care for patients insured through The Health Plan, explains that, "The Health Plan has entered into a contract with the Centers for Medicare and Medicaid Services (CMS), the federal agency that administers the Medicare program. Under this contract, CMS makes a monthly payment to The Health Plan for each Medicare beneficiary who enrolls in our Plan. ... The Health Plan receives a set rate for each member plus any enrollee premium."

179.    The categorical Exclusions maintained by Defendants BMS, The Health Plan, Crouch, and Beane, on their face and as applied to Plaintiffs and members of the proposed Classes, violate Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

180.     Defendants Crouch and Beane's actions under color of state law to maintain the categorical Exclusions deprive Plaintiffs and members of the proposed Classes of the protection from sex discrimination secured by Section 1557.

181.     Discrimination on the basis of transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

182.     By categorically excluding gender-confirming care regardless of medical necessity, Defendants BMS, The Health Plan, Crouch, and Beane have drawn a classification that has and continues to unlawfully discriminate against Plaintiffs and members of the proposed Classes based on sex, in violation of Section 1557.

183.     Because Defendant BMS and Defendant The Health Plan receive federal funding that flows to health programs or activities, Plaintiffs and the proposed Classes have a right under Section 1557 to receive health insurance through BMS and The Health Plan free from discrimination on the basis of transgender status, sex, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition.

184.     Defendants BMS, The Health Plan, Crouch, and Beane have discriminated against Plaintiffs and the proposed Classes on the basis of sex in violation of Section 1557 and have thereby denied Plaintiffs and the proposed Classes the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

185.     Plaintiffs and the proposed Classes have been and continue to be injured by the application of the Exclusion by Defendants BMS, The Health Plan, Crouch, and Beane to deny coverage for gender-confirming care and have suffered harm as a result.

40

186.    The named Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of BMS' and The Health Plan's targeted discrimination against transgender Medicaid participants and The Health Plan enrollees respectively, which wrongly deems their health care needs as unworthy of equal coverage.  By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates on the basis of sex, Defendant BMS and Defendant The Health Plan have intentionally violated the ACA, for which named Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

187.    Without injunctive relief from the Exclusions of coverage for gender-confirming care, Plaintiffs and the proposed Classes will continue to suffer irreparable harm in the future.

**COUNT THREE**
**Violation of the Medicaid Act's Availability Requirements**
**42 U.S.C. § 1396a(a)(10)(A)**

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against*
*Defendants Crouch and Beane for Declaratory and Injunctive Relief*

188.    Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this complaint, as though fully set forth herein.

189.    Plaintiffs Fain and Anderson state this cause of action on behalf of themselves and members of the proposed Medicaid Class against Defendants Crouch and Beane in their official capacity, for purposes of seeking declaratory and injunctive relief, and challenge Defendants' enforcement of the Exclusions both facially and as applied to Mr. Fain and Ms. Anderson, and the proposed Medicaid Class.

190.    The Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A), require that a state plan must "provide for making medical assistance available … to" eligible individuals.

191.    The categorical Exclusions maintained and enforced by Defendants Crouch

and Beane eliminate mandatory Medicaid coverage of medically necessary services and render

them unavailable to Plaintiffs Fain, Anderson, and members of the proposed Medicaid Class,

thereby violating Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A), which is

enforceable by Plaintiffs Fain and Anderson under 42 U.S.C. § 1983.

### COUNT FOUR
### Violation of the Medicaid Act's Comparability Requirements
### 42 U.S.C. § 1396a(a)(10)(B)

*Plaintiffs Christopher Fain and Shauntae Anderson on Behalf of the Medicaid Class, Against
Defendants Crouch and Beane for Declaratory and Injunctive Relief*

192.    Plaintiffs re-allege and incorporate by reference the allegations in each of the

preceding paragraphs of this complaint, as though fully set forth herein.

193.    Plaintiff Fain and Anderson state this cause of action on behalf of themselves and

members of the proposed Medicaid Class against Defendants Crouch and Beane in their official

capacity, for purposes of seeking declaratory and injunctive relief, and challenges Defendants'

enforcement of the Exclusions both facially and as applied to Mr. Fain, Ms. Anderson, and the

proposed Medicaid Class.

194.    The Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B),

require that the "medical assistance made available to [eligible individuals] shall not be less in

amount, duration, or scope than the medical assistance made available to" other eligible or

ineligible individuals.

195.    The categorical Exclusions maintained and enforced by Defendants Crouch

and Beane, and the denial of medically necessary services and treatments to Plaintiffs Fain,

Anderson, and members of the proposed Medicaid Class, while the same or similar services and

treatments are covered for cisgender Medicaid beneficiaries, violates Medicaid's comparability

requirement, 42 U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiffs Fain and Anderson under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs as class representatives, on behalf of themselves and the proposed Classes, respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A.      Certification of a class action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed Classes;

B.      Appointment of Plaintiffs as class representatives and their counsel as class counsel;

C.      Issuance of a preliminary and permanent injunction enjoining any further enforcement or application of the Exclusions, and directing Defendants and their agents to provide access to coverage for all gender-confirming care without regard to the Exclusions;

D.      Declaratory judgment that the Exclusions, facially and as applied to Plaintiffs and members of the proposed Classes:

1.      Violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition), and on the basis of transgender status;

2.      Violate Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including transgender status, sex characteristics, gender, gender identity, sex assigned at birth, nonconformity with sex stereotypes, and gender transition);

43

        3.      Violate the Medicaid Act's availability requirement, 42 U.S.C.

§ 1396a(a)(10)(A); and,

        4.      Violate the Medicaid Act's comparability requirement, 42 U.S.C.

§ 1396a(a)(10)(B);

      E.      An award of the declaratory and injunctive relief requested in this action against

Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons

who are in active concert or participation with them;

      F.      An award of compensatory and consequential damages to the individual Plaintiffs

in an amount that would fully compensate Plaintiffs for their financial harm, emotional distress

and suffering, embarrassment, humiliation, pain and anguish, violations of their dignity, and

other damages that have been caused by the conduct of Defendants BMS and The Health Plan in

violation of the ACA;

      G.      An award of reasonable attorneys' fees, costs, and expenses under 42 U.S.C.

§ 1988 and all other applicable statutes; and

      H.      Such other and further relief as the Court may deem just and proper.

* * *

Dated: September 23, 2021

Respectfully submitted,

/s/ Walt Auvil

Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-6344
auvil@theemploymentlawcenter.com

Avatara Smith-Carrington, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: 214-219-8585
Facsimile: 214-219-4455
asmithcarrington@lambdalegal.org

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
Phone: 612-256-3200
Facsimile: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Tara L. Borelli, Visiting Attorney
Carl Charles, Visiting Attorney
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Sasha Buchert, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Phone: 202-804-6245
Facsimile: 202-429-9574
sbuchert@lambdalegal.org

Nora Huppert, Visiting Attorney
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010
Phone: 213-382-7600
Facsimile: 213-351-6050
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*