IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

      *Plaintiffs*,

   v.

WILLIAM CROUCH, *et al.*,

      *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF UNDISPUTED FACTS ........................................................... 2

  A.   The parties in this case are transgender West Virginia Medicaid participants and the state entity and individuals who deny those participants Medicaid coverage for gender-confirming care. ...................................................................................................... 2

  B.   The West Virginia Medicaid Program is supposed to serve the state's most vulnerable residents, including transgender people. ........................................................... 4

  C.   Defendants exclude gender-confirming care from coverage based on purported governmental interests that the record does not support. .................................................... 6

  D.   There is an established and sound standard of care for treatment of gender dysphoria.....9

III.  LEGAL STANDARD ........................................................................................... 11

IV.   ARGUMENT ........................................................................................................ 12

  A.   The Exclusion violates Equal Protection. ...................................................... 12

    1.   The Exclusion discriminates based on sex. ........................................... 12

    2.   The Exclusion discriminates based on transgender status. ..................... 14

    3.   The Exclusion cannot survive heightened scrutiny. ............................... 14

  B.   The Exclusion violates Section 1557 of the ACA. ........................................ 17

  C.   The Exclusion violates the Medicaid Act. ..................................................... 17

    1.   The Exclusion violates the Medicaid Act's Comparability Requirement. ................ 18

    2.   The Exclusion violations the Medicaid Act's Availability Requirement. .................. 19

V.    CONCLUSION ..................................................................................................... 20

## I.      INTRODUCTION

West Virginia's Medicaid program discriminates on the basis of sex and transgender status. Specifically—through Defendants Crouch, Beane, and the State's Bureau for Medical Services—the program prohibits insurance coverage for gender-confirming surgical care as treatment for gender dysphoria (the "Exclusion"), while covering the same kinds of treatments for cisgender participants who require that care for other reasons.[1] Accordingly, Defendants have violated and continue to violate the Equal Protection Clause, Section 1557 ("Section 1557") of the Affordable Care Act ("ACA"), and the Medicaid Act's Comparability and Availability Requirements as to all transgender people who are or will be enrolled in West Virginia Medicaid and who are seeking or will seek gender-confirming care barred by the Exclusion. Plaintiffs Christopher Fain and Shauntae Anderson are two such people. They require gender-confirming surgical care but cannot receive it because of the Exclusion. On behalf of themselves and all those similarly situated,[2] they now seek summary judgment on their Equal Protection, ACA, and Medicaid Act claims.

_As to Equal Protection_, the Exclusion's expressly sex-based terms—excluding coverage for "transsexual surgery"—evince facial discrimination based on sex. Further, discrimination based on transgender status is presumptively unconstitutional. Discovery has revealed nothing that justifies Defendants' conduct. Defendants' purported "cost savings" justification cannot pass even rational, let alone heightened, scrutiny. Nor can Defendants point fingers at a federal agency to avoid their own obligations under the law. Defendants' testimony tellingly reveals they lack even

---

[1] _See infra_ Pt. II(C) (further explaining the Exclusion to encompass all surgical care and any other uncovered treatment, such as puberty-delaying treatment).

[2] Plaintiffs have contemporaneously filed a motion for class certification under Fed. R. Civ. P. 23, seeking only an injunctive relief class through Fed. R. Civ. P. 23(b)(2). As there is no notice requirement or opt-out allowance with such a class, both summary judgment and class certification can be decided simultaneously if the Court so chooses.

a legitimate government interest in their discrimination:

> A:     If we're not going to provide the surgery, we can at least provide access to [hormone] therapy and it may help these folks. And so . . . it's a story of compassion . . .
>
> ***
>
> Q:     Why didn't that compassion extend to surgical care for gender dysphoria?
> A:     I don't know the answer to that.[3]

_As to the ACA_, West Virginia Medicaid is a health program or activity that receives federal financial assistance and Plaintiffs were subjected to discrimination in healthcare services on the basis of sex. There are no genuine factual disputes on either element of the ACA claim.

_Finally, as to the Medicaid Act_, because the Exclusion prevents surgical care from being covered even where that same care is medically necessary for cisgender people for other reasons, Defendants fail to make covered treatments available in sufficient amount, duration and scope and discriminate because Plaintiffs need this care for gender dysphoria. This violates the Medicaid Act.

For all of these reasons, Plaintiffs respectfully request that the Court grant this motion.[4]

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     The parties in this case are transgender West Virginia Medicaid participants and the state entity and individuals who deny those participants Medicaid coverage for gender-confirming care.

1.     <u>Plaintiff Christopher Fain</u> is a 46-year-old transgender man enrolled in West Virginia Medicaid.[5] He has a diagnosis of gender dysphoria and receives hormone therapy.[6] He also requires a bilateral mastectomy to treat his chest-related gender dysphoria, which is so severe

---

[3] Ex. 11, F. Lewis Dep. Tr. at 78:17-79:21 (30(b)(6) designee). **_All exhibits cited herein are attached to the Declaration of Walt Auvil unless otherwise noted_**.

[4] Because Plaintiffs no longer pursue emotional distress damages in light of _Cummings v. Premier Rehab Keller, P.L.L.C._, 142 S. Ct. 1562 (2022), this motion encompasses all relief sought.

[5] Ex. 6, Fain Dep. Tr. at 10:1-12, 10:15-16, 32:9-12; Fain Decl. ¶¶ 3-5.

[6] Ex. 6, Fain Dep. Tr. at 31:3-10, 33:14-22, 82:8-18; Fain Decl. ¶¶ 14-16.

that he feels physically sick when hugging others.[7] This procedure would alleviate Mr. Fain's overwhelming distress and eliminate his need to use a compression garment for his chest, which chafes his skin, causes deep sores, and impacts his breathing.[8] Although this surgical care is medically necessary for Mr. Fain, the Exclusion categorically prohibits it.[9]

2.  Plaintiff Shauntae Anderson is a 45-year-old transgender woman enrolled in West Virginia Medicaid.[10] She has a diagnosis of gender dysphoria and receives hormone therapy, but this is not sufficient to relieve the anguish she experiences from the lack of alignment between her gender identity and her body.[11] The distress is "agonizing" and affects Ms. Anderson "day in and day out," including during basic functions such as bathing and using the restroom.[12] Ms. Anderson requires gender-confirming surgery, including vaginoplasty and breast reconstruction surgery.[13] These procedures would alleviate Ms. Anderson's gender dysphoria, further align her body with her gender identity, and increase her personal safety.[14] This surgical care is medically necessary for Ms. Anderson, but the Exclusion categorically prohibits it.[15]

3.  Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services ("BMS") is a bureau of the West Virginia Department of Health and Human Resources ("DHHR") and the designated state agency responsible for administering the Medicaid program in West Virginia.[16] BMS receives federal funding from the U.S. Department of Health

---

[7] Ex. 6, Fain Dep. Tr. at 83:16-84:15; Fain Decl. ¶¶ 19-21.
[8] Ex. 6, Fain Dep. Tr. at 91:19-22, 127:13-128:5; Fain Decl. ¶¶ 17-19.
[9] Mot. to Seal, Ex. A, Karasic Rep. ¶ 73.
[10] Ex. 7, Anderson Dep. Tr. at 16:7-8, 21-22, 133:13-16; Anderson Decl. ¶¶ 3-5, 15.
[11] Ex. 7, Anderson Dep. Tr. at 147:12-18; 164:22-166:1; Anderson Decl. ¶¶ 12, 14-15, 17.
[12] Anderson Decl. ¶ 17.
[13] Ex. 7, Anderson Dep. Tr. at 167:4-168:19; Anderson Decl. ¶ 18.
[14] Anderson Decl. ¶¶ 18-19.
[15] Mot. to Seal, Ex. A, Karasic Rep. ¶ 93.
[16] Ex. 8, Crouch Dep. Tr. at 13:5-7; Ex. 11, F. Lewis Dep. Tr. at 10:1-3; ECF No. 151 ¶ 15, 59.

and Human Services, including Medicaid funding through the U.S. Centers for Medicare & Medicaid Services ("CMS").[17] BMS admits that its receipt of federal funding renders it a health program or activity within the meaning of Section 1557 of the ACA.[18]

4.    <u>Defendant Bill Crouch</u> is Secretary of DHHR[19] and responsible for making sure BMS meets federal requirements, *e.g.*, "[d]evelop[ing] a managed care system to monitor the services provided by the [M]edicaid program . . ." and "[p]repar[ing] and submit[ing] state plans which . . . meet the requirements of federal laws, rules governing federal-state assistance."[20]

5.    <u>Defendant Cynthia Beane</u> is Commissioner of BMS and responsible for administering the state Medicaid plan and ensuring that it complies with the ACA and Medicaid Act.[21] If the state were to cover gender-confirming surgery Commissioner Beane would oversee coverage implementation, and she approves all new state plans for covered medical services.[22]

**B.    The West Virginia Medicaid Program is supposed to serve the state's most vulnerable residents, including transgender people.**

6.    Medicaid is a joint federal-state program that provides health insurance for eligible individuals.[23] West Virginia has participated since Medicaid's inception in 1965 and does so to "serve [its] most vulnerable citizens," including transgender people.[24]

7.    The Medicaid program's annual budget ranges between $4.5 and $5.1 billion, and is projected for $5.49 billion in 2022.[25] Medicaid is jointly funded by the federal and state

---

[17] ECF No. 151 ¶ 15; Ex. 8, Crouch Dep. Tr. at 13:11-14:17.
[18] ECF No. 151 ¶¶ 177A, 178A.
[19] ECF No. 151 ¶ 13; Ex. 8, Crouch Dep. Tr. at 11:10-13; 12:3-5.
[20] Ex. 8, Crouch Dep. Tr. at 38:17-39:6, 40:5-14, 42:2-21; W. Va. Code §§ 9-2-6(12), 9-2-9(a)(1).
[21] Ex. 9, Beane Dep. Tr. at 15:4-9, 31:15-23, 32:3-10, 34:18-36:2, 46:2-9; ECF No. 151 ¶ 14.
[22] Ex. 9, Beane Dep. Tr. at 45:16-46:1, 69:13-19.
[23] ECF No. 151 ¶ 50.
[24] Ex. 9, Beane Dep. Tr. at 58:18-24, 59:7-13, 59:19-60:2.
[25] Ex. 12, Manning Dep. Tr. at 27:6-11, 31:20-32:16.

government, with funding from CMS subsidizing 74% to 81% of the state's program, and 90% of the budget for the 165,000 participants covered through the state's expansion of its Medicaid program under the ACA.[26] The match is tied to each state's economic outlook and is adjusted downward as the state obtains more revenue.[27]

8.    The Medicaid program averages 500,000 to 525,000 participants, with expanded participation of 628,000 during the pandemic.[28] For perspective, the 686 participants who submitted claims for gender-confirming care during the first nine months of 2021 make up just 0.001% of all current participants.[29]

9.    Approximately 85% of Medicaid participants receive coverage through Mountain Health Trust, West Virginia's Medicaid managed care program administered by Defendant BMS.[30] BMS contracts with several managed care organizations ("MCO") that coordinate services to provide health coverage to Medicaid participants.[31] MCOs are selected through a bidding process and provide services based on the Medicaid program's guidelines of which services are covered.[32] As part of Mountain Health Trust, eligible Medicaid participants are enrolled with one of three MCOs: (1) UniCare Health Plan of West Virginia, (2) The Health Plan, and (3) Aetna Better Health of West Virginia.[33] The remaining 15% of Medicaid enrollees receive care through a fee for service model, where Medicaid pays providers directly.[34]

---

[26] Ex. 9, Beane Dep. Tr. at 40:5-9, 79:11-21, 101:3-20; Ex. 12, Manning Dep. Tr. at 24:17-25:25.
[27] Ex. 8, Crouch Dep. Tr. at 60:1-11.
[28] Ex. 9, Beane Dep. Tr. at 41:16-19, 110:16-20.
[29] Ex. 14, Young Dep. Tr. at 103:9-104:12; Ex. 3 at 3-4, Interrog. 11.
[30] ECF No. 151 ¶ 61; Ex. 11, F. Lewis Dep. Tr. at 10:4-7; Ex. 9, Beane Dep. Tr. at 81:17-25; Ex. 14, Young Dep. Tr. at 28:10-14.
[31] ECF No. 151 ¶ 61.
[32] Ex. 8, Crouch Dep. Tr. at 49:4-21.
[33] ECF No. 151 ¶ 61; Ex. 11, F. Lewis Dep. Tr. at 10:8-11:7.
[34] Ex. 9, Beane Dep. Tr. at 82:1-19.

10.     The Medicaid program covers all CMS-mandated services and a number of additional optional services.[35]

C.     **Defendants exclude gender-confirming care from coverage based on purported governmental interests that the record does not support.**

11.     Defendants maintain a comprehensive state plan for medical assistance.[36] That plan provides a broad outline of coverage, with more detail about covered services provided in a separate policy manual.[37] While Defendants do cover hormone therapy and counseling for gender dysphoria,[38] their manual categorically excludes "[t]ranssexual surgery."[39]

12.     Moreover, BMS's contract with each MCO states that the MCO is "not permitted to provide" gender-confirming surgery.[40] Thus, each MCO excludes coverage for gender-confirming surgery.[41] And because MCOs could only cover this care with their own funds, without reimbursement from BMS, no MCO does so.[42]

13.     Defendants exclude coverage for gender-confirming surgical care regardless of

---

[35] Ex. 8, Crouch Dep. Tr. at 56:8-24; Ex. 9, Beane Dep. Tr. at 161:17-164:9; Ex. 28.

[36] ECF No. 151 ¶ 52.

[37] Ex. 9, Beane Dep. Tr. at 68:16-69:3.

[38] Ex. 14, Young Dep. Tr. at 59:17-60:3. To the extent Defendants omit coverage for other gender-confirming care, that is also part of the Exclusion. For example, Medicaid's policy for puberty-delaying treatment is unclear. This treatment pauses puberty so that a transgender adolescent does not have to experience distressing and potentially traumatic pubertal changes before they transition. Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 40. While Medicaid has denied this care at least once, Ex. 9, Beane Dep. Tr. at 150:19-155:21, its Medical Director agrees that this treatment is "standard of care" for gender dysphoria, and Medicaid has previously covered it. Ex. 10, Becker Dep. Tr. at 58:8-59:23, 72:7-73:16, 74:3-75:24; Ex. 13, Thompson Dep. Tr. at 33:17-24, 37:1-38:1; Ex. 32. Regardless, surgery, hormones, counseling, and puberty-delaying treatment are all gender-confirming care. To the extent Defendants omit such care from coverage—*i.e.*, surgical care and any excluded puberty-delaying treatment—they violate the law.

[39] Ex. 14, Young Dep. Tr. at 14:1-16:18; Ex. 23 at CFAIN0001662; Ex. 24 at 77.

[40] Ex. 29, DHHRBMS001193-94; Ex. 30, DHHRBMS001754-55; Ex. 31, DHHRBMS002284-85; Ex. 9, Beane Dep. Tr. at 93:12-22.

[41] ECF No. 151 ¶ 63; Ex. 11, F. Lewis Dep. Tr. at 27:18-28:8; Ex. 25, Health Plan Composite.

[42] Ex. 9, Beane Dep. Tr. at 88:22-89:11, 90:10-13.

medical necessity.[43] However, Defendants provide coverage for those same surgical procedures when medically necessary to treat conditions other than gender dysphoria, including the chest surgery and vaginoplasty procedures sought by Plaintiffs.[44]

14.    The surgical exclusion was adopted in approximately 2004,[45] but BMS's organizational representatives could not identify why the Exclusion was adopted.[46] The decision to maintain it has not been revisited since then.[47]

15.    Despite being unable to identify the process leading to the adoption of the surgical Exclusion or anything considered at the time,[48] BMS's organizational designees identified two purported governmental interests:

A.    First, Defendants "provide coverage that is mandated for coverage by [CMS]."[49] The BMS designee's "factual basis" for this is simply that she searched and could not "find any directive from CMS telling me I have to cover this service."[50] But BMS also admitted that CMS does not bar such coverage, and the decision to exclude coverage "resides with BMS."[51]

B.    Second, Defendants "are constrained by budgetary/cost considerations."[52]

---

[43] Ex. 10, Becker Dep. Tr. at 52:3-25; Ex. 9, Beane Dep. Tr. at 170:9-17.

[44] Cisgender people also receive coverage for counseling (Ex. 1 at 2, Req. for Admis. 2); chest surgeries (Ex. 1 at 2, Req. for Admis. 3; Ex. 4 at 1-2, Interrog. 5); hysterectomy (Ex. 1 at 2, Req. for Admis. 4; Ex. 5 at 1-2, Interrog. 8); vaginoplasty (Ex. 1 at 2, Req. for Admis. 5; Ex. 5 at 3, Interrog. 9); and orchiectomy, penectomy, and phalloplasty (Ex. 1 at 2, Req. for Admis. 6; Ex. 5 at 4, Interrog. 10); Ex. 14, Young Dep. Tr. at 169:21-170:5.

[45] Ex. 8, Crouch Dep. Tr. at 53:11-21; Ex. 9, Beane Dep. Tr. at 131:19-23.

[46] Ex. 9, Beane Dep. Tr. at 131:24-132:9.

[47] Ex. 10, Becker Dep. Tr. at 46:24-47:7; Ex. 9, Beane Dep. Tr. at 132:21-23; Ex. 14, Young Dep. Tr. at 115:13-116:1.

[48] Ex. 9, Beane Dep. Tr. at 131:24-132:10-17; Ex. 14, Young Dep. Tr. at 143:16-25.

[49] Ex. 2 at 2, Interrog. 2; Ex. 9, Beane Dep. Tr. at 137:20-138:8, 139:4-14; Ex. 12, Manning Dep. Tr. at 62:21-63:1.

[50] Ex. 9, Beane Dep. Tr. at 139:15-142:1.

[51] Ex. 9, Beane Dep. Tr. at 167:9-24; Ex. 14, Young Dep. Tr. at 65:24-66:3; 160:13-162:23.

[52] Ex. 2 at 2, Interrog. 2; Ex. 9, Beane Dep. Tr. at 137:20-138:8, 139:4-14; Ex. 12, Manning Dep. Tr. at 49:22-51:24, 62:21-63:1.

Despite invoking budget considerations, BMS has not conducted any research into the cost of gender-confirming surgery.[53] Further, it anticipates having a *surplus* of $343 million and $117 million in 2022 and 2023, respectively.[54] Surpluses are used "to save money for future years" where there may be a shortfall.[55] Although officials anticipate a budget shortfall of $128.3 million in 2024,[56] that would be less than one-third their total projected surplus in 2022 and 2023. The federal government has also previously provided assistance for shortfalls, and BMS's designee testified that BMS has not had to cut coverage based on shortfalls during her more than 20-year tenure.[57] Additionally, federal matching funds already help subsidize the counseling and hormone therapy that West Virginia currently covers to treat gender dysphoria.[58]

16.     As a general matter, the Medicaid program has not performed any research or analysis regarding providing access to gender-confirming care.[59] Nor has the program spoken with representatives of other Medicaid programs who provide this care.[60]

17.     Tellingly, BMS began covering hormone therapy in 2017.[61] The decision was made by the then-Pharmacy Director and informed by her prior experience with transgender people who were "distraught" when they could not access gender-confirming hormones and surgery.[62] As

---

[53] Ex. 12, Manning Dep. Tr. at 57:12-23; Ex. 9, Beane Dep. Tr. at 182:7-22; Ex. 14, Young Dep. Tr. at 164:8-11.
[54] Ex. 9, Beane Dep. Tr. at 179:7-10; Ex. 12, Manning Dep. Tr. at 41:2-7.
[55] Ex. 12, Manning Dep. Tr. at 41:2-7.
[56] Ex. 12, Manning Dep. Tr. at 41:8-15.
[57] Ex. 12, Manning Dep. Tr. at 12:1-3, 44:2-17.
[58] Ex. 9, Beane Dep. Tr. at 101:3-9, 144:6-15, 146:10-17.  *See also* Ex. 27 at CFAIN0009545-46 (describing Medicaid spending as "tremendous financial boon for the state"); Ex. 9, Beane Dep. Tr. at 60:6-62:7.
[59] Ex. 8, Crouch Dep. Tr. at 64:5-8, 64:19-65:4, 65:19-24.
[60] Ex. 8, Crouch Dep. Tr. at 64:15-18; Ex. 14, Young Dep. Tr. at 66:4-11.
[61] Ex. 1 at 2, Req. for Admis. 8; Ex. 2 at 4, Interrog. 6; Ex. 11, F. Lewis Dep. Tr. at 68:4-19; Ex. 13, Thompson Dep. Tr. at 48:25-49:11.
[62] Ex. 11, F. Lewis Dep. Tr. at 76:23-78:7.

BMS itself testified through a 30(b)(6) designee: the pharmacy director "felt that there—we can at least do this much [by providing hormone therapy]. If we're not going to provide the surgery, we can at least provide access to this therapy and it may help these folks."[63] While some new plan offerings need CMS approval, neither counseling nor hormone therapy for gender dysphoria did because they were already provided to cisgender people for other reasons.[64]

### D.    There is an established and sound standard of care for treatment of gender dysphoria.

18.      Gender identity is a person's deeply felt, inherent sense of their gender.[65] Although most people are cisgender, meaning their gender identity matches their sex assigned at birth, transgender people have a gender identity that does not match their sex assigned at birth.[66] Left untreated, the dissonance between one's gender identity and sex assigned at birth can be associated with clinically significant distress or impairment of functioning.[67] The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria.[68]

19.      Being transgender is widely accepted as a variation in human development and "[j]ust like being cisgender, being transgender is natural and is not a choice."[69]

20.      Developed by the World Professional Association for Transgender Health ("WPATH"), the *Standards of Care for the Health of Transgender, Transsexual, and Gender-*

---

[63] Ex. 11, F. Lewis Dep. Tr. at 78:16-19.

[64] Ex. 9, Beane Dep. Tr. at 74:1-22, 145:25-146:9.

[65] Ex. 15, Karasic Dep. Tr. at 18:19-20:13; Ex. 16, Karasic Rep. ¶ 21; Ex. 17, Karasic Rebuttal Rep. ¶ 29; Ex. 18, Schechter Dep. Tr. at 101:16-23; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 18.

[66] Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 18; *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020).

[67] Ex. 15, Karasic Dep. Tr. at 8:15-9:20; Ex. 16, Karasic Rep. ¶ 28; Ex. 19, Schechter Rep. ¶ 41.

[68] Ex. 15, Karasic Dep. Tr. at 9:4-13; Ex. 16, Karasic Rep. ¶¶ 22, 23; Ex. 19, Schechter Rep. ¶ 19; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶¶ 24, 26.

[69] *Grimm*, 972 F.3d at 594; *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021) (same); Ex. 16, Karasic Rep. ¶ 27.

*Nonconforming People* ("WPATH SOC") "represent the consensus approach of the medical and mental health community . . . and have been recognized by various courts, including this one, as *the authoritative standards of care*."[70] The Endocrine Society also publishes comprehensive guidelines entitled *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons* ("Endocrine Society Guidelines"), which are consistent with the WPATH SOC.[71] The goal of treatment is to bring a person's body into better alignment with their gender identity.[72]

21.     The American Medical Association ("AMA") along with other leading health organizations recognize the WPATH SOC and Endocrine Society Guidelines as authoritative.[73] "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups."[74]

22.     Defendants' own screening tool for medical necessity also relies on those standards: BMS contracts with a vendor, Kepro, to make such determinations, which uses nationally accredited criteria by InterQual.[75] InterQual criteria are derived from the systematic continuous review and critical appraisal of the most current evidence-based literature and include input from an independent panel of clinical experts.[76] InterQual relies on the WPATH SOC and the Endocrine Society Guidelines in its criteria.[77]

---

[70] *Grimm*, 972 F.3d at 595 (emphasis added; collecting authorities); Ex. 15, Karasic Dep. Tr. at 49:21-50:22; Ex. 16, Karasic Rep. ¶ 24-25; Ex. 19, Schechter Rep. ¶¶ 22, 24; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 27.

[71] Ex. 16, Karasic Rep. ¶ 26; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 28.

[72] Ex. 19, Schechter Rep. ¶¶ 20, 29; Ex. 16, Karasic Rep. ¶ 40; Ex. 21, Olson-Kennedy Dep. Tr. at 98:10-23; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 45.

[73] Ex. 16, Karasic Rep. ¶¶ 25-26; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶¶ 27-28.

[74] *Grimm*, 972 F.3d at 595-96 (citation omitted).

[75] Ex. 14, Young Dep. Tr. at 109:2-111:5; 10, Becker Dep. Tr. at 119:22-121:1; Ex. 5 at 1-5, Interrogs. 8-10.

[76] Ex. 14, Young Dep. Tr. at 115:4-12; Ex. 26, InterQual Composite at DHHRBMS015403 ¶ 7.

[77] *See generally,* Ex. 26, InterQual Composite at DHHRBMS015370 ¶¶ 2-3.

23.     Under the WPATH SOC, treatment for gender dysphoria may involve counseling, hormone therapy, and surgical care.[78] For transgender adolescents, hormone care may also include puberty-delaying treatment.[79] The treatments for gender dysphoria are comparable to those for other medical and mental health conditions that BMS covers.[80]

24.     Major medical organizations, including the AMA, American Academy of Pediatrics, the Endocrine Society, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American Congress of Obstetricians and Gynecologists, and the American Academy of Family Physicians agree that medical treatment for gender dysphoria is safe, effective, and medically necessary.[81]

25.     BMS already accepts the diagnosis of gender dysphoria and recognizes that at least some forms of care are medically necessary to treat it because BMS covers counseling and hormone therapy, arbitrarily excluding surgical care.[82] BMS admits that any treatment it covers, such as its existing counseling and hormone therapy coverage, necessarily has "been deemed medically necessary" by virtue of being covered.[83]

## III.    LEGAL STANDARD

Summary judgment is warranted when "the movant . . . shows that there is no genuine

---

[78] Ex. 19, Schechter Rep. ¶¶ 21-27; Ex. 16, Karasic Rep. ¶ 33; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶¶ 39-47.

[79] Ex. 22, Olson-Kennedy Rebuttal Rep. ¶¶ 40-43; Ex. 10, Becker Dep. Tr. at 56:2-20, 58:8-59:20, 67:25-68:6.  *See Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021) ("Gender-affirming treatment is supported by medical evidence that has been subject to rigorous study."); *Eknes-Tucker v. Marshall*, No. 2:22-cv-184, 2022 WL 1521889, at *8 (M.D. Ala. May 13, 2022).

[80] Ex. 16, Karasic Rep. ¶ 33; Ex. 19, Schechter Rep. ¶¶ 29-33.

[81] Ex. 16, Karasic Rep. ¶ 34; Ex. 22, Olson-Kennedy Rebuttal Rep. ¶ 47; *see also* Ex. 20, Schechter Rebuttal Rep. ¶ 16.

[82] Ex. 10, Becker Dep. Tr. at 124:4-8; Ex. 1 at 1, Req. for Admis. 1 (admitting that "Gender-Confirming Care can be medically necessary for the treatment of gender dysphoria," "with the understanding that this area of treatment continues to evolve").

[83] Ex. 9, Beane Dep. Tr. at 169:18-25; Ex. 1 at 2, Req. for Admis. 7.

dispute as to any material fact and that the movant party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While "the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party," *Ohio Valley Env't Coal., Inc. v. Alex Energy, Inc.*, 34 F. Supp. 3d 632, 635 (S.D.W. Va. 2014), the nonmoving party must offer more than a mere "scintilla of evidence" to create a material dispute of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Here, where, as this Court has said, the "claims are purely legal and require little to no fact development," summary judgment is appropriate.[84]

## IV.     ARGUMENT

### A.      The Exclusion violates Equal Protection.

A claim under the Equal Protection clause requires that a plaintiff demonstrate "[they have] been treated differently from others with whom [they are] similarly situated," either facially or as "the result of intentional . . . discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). On its face, the Exclusion—which explicitly prohibits "[t]ranssexual surgery"—unequivocally targets transgender Medicaid participants for discrimination based on their sex and transgender status, thus precluding the need to show intent.[85] *See Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1027, 1030 (D. Alaska 2020) (finding policy excluding coverage for "changing sex or sexual characteristics" facially discriminatory).

#### 1.     The Exclusion discriminates based on sex.

There is no question that the Exclusion's expressly sex-based terms—excluding coverage for, *inter alia*, "transsexual surgery"—evince facial discrimination based on sex.[86] As the Supreme Court has explained, when the government takes adverse action against "a transgender person who

---

[84] *Fain v. Crouch*, 540 F. Supp. 3d 575, 586 (S.D.W. Va. 2021).
[85] *Supra* Pt. II ¶¶ 11-12.
[86] *Supra* Pt. II ¶ 11.

was identified as a male at birth but who now identifies as a female," while treating more favorably "an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741-42 (2020). This is what the Exclusion does: Ms. Anderson could access vaginoplasty and chest reconstruction surgery if her sex assigned at birth were female. But because her sex assigned at birth was male, she cannot. This is discrimination on the basis of sex. *Fletcher*, 443 F.Supp.3d at 1030 (where plan "covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex," that constitutes "discrimination because of sex"); *Boyden v. Conlin*, 341 F.Supp.3d 979, 995 (W.D. Wisc. 2018) (discrimination in coverage for vaginoplasty based on one's birth-assigned sex is a "straightforward" case of sex discrimination).

Moreover, discrimination "on the basis that an individual was going to, had, or was in the process of *changing* their sex . . . is still discrimination based on sex." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949 (W.D. Wis. 2018) (emphasis added); *see also Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) (employer's "refusal to hire [plaintiff] after being advised that she planned to . . . undergo[] sex reassignment surgery was literally discrimination because of . . . sex"). The same is true here, because the Exclusion expressly prohibits coverage for "transsexual surgery."[87]

Further, discrimination against transgender people also "punish[es] transgender [people] for gender non-conformity, thereby relying on sex stereotypes." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d at 608; *see also id.* at 608-09 (collecting authorities). As *Boyden* explained, a health

---

[87] *Supra* Pt. II ¶¶ 11-12.

plan exclusion for gender-confirming care "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [birth-assigned] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." 341 F. Supp. 3d at 997; *see also Flack*, 328 F. Supp. 3d at 951. Indeed, courts throughout the country have found that discrimination in healthcare against transgender people is rooted in impermissible sex stereotyping. *See, e.g.*, *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020) (the Exclusion "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject"); *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) ("Discrimination based on the incongruence between natal sex and gender identity—which transgender individuals, by definition, experience and display—implicates . . . gender stereotyping . . . ."); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). This Court should do the same.

### 2.    The Exclusion discriminates based on transgender status.

As the Fourth Circuit has confirmed, discrimination based on transgender status is presumptively unconstitutional and subject to "at least" heightened scrutiny. *Grimm*, 972 F.3d at 607. There is no dispute that the Exclusion at issue here discriminates on the basis of transgender status.[88] *See e.g., Toomey*, 2019 WL 7172144, at *6 (exclusion "singles out transgender individuals for different treatment" because "transgender individuals are the only people who would ever seek gender reassignment surgery").[89]

### 3.    The Exclusion cannot survive heightened scrutiny.

Because the Exclusion discriminates against transgender West Virginia Medicaid

---

[88] *See supra* Pt. II ¶¶ 11-13.
[89] *See also* Ex. 18, Schechter Dep. Tr. at 66:1-68:10.

participants based on both sex and transgender status, Defendants must carry the heavy burden under heightened scrutiny of showing that the Exclusion is substantially related to an important governmental interest. *Grimm*, 972 F.3d at 607-10; *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). The justification must be genuine, "not hypothesized or invented post hoc in response to litigation." *VMI*, 518 U.S. at 533. Defendants have asserted that the Exclusion is justified for two reasons: purported cost savings and CMS policy.[90] Defendants are wrong.

*First*, cost savings cannot justify a sex-based exclusion. As a matter of law, cost savings is not even a legitimate governmental interest, let alone an "exceedingly persuasive" one. A state may not "protect the public fisc by drawing an invidious distinction." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-75 (1971) (same); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974) (same); *Bassett v. Snyder*, 59 F. Supp. 3d 837, 854 (E.D. Mich. 2014) ("Although a state has a valid interest in preserving the fiscal integrity of its programs and may legitimately attempt to limit its expenditures," it "may not accomplish such a purpose by invidious distinctions between classes of its citizens.") (internal quotation marks omitted). Moreover, the cost saving rationale is implausible given that any savings from denying this care would be negligible, if not "illusory." *Mem'l Hosp.*, 415 U.S. at 265 (delayed medical care can cause a patient needless deterioration, requiring more expensive future care and possibly causing disability, which can strain state social services).

Even as a factual matter, Defendants cannot credibly invoke this interest when they have not conducted any real research on cost and have projected surpluses of $343 million and $117

---

[90] *Supra* Pt. II ¶ 15.

million in 2022 and 2023, respectively.[91] And the handful of documents purportedly considered by those responsible for maintaining the Exclusion shows the cost of this care is negligible in the context of a group health plan. As those documents state: "where state Medicaid programs have assessed the cost of covering transition-related care, minimal costs have been observed"; "transition-related care coverage does not impose significant costs"; "[g]iven the abundance of empiric data that supports the benefit to patient quality of life, and cost-savings to state health care systems, it is hard to understand why some states would make such services inaccessible under Medicaid."[92] Experts agree.[93] Regardless, Defendants must "do more than show" that denying coverage "saves money." *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). Absent that, Defendants' rationale simply "justif[ies the] classification with a concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982).

 *Second*, the purported absence of CMS policy cannot justify the Exclusion. Defendants assert that BMS cannot "find any directive from CMS telling [it that it has] to cover this service."[94] But the directive to administer government healthcare free from invidious sex discrimination is found in the Equal Protection Clause, which is "a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Further, BMS's 30(b)(6) designee admitted both that (1) CMS does not prohibit this care—in fact, CMS subsidizes the existing counseling and hormone therapy coverage—and (2) the decision to exclude

---

[91] *Supra* Pt. II ¶ 15(B).

[92] Defendants confirmed the specific documents decision-makers considered at ECF No. 228 ¶¶ 2-3; Ex. 10, Becker Dep. Tr. at 60:4-62:21; Ex. 5(a) at 3, Req. for Produc. 6.  Those documents are excerpted and highlighted at Ex. 33, DHHSBMS012441, 0124989, and 015463.

[93] Ex. 19, Schechter Rep. ¶¶ 31, 38-39; *id.* Ex. 16, Karasic Rep. ¶ 46.

[94] *Supra* Pt. II ¶ 15(A).

gender-confirming surgery thus "resides with BMS."[95] Where the purported lack of a mandate is no barrier to Defendants' existing hormone coverage, it cannot excuse withholding surgery. In short, the Exclusion does not survive heightened scrutiny.

### B.    The Exclusion violates Section 1557 of the ACA.

The ACA "aims to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583 (2012). An "important component of the ACA's effort to ensure the prompt and effective provision of health care to all individuals . . . is the statute's express anti-discrimination mandate" in Section 1557. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 11 (D.D.C. 2020).

To prevail on a claim under Section 1557, a plaintiff must demonstrate that (1) defendant is a health program or activity that receives federal financial assistance, and (2) plaintiff was subjected to discrimination in healthcare services on the basis of sex. *See Kadel*, 12 F.4th at 430; *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 589 (D. Md. 2021); *C.P. by & through Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791, 796 (W.D. Wash. 2021).

Here, BMS admits that it is a covered "health program or activity" for purposes of Section 1557.[96] And Plaintiffs have been subjected to sex discrimination in the provision of healthcare services for all the reasons discussed above.[97] Plaintiffs have thus proven their case, and the Court should grant them summary judgment on their ACA claim.

### C.    The Exclusion violates the Medicaid Act.

Title XIX of the Social Security Act of 1965 establishes the Medicaid program, 42 U.S.C.

---

[95] *Supra* Pt. II ¶ 15(A).
[96] 42 U.S.C. § 18116(a); *supra* Pt. II ¶¶ 3, 7.
[97] *Supra* Pt. IV(A)(1).

§§ 1396 *et seq.*, for "the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish . . . medical assistance [to persons] whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. Defendants undisputedly exclude coverage for gender-confirming surgery regardless of medical necessity when indicated for gender dysphoria but cover the same surgical care when medically necessary to treat other conditions.[98] This violates the Medicaid Act's Comparability and Availability Requirements because the Exclusion "fails to make covered treatments available in sufficient 'amount, duration and scope' and discriminates on the basis of diagnosis."[99] *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1019 (W.D. Wis. 2019) (granting summary judgment on Medicaid Act claims where coverage for treatment for gender dysphoria was excluded).

### 1.    The Exclusion violates the Medicaid Act's Comparability Requirement.

Defendants unabashedly admit that West Virginia Medicaid provides coverage for the same surgical procedures so long as those procedures are not related to gender dysphoria or transition.[100] This violates the Medicaid Act's Comparability Requirement, which "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions by requiring participating States to provide medical assistance to all participants in equal amount, duration, and scope." *Id.* at 1018 (cleaned up); *see also*, 42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. § 440.240(b) (services available must be "equal in amount, duration, and scope"); (42 C.F.R. § 440.230(c) (Medicaid "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition.").

---

[98] *Supra* Pt. II ¶ 13.
[99] *Supra* Pt. II ¶ 13.
[100] *Supra* Pt. II ¶ 13.

*Flack* is particularly instructive. The court considered an exclusion for "[t]ranssexual surgery" in Wisconsin Medicaid, and held that the program's refusal to cover the same medical treatments for gender dysphoria that are available for other diagnoses "both fail[ed] to make covered treatments available in sufficient 'amount, duration and scope' and discriminate[d] on the basis of diagnosis," violating the Comparability Requirement. *Flack*, 395 F. Supp. 3d at 1007, 1019. Other courts, too, have repeatedly applied the Comparability Requirement to prohibit participating states from providing particular services to some Medicaid participants but not others based solely on their medical diagnoses. *See, e.g.*, *Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016) (striking down New York policy that denied participants coverage for services based on the "nature of their medical conditions" and holding that the Comparability Requirement "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions"); *White v. Beal*, 555 F.2d 1146, 1148 (3d Cir. 1977) (enjoining a Pennsylvania policy that covered eyeglasses for individuals with eye disease or pathology, but not for those with ordinary refractive errors). Here, as in *Flack*, *Davis*, and *White*, by failing to provide comparable services for comparable needs, Defendants plainly violate the Comparability Requirement.

## 2. The Exclusion violates the Medicaid Act's Availability Requirement.

The Availability Requirement of the Medicaid Act, mandates that a state "must" "provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), and (28) of section 1396d(a) of this title, to all individuals" who meet certain Medicaid eligibility criteria. 42 U.S.C. § 1396a(a)(10)(A). States must provide coverage for the mandatory categories of treatment, including physician's services and inpatient and outpatient hospital services. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(1), (2), (5). The Availability Requirement requires a state to cover services when they (1) fall within a category of

mandatory medical services or optional medical services that the state has elected to provide; and (2) are "medically necessary" for a particular individual. *See, e.g.*, *Beal v. Doe*, 432 U.S. 438, 444 (1977) ("[S]erious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage . . . .").

Here, there is no dispute that BMS is either mandated or chooses to cover the same surgical procedures for cisgender participants that Plaintiffs need.[101] Nor is there any dispute regarding the medical necessity of this care, which BMS has already admitted.[102] Further, the unrebutted testimony of Plaintiffs' expert, Dr. Karasic, who evaluated Plaintiffs, confirms their gender dysphoria diagnoses and medical necessity of surgical care.[103] The excluded gender-confirming surgical care falls within the categories of mandatory and optional medical services in the Medicaid Act and covered by West Virginia Medicaid, as there is no dispute they are covered for cisgender people.[104] Were it not for the Exclusion, West Virginia Medicaid would evaluate requests for gender-confirming surgical care using InterQual criteria, which make clear the care is medically necessary.[105] Accordingly, there is no dispute that the Exclusion fails to make covered surgical procedures available for treatment of gender dysphoria in sufficient "amount, duration and scope" in violation of the Availability Requirement. 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 440.230(b).

## V.    CONCLUSION

Plaintiffs respectfully request that the Court grant them summary judgment, declare that the Exclusion's categorical ban on gender-confirming care violates the Equal Protection Clause, Section 1557 of the ACA, and the Medicaid Act, and permanently enjoin its enforcement.

---

[101] *Supra* Pt. II ¶ 13.
[102] *Supra* Pt. II ¶ 25.
[103] *Supra* Pt. II ¶¶ 1-2.
[104] *Supra* Pt. II ¶ 13.
[105] *Supra* Pt. II ¶ 22.

Dated: May 31, 2022

Respectfully submitted,

/s/ Walt Auvil
Walt Auvil, WVSB No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058 | Fax: 304-485-6344
auvil@theemploymentlawcenter.com

Anna P. Prakash, MN Bar No. 0351362*
Nicole J. Schladt, MN Bar No. 0400234*
NICHOLS KASTER, PLLP
IDS Center, 80 South 8th Street
Suite 4700
Minneapolis, MN 55402
Phone: 612-256-3200 | Fax: 612-338-4878
aprakash@nka.com
nschladt@nka.com

Sasha Buchert, OR Bar No. 070686*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC  20006-2304
Phone: 202-804-6245 | Fax: 202-429-9574
sbuchert@lambdalegal.org

Avatara Smith-Carrington, MD Bar*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
Phone: 214-219-8585 | Fax: 214-481-9140
asmithcarrington@lambdalegal.org

Tara L. Borelli, GA Bar No. 265084*
Carl Charles, NY Bar No. 5427026*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Phone: 470-225-5341
Facsimile: 404-506-9320
tborelli@lambdalegal.org
ccharles@lambdalegal.org

Nora Huppert, CA Bar No. 330552*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Phone: 312-663-4413 | Fax: 312-663-4307
nhuppert@lambdalegal.org

*Attorneys for Plaintiffs*

* Admitted Pro Hac Vice

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

CHRISTOPHER FAIN, *et al.*, individually and
on behalf of all others similarly situated,

        *Plaintiffs*,

    v.

WILLIAM CROUCH, *et al.*,

        *Defendants.*

CIVIL ACTION NO. 3:20-cv-00740
HON. ROBERT C. CHAMBERS

**CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing document, and any attachments, were served

electronically on May 31, 2022 on the following counsel for Defendants in this case:

Lou Ann S. Cyrus (WVSB # 6558)
Roberta F. Green (WVSB #6598)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953, Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com, rgreen@shumanlaw.com
cdavid@shumanlaw.com, kbandy@shumanlaw.com

*Attorneys for Defendants William Crouch; Cynthia Beane; and West Virginia Department of
Health and Human Resources, Bureau for Medical Services*

Dated: May 31, 2022

Respectfully submitted,

s/ Walt Auvil
Walt Auvil, WV Bar No. 190
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
Phone: 304-485-3058
Facsimile: 304-485-3058
auvil@theemploymentlawcenter.com