**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**CHRISTOPHER FAIN**, *et al.*,
                    *Plaintiffs*,                    **Civil Action No. 3:20-cv-00740**
                                                     **Hon. Robert C. Chambers, Judge**
v.

**WILLIAM CROUCH**, *et al.*,
                    *Defendants.*

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now come Defendants, by counsel, and, pursuant to Rule 56(c) of the Federal Rules of

Civil Procedure, hereby move this Court for summary judgment.

## I. FACTS

The West Virginia Department of Health and Human Resources, Bureau for Medical

Services ("Medicaid"), is the State agency that administers West Virginia's Medicaid program.

(Ex. 1 p. 74). Bill Crouch is the Cabinet Secretary of the WVDHHR. (Ex. 2 pp. 10-11). Cynthia

Beane is Commissioner for BMS. (Ex. 3 p. 15). Plaintiffs are participants in Medicaid.

Plaintiffs' Amended Complaint alleges that Medicaid has exclusions from coverage that

"categorically deny transgender people coverage for gender-confirming care" and defines "gender-

confirming care" to include "counseling, hormone replacement therapy, and surgical care." (ECF

140, ¶1). It alleges that "[w]hile cisgender people receive coverage for those forms of health care

as a matter of course, transgender people are targeted for discrimination by exclusions in the state

health plans." (ECF 140, ¶1). Discovery has proven these allegations to be untrue.

Plaintiffs have each been deposed and confirmed that they personally have not been denied

any coverage for gender-confirming care through Medicaid based on being transgender or having

a transgender diagnosis. (Ex. 4 pp. 142, 146; Ex. 5 pp. 73-75). All medical claims submitted by

Plaintiffs for gender-confirming care have been covered and paid. (Ex. 1 pp. 117-119; Ex. 6).[1] Similarly, none of the Plaintiffs' requests for hormones have been denied by Medicaid based on transgender identity. (Ex. 4 p. 142; Ex. 5 pp. 62-63; pp. 82-83).[2]

Shauntae Anderson has been a Medicaid participant since 2019. (Ex. 4 p. 133). She has been diagnosed with gender dysphoria. (Ex. 4 pp. 197-198). There has not been a denial of coverage by Medicaid for her gender-confirming hormones based on the fact that she is transgender. (Ex. 4 p. 142). When asked whether office visits related to prescribing hormones have been covered, Ms. Anderson responded, "To my knowledge, I don't have – I've never had any claims denied." (Ex. 4 p. 146). Ms. Anderson confirmed that Medicaid pays for her lab work and psychological/psychiatric visits, "[j]ust like they do for anyone else." (Ex. 4 p. 151).

Christopher Fain became a Medicaid participant most recently in 2016. (Ex. 5 p. 59). He has been diagnosed with gender dysphoria. (Ex. 5 p. 82). Mr. Fain began taking male hormones in 2019. (Ex. 5 p. 33). Mr. Fain's first prescription for hormones was paid by Medicaid; however, he went through a period of time in which he paid for his hormones due to his doctor's failure to communicate with and to bill Medicaid. (Ex. 5 62-63, 111-112; ECF 32-1; ECF 32-2). He switched doctors, got it straightened out, and never had a problem with coverage for hormones again. (Ex. 5 p. 63). His doctor's visits and lab work have always been covered, and he is not aware of any denial of a claim made to Medicaid on the basis that he is transgender. (Ex. 5 pp. 62-63, 73-75).

It is undisputed that Medicaid does not exclude, but in fact covers, psychiatric diagnostic evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work as treatment related to gender-confirming care. (Ex. 4 pp. 142, 146, 151, 161-162, 164; Ex.

---

[1] A redacted version of the Myers Affidavit has been submitted with Defendants' Motion for Summary Judgment. The parties have sought leave to file the complete version under seal. (ECF 245).
[2] Requests for coverage for hormones have at times not been approved based upon other factors not related to transgender identity or diagnosis..

5 pp. 62-63, 65, 71, 73; Ex. 6; Ex.7 pp. 28-30; Ex. 1 pp. 168-169). This conclusively establishes that Medicaid does not "categorically deny transgender people coverage for gender-confirming care" as alleged in Paragraph 1 of the Amended Complaint.

Plaintiffs have not demonstrated that Medicaid has any exclusion of coverage that pertains categorically to transgender individuals. All services that are considered covered services by Medicaid are covered for transgender participants to the same extent and based on the same criteria as cisgender participants. There is no service that would be covered for a cisgender person that is not covered for a transgender person meeting the same criteria. The "system does not designate whether an individual is transgender, so all services that are available to all members are available to all members. There's no designation as a specific benefit or package for transgender versus non-transgender, it's not in [Medicaid's] system or policies." (Ex. 1 pp. 34, 100). No evidence has been produced in discovery indicating that any covered services are denied to members on the basis of transgender identity.

Medicaid does not, and cannot, cover everything that is medically necessary for its members. (Ex. 3 pp. 168-169). Medicaid has certain non-covered services that are applicable to all participants. The non-covered services are found in Chapter 100 of the Medicaid Policy Manual. (Exhibit 0001 to Ex. 1). Specifically, Section 161, entitled "General Non-Covered Services," contains a non-exhaustive list of various services that Medicaid does not cover. (Chapter 100, pp. 12-13). Section 161 identifies at least 20 services that are considered non-covered by Medicaid, including "[t]ranssexual surgery." (Chapter 100, pp. 12-13; Ex. 1 p. 120). Gender-confirming surgery is simply one of numerous other services that are considered non-covered services.[3]

---

[3] Other non-covered services include drugs for weight gain, weight loss, or fertility, optometry services for individuals over age 21, and inpatient psychiatric services for individuals between 22 and 65 years of age. (Chapter 100, pp. 12-13).

Not all transgender people are affected by the policy. As Plaintiffs' experts agree, not all transgender individuals are diagnosed with gender dysphoria. There is a difference between a transgender identity and gender dysphoria. (Ex. 8 p. 8). Being transgender is an identity. (Ex. 8 p. 8). Gender dysphoria is a DSM-V disorder. (Ex. 8 pp. 8-9). According to Plaintiffs' expert, Dan Karasic, M.D., roughly one in 200 people identifies as transgender. (Ex. 8 p. 10). About one in a thousand are in clinical care for gender dysphoria. (Ex. 8 p. 10). Even though the numbers have not been precisely established, it is a fraction of individuals who identify as transgender who receive care for gender dysphoria according to Dr. Karasic. (Ex. 8 pp. 10-11).

Some gender dysphoric patients receive gender-affirming care and some do not. (Ex. 8 pp. 36-39). Thus, designating gender-confirming surgery as non-covered potentially affects only those individuals who are diagnosed with gender dysphoria, seeking gender-confirming surgery, determined to be candidates for surgery, approved for surgery, and who actually submit a claim for such services to Medicaid. This is a much smaller group of people than "all transgender people." Notably, neither Ms. Anderson nor Mr. Fain has submitted any claim to Medicaid to cover gender-confirming surgery to date.[4] (Ex. 4 pp. 170-171); (Ex. 5 pp. 86-89).

Plaintiffs attempt to characterize Medicaid's policy as a broad-sweeping, blanket exclusion that affects "all transgender people." To the contrary, it designates a particular service as not being covered. "Transsexual surgery" has been designated as a non-covered service since at least 2004. (Ex. 1 p. 140; Chapter 100, p. 1). The policy has been maintained year-to-year without change and has not been challenged until the instant lawsuit. (Ex. 1 p. 140). The Centers for Medicare and Medicaid Services ("CMS") does not require coverage for this service. (Ex. 1 p. 162). Based upon

---

[4] Additionally, Mr. Fain is not willing to undergo gender-confirming surgery until he has "completely kicked" his smoking habit, and he is a smoker. (Ex. 5 p. 87-88). Thus, Mr. Fain is not currently in a position to undergo the surgery he desires based upon his stated understanding of the risks. (Ex. 5 pp. 87-88).

the absence of any notification from CMS to the contrary, Medicaid understands that its policy complies with applicable laws. (Ex. 1 p. 143).

Medicaid is "mandated and is overseen by the CMS in that [CMS] maintain[s] the Code of Federal Regulations and approve[s] our state plan and state plan amendments." (Ex. 1 pp. 161-162). Medicaid bases "all of [its] policies and procedures within the confines of the federal regulation, the state code, state laws, and [it] ensure[s] that the covered services are available to members and that reimbursement is available to providers who provide those services to [its] members." (Ex. 1 pp. 74-75). Medicaid has oversight by CMS and receives communications from CMS regarding policy and compliance. (Ex. 1 84, 87-88; Becker p. 20). CMS communicates with Medicaid to either clarify how something is to be done or will provide a change that needs to be made. (Ex. 1 pp. 34, 80). CMS has an active role in reviewing and approving changes made in coverage provided by Medicaid. (Ex. 1 p. 62). Medicaid has never received any communication from CMS stating that not covering gender-confirming surgery is in violation of any law. (Ex. 1 p. 143; Ex. 10 p. 32).

As noted by Defendants' expert, Stephen Levine, M.D., Health and Human Services ("HHS") evaluated the evidence in 2016 and refused to mandate coverage for transgender surgeries, leaving it up to the individual states to decide, due to lack of evidence of long-term benefits. (Ex. 11, ¶ 24). While this decision was made in connection with Medicare, it is notable that HHS, which houses CMS, has declined to mandate coverage for these same services in other contexts as well. If the federal agency administering the nation's major healthcare programs does not mandate coverage for gender-confirming surgeries within its programs, Medicaid and the officials who administer the state program are acting reasonably in also declining to mandate such coverage. There is no evidence that Secretary Crouch or Commissioner Beane have deliberately

selected such services for non-coverage. Rather, they rely upon guidance from HHS and CMS to determine required coverages.

Medicaid is unable to add gender-confirming surgery to its covered services due to budgetary constraints, including a flat budget and projected deficits. (Ex. 3 p. 179). Medicaid receives a federal match on state funds allocated to the Medicaid program, but is only allocated so many funds by the State Legislature. (Ex. 1 p. 163). This creates a limit to what Medicaid can cover, because it has to be able to pay for existing coverages on an ongoing basis as well as any services added to existing coverages. (Ex. 1 p. 163-164). Recent efforts to add services at even a minimal cost have been unsuccessful. In the 2022 Legislative session, a bill was presented for Medicaid to be able to cover blood pressure cuffs for individuals with uncontrolled blood pressure. (Ex. 3 p. 178). The corresponding fiscal note indicated that Medicaid's share of that coverage was going to be a little over $500,000. (Ex. 3 pp. 178-179). The Legislature did not want to increase the Medicaid budget at all, so the measure did not pass. (Ex. 3 p. 178). A second bill that would have cost the State only about $75,000 similarly did not pass. (Ex. 12 pp. 53-57). Medicaid is projecting a budget deficit within two years. (Ex. 3 p. 179). In order to add any additional services, Medicaid would "either have to cut existing services or receive additional appropriations from the [L]egislature[.]" (Ex. 3 p. 179). Because Medicaid has to consider providing services on an ongoing basis, and in light of budget deficit projections, Medicaid does not have the funds to add additional services, regardless of the nature of the services. (Ex. 3 p. 180).

## II. STANDARD OF REVIEW

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). The moving party has the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the non-moving party's case." *Celotex Corp,* 477 U.S. at 325. If the moving party satisfies this burden, then the non-moving party must set forth specific facts, admissible in evidence, that demonstrate the existence of a genuine issue of material fact for trial. *See id.* at 322-23; Fed. R. Civ. P. 56(c), (e). A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find for the non-moving party. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). Here, Plaintiff has failed to show that Medicaid discriminates against transgender individuals on the basis of transgender identity. Therefore, Defendants are entitled to judgment as a matter of law.

## III. ANALYSIS

### A. Defendants Crouch and Beane have not deprived Plaintiffs of Equal Protection.

In Count I, Plaintiffs seek declaratory and injunctive relief against Defendants Crouch and Beane based upon alleged deprivation of their Equal Protection rights. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If this showing is made, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* (additional citations omitted).

### 1. Plaintiffs Have Not Been Treated Differently From Others Similarly Situated and There is No Evidence of Intentional or Purposeful Discrimination.

Plaintiffs' claims fail because the evidence does not support a finding that Plaintiffs have been treated differently from others with whom they are similarly situated based upon Medicaid's

policy, either facially or as applied. "The Equal Protection Clause . . . is 'essentially a direction that all persons similarly situated should be treated alike.'" *Grimm*, 972 F.3d 586, 606 (4th Cir. 2020) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)). "The Clause 'does not take from the States all power of classification,' but 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" *Morrison*, 239 F.3d at 654 quoting *Pers.Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979)) and *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Here, "similarly situated" individuals who are "in all relevant respects alike" can only refer to other Medicaid participants with gender dysphoria who seek gender-confirming surgery. Though Plaintiffs seek comparison with cisgender individuals who seek coverage for surgical care such as mastectomy for reasons other than gender-confirmation, those individuals are not "in all relevant respects alike" because the procedures sought by cisgender individuals are not gender-confirming procedures, and transgender individuals also have access to those procedures.

Equal protection claims by transgender individuals for failure to provide sex reassignment surgery "simply do[] not fit within an equal protection analysis." *Williams v. Kelly*, 2018 U.S. Dist. LEXIS 158119 (E.D. La. Aug. 27, 2018) (adopted by *Williams v. Kelly*, 2018 U.S. Dist. LEXIS 157002 (E.D. La. Sept. 14, 2018). As the court explained in *Kelly*:

> [P]laintiff is not alleging that she is being treated differently than other prisoners suffering from gender dysphoria. Her complaint is that she, a transgender inmate, is being denied sex reassignment surgery, while cisgender female inmates suffering from cystocele … or rectocele … are provided with surgical treatments for their conditions. However, because plaintiff is not "similarly situated" to the prisoners she uses as a basis of comparison, her equal protection claim necessarily fails.

*Id.* at *29.

Mastectomy and chest reconstruction surgery have been covered by Medicaid. (Ex. 13). Approval is based on many factors other than the diagnosis, such as medical history, previous treatment, severity of diagnosis, and combination of other symptoms and conditions. (Ex. 13).

Access to these covered services is not limited or denied based upon sex or transgender identity. (Ex. 1 pp. 34, 100). Under Medicaid's policy, individuals diagnosed with breast cancer do not require prior authorization. (Ex. 6 pp. 16-17). To determine whether mastectomy or related reconstructive procedures are covered for any reason other than breast cancer, "a request would have to go through the UM vendor, which is the utilization management vendor which is Kepro. They have a list they could review for medical necessity to determine if that would be covered or not under [Medicaid] policy." (Ex. 6 pp. 17-18). Kepro uses guidelines from InterQual, a nationally recognized utilization management software, to determine medical necessity for services. (Ex. 6 pp. 20, 60). Insurance coverage determinations are made utilizing specific diagnosis and procedure codes. (Ex. 6 p. 21). Transgender Medicaid members seeking to access covered services who meet Kepro's coverage criteria are not be denied services based on transgender status.[5]

Plaintiffs allege that cisgender Medicaid participants can access "the same kinds of treatments" as the non-covered gender-confirming services. (ECF 140, ¶ 164). However, these are not "the same kinds of treatments." InterQual has guidelines that are specific to gender-affirming surgical services. (Ex. 1 pp. 110-116; Ex. 6 pp. 26, 60, 63). Those guidelines are distinct from the guidelines that relate to surgical services covered by Medicaid and have different criteria than covered services. (Ex. 1 pp. 110-116; Ex. 6 pp. 26, 60, 63). The guidelines specific to gender-affirming surgical services are not utilized by Kepro for Medicaid because gender-affirming surgical services are not a covered service. (Ex. 1 pp. 115-116; Ex. 6 pp. 26, 60, 64). The fact that different coverage guidelines have been developed by Kepro that apply exclusively to gender-

---

[5] Mr. Fain's coverage history is instructive on this point. In 2018, he had a hysterectomy, which was not a gender-confirming surgery, that was covered by Medicaid. (Ex. 5 pp. 52-53). Mr. Fain met the coverage criteria that would have been applied to any other individual for the service, regardless of transgender status. In that instance, Mr. Fain was "similarly situated" "in all relevant respects" to other individuals meeting the criteria for that covered service and was treated in the same manner by receiving coverage.

affirming surgical services demonstrates that the services are, in fact, different services. Additionally, Medicaid has not had any claims or requests for vaginoplasty going at least as far back as 2016. (Ex. 6 p. 31). This includes all members, regardless of sex or gender identity. There is no basis for Plaintiffs to allege any difference in treatment regarding access to vaginoplasty because this service has not been utilized by the cisgender population of Medicaid members for at least the past six years. No members are similarly situated for the purposes of making any comparison, and certainly none that are "in all relevant respects alike."

Plaintiffs' expert, Loren Schechter, M.D., explained that gender-confirming surgeries "are typically a constellation of procedures that include top surgery, so typically chest or breast, genital surgeries, in addition to, for example, a hysterectomy, oophorectomy, orchiectomy." (Ex. 15 p. 65). According to Dr. Schechter, transgender individuals are the only individuals that seek access to gender-confirming surgeries. (Ex. 15 pp. 65-66). When asked the reason for this, Dr. Schechter stated, "[c]isgender individuals do not typically seek a procedure, a sex transformation – or I'll call it gender-affirming – procedure." (Ex. 15 p. 70). He further reiterated, "cisgender individuals may undergo mastectomy, as we've said, oophorectomy, and so forth. But those aren't considered to be sex transformation procedures in cisgender individuals. Only for transgender individuals would a sex transformation procedure be performed." (Ex. 15 pp. 70-71). This is further clarified by Dr. Schechter's explanation of what is involved in a vaginoplasty for gender-affirming surgery: "The typical procedure involves formation of a vulva and associated structures, meaning clitoris and labia, removal of the penis and testicles, most often construction of a vaginal canal." (Ex. 15 p. 127). In such surgeries, tissue from the penis is used to construct the vaginal canal, labia and clitoris. (Ex. 15 pp. 128-129). It is clear from this description that this is not a comparable procedure or service that a cisgender individual would receive. Similarly, there is not simply one

uniform mastectomy procedure for all purposes. According to Dr. Schechter, "[t]here is a wide range of indications or techniques used to perform mastectomy, whether for gender-affirming mastectomy or for a mastectomy pertaining to oncologic reasons or for risk reduction mastectomies, meaning removing a breast that is not cancerous but may have an increased predilection or risk of breast. There are different ways to perform that mastectomy, so as to how it would be performed compared to a gender affirming mastectomy, again, would depend upon the specific situation." (Ex. 15 pp. 155-156).[6] Plaintiffs have no evidence that transgender individuals with breast cancer have been denied coverage for treatments. (Ex. 15 pp. 67-69). Therefore, for purposes of comparing coverage for gender-confirming surgery, there simply is no similarly situated group to use as a comparator. Without a similarly situated group, Plaintiffs cannot demonstrate that they have been denied equal protection.

Furthermore, even if Plaintiffs can demonstrate different treatment, there is no evidence of intention on the part of Secretary Crouch or Commissioner Beane to discriminate against Plaintiffs. First, the policies simply do not discriminate based on sex or transgender identity. The facts show that "[t]ranssexual surgery" has been included among Medicaid's non-covered services going back to at least 2004, possibly earlier. (Ex. 1 p. 140; Chapter 100, p. 1). This predated Secretary Crouch's appointment as Secretary in 2017 and Commissioner Beane's selection as both acting Commissioner (2014) and Commissioner (2017). (Ex. 2 p. 12; Ex. 3 pp. 15-16). The policy has been maintained year-to-year without change, and CMS does not require coverage for this particular service. (Ex. 1 pp 140, 162).

---

[6] Similarly, Plaintiffs' expert Dr. Olson-Kennedy describes one such gender-confirming surgery as "masculinizing chest surgery." (Ex. 16 p. 130). Again, this is extremely distinct from a mastectomy that would be sought by a cisgender woman, to whom Plaintiffs seek to make a comparison for purposes of their equal protection claim.

Medicaid does not provide surgical coverage for any DSM-V diagnosis. (Ex. 17). Plaintiffs' rebuttal expert, Johanna Olson-Kennedy, M.D., stated that the clinical condition "is outlined in the DSM-V. That is the definition of gender dysphoria." (Ex. 16 pp. 52-53). The DSM-V is a diagnostic manual of psychiatric conditions and their diagnostic criteria. (Ex. 16 p. 105). Indeed, Plaintiffs' expert, Dan Karasic, M.D., testified that there are no other DSM-V diagnoses that are treated surgically. (Ex. 8 p. 137). If the gender-confirming surgeries were to be covered for a diagnosis of gender dysphoria, it would be the only covered surgery based on a DSM-V diagnosis. Dr. Olson-Kennedy suggested that a comparable procedure for a cisgender woman would be a procedure to treat distress caused from failure to develop breasts such that their chest is not identifiable as an adult female chest, known as hypomastia. (Ex. 16 pp. 139-140). Medicaid does not cover surgery for hypomastia, regardless of gender identity. (Ex. 17). Medicaid does not cover surgery for gynecomastia based solely on psychosocial symptoms. (Ex. 17). Medicaid's coverage for mastectomies based upon some clinical conditions, but not others, is not unlawful discrimination, because, as Dr. Schechter testified, the procedures are not the same. There are no comparable covered procedures, and, thus, there is no basis to find intentional discrimination.

## 2.     The Classification Survives Rational Basis Review.

Equal Protection Clause challenges based on sex are subject to intermediate scrutiny. *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010). However, this does not apply to the classification at issue. Though Plaintiffs have a transgender identity, it is not this identity upon which the difference in coverage is based. Instead, it is related to the specific services sought. The "classification" is not directed at individuals at all, but a specific procedure. It potentially affects only individuals who share a DSM-V diagnosis of gender dysphoria and seek specific surgical care for that diagnosis. Such a classification is not a suspect or quasi-suspect class; therefore, rational

basis review applies, which cannot be overcome in this case. As one District Court concluded, a policy that "discriminates against some natal females but not all . . . is not, on its face, discrimination on the basis of sex." *Toomey v. Arizon*a, 2020 U.S. Dist. LEXIS 224159, *13 (U.S.D.C. D. Ariz. Nov. 30, 2020). Likewise, a policy that affects some, but not all, transgender individuals, is not discrimination on the basis of sex or transgender identity. *Id.* at *14 ("the Plan exclusion [for 'gender reassignment surgery'] is not facially discriminatory against all transgender individuals.") (additional citations omitted); *Lange v. Houston Cty., Georgia*, 499 F. Supp. 3d 1258 (M.D. Ga. 2020) (healthcare plan exclusion for "sex change surgery" facially neutral for purposes of the Equal Protection Clause under analysis in *Geduldig v. Aiello*, 417 U.S. 484 (1974)).

If a law "neither burdens a fundamental right nor targets a suspect class," it will be upheld so long as it bears a rational relation to some legitimate end. *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627 (1996). It is Plaintiffs' burden "to negate every conceivable basis which might support" the alleged unequal treatment, and Defendants have "no obligation to produce evidence to support the rationality of the [classification], which may be based on rational speculation unsupported by any evidence or empirical data." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citation omitted). The policy complained of by the Plaintiffs is rationally related to the State's interests in providing coverage consistent with what is required by CMS and in conserving financial resources available to the Medicaid program for the benefit of providing services to its members on an ongoing basis. Thus, the rational basis test has been satisfied.

### 3.    The Classification Serves An Important Governmental Purpose.

Even if intermediate scrutiny were applied, the classification is not unlawful. Intermediate scrutiny requires "a reasonable fit between the challenged regulation and a substantial governmental objective." *Md. Shall Issue, Inc. v. Hogan*, 2021 U.S. Dist. LEXIS 159168, *33-34

(D. Md. Aug. 23, 2021) quoting *U.S. v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (citations omitted). Intermediate scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.'" *Id.* at *34, quoting *U.S. v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (citation omitted).

Medicaid includes gender-confirming surgery among a list of non-covered services because Medicaid cannot cover everything that is medically necessary. (Ex. 3 pp. 168-169). Its governmental purpose is to provide coverage consistent with what is required by CMS and to conserve financial resources available to the Medicaid program for the benefit of providing services to its members on an ongoing basis. Medicaid's means are substantially related to important purposes because Medicaid cannot add additional covered services without potentially jeopardizing coverage for existing services on an ongoing basis. Medicaid is projected to have budget deficits within two years and is only allocated so many funds by the State Legislature. (Ex. 3 179; Ex. 1 p. 163). This creates a limit to what Medicaid can cover because it has to be able to pay for existing coverages on an ongoing basis as well as any services added to existing coverages. (Ex. 1 p. 163-164). Medicaid must look at costs in the current year as well as a six-year projection to see if coverage can be maintained and is not adding new services at this time without further appropriation from the Legislature due to cost concerns. (Ex. 12 p. 53). Thus, even under intermediate scrutiny, the classification must be upheld.

**B.      Defendants have not violated Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.**

In Count II, Plaintiffs seek declaratory and injunctive relief against all Defendants and compensatory damages against Medicaid for violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116. That section states:

> Except as otherwise provided for in this title … an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 …, title IX of the Education Amendments of 1972 …, the Age Discrimination Act of 1975 …, or section 504 of the Rehabilitation Act of 1973 …, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. §18116(a).

Plaintiffs allege that Defendants have drawn a classification that discriminates against Plaintiffs based on sex. However, historically in terms of Title IX jurisprudence, the term "sex" referred to the binary sex of male and female, and "gender identity" was understood as a distinct concept. The express language of Title IX indicates Congress's binary definition of "sex." *See* 20 U.S.C. § 1681 (referring to "students of one sex," "both sexes," "students of the other sex").[7] Plaintiffs do not allege classification based upon binary sex and therefore state no claim that has been recognized by the Supreme Court in the Title IX context.

Plaintiffs assert that, for purposes of the ACA, the term "sex" includes "gender identity." Even understood in this light, as set forth above in this memorandum, the Defendants have not drawn a classification that discriminates based on gender identity. *See Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1045 (D. Ariz. 2021) (*aff'd by Doe v. Snyder*, 2022 U.S. App. LEXIS 6217 (9th Cir. Mar. 10, 2022) (Plaintiff unlikely to succeed on claim under Section 1557 where the challenged policy "only excludes gender reassignment *surgery*—it does not exclude coverage for other treatments for gender dysphoria such as hormone therapy")(emphasis in original). As the

---

[7] When interpreting a statute, courts look to its ordinary meaning at the time it was enacted. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009).

Supreme Court has explained, "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs." *Alexander v. Choate*, 469 U.S. 287, 303 (1985). Instead, the benefit provided by Medicaid "remains the individual services offered[.]" *Id.* Medicaid does not classify coverage based on transgender identity. Instead, it has designated certain services as non-covered services. The ACA and the rules implementing it have never required Medicaid to cover any particular procedure or treatment for transition-related care, and did not prevent Medicaid from applying neutral standards that govern the circumstances in which it will offer coverage to all its enrollees.

## C.    Defendants Have Not Violated the Medicaid Act's Availability Requirements.

In Count III, Plaintiffs seek declaratory and injunctive relief against Defendants Crouch and Beane for violation of the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A). Plaintiffs allege that the "categorical Exclusions maintained and enforced by Defendants Crouch and Beane eliminate mandatory Medicaid coverage of medically necessary services and render them unavailable to Plaintiffs Fain, Anderson, and members of the proposed Medicaid Class, thereby violating Medicaid's availability requirement, 42 U.S.C. § 1396a(a)(10)(A) ...." (ECF 140, ¶ 191). Plaintiffs' claim for violation of the Medicaid Act's availability requirement fails as a matter of law.

The Medicaid Act states, in relevant part, "[a] State plan for medical assistance must … (10) provide—(A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a) [42 USCS § 1396d(a)] …." 42 U.S.C. § 1396a(a)(10)(A). Plaintiffs' Amended Complaint does not identify under which provision of Section 1396d gender-affirming surgery allegedly falls. Regardless, "nothing in the statute suggests that participating States are required to fund every medical

procedure that falls within the delineated categories of medical care." *Beal v. Doe*, 432 U.S. 438, 444, 97 S. Ct. 2366, 53 L. Ed. 2d 464 (1977). "Indeed, the statute expressly provides: 'A State plan for medical assistance must… include reasonable standards… for determining eligibility for and the extent of medical assistance under the plan which… are consistent with the objectives of this [Title]….' 42 U.S.C. § 1396a (a)(17) (1970 ed., Supp. V)." *Id.*[8]

The Supreme Court's decision in *Beal* is consistent with the Medicaid Act's accompanying regulations. HHS regulations implement the statutory requirements of "Section 1902(a)(10), regarding comparability of services for groups of beneficiaries, and the amount, duration, and scope of services described in section 1905(a) of the Act that the State plan must provide for beneficiaries[.]" 42 C.F.R. § 440.200(a)(1). The regulations set forth the criteria for availability:

> (a) The plan must specify the amount, duration, and scope of each service that it provides for—
>> (1) The categorically needy; and
>> (2) Each covered group of medically needy.
> (b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.
> (c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition.
> (d) **The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.**

42 C.F.R. § 440.230 (emphasis added). Thus, it is clear that the regulations permit a State Medicaid plan to place limits on services even if those services are required to be covered. *See Casillas v. Daines*, 580 F. Supp. 2d 235, 245-46 (S.D.N.Y. 2008) ("Thus, in the Secretary's view, § 1396a(a), permits a state plan to place 'appropriate limits' upon a 'service' regardless of an individual medical doctor's view of the appropriateness of the categorical limitation.").

---

[8] This language appears in the current version of 42 U.S.C. § 1396a(a)(17), though additional language has been added to this section of the statute.

Here, however, Plaintiffs have not demonstrated that gender-affirming care is a service that is required to be covered under the Medicaid Act. Required services are defined under 42 C.F.R. §§ 440.210 and 440.220.[9] "A State plan must specify that . . . categorically needy beneficiaries are furnished the following services: (1) The services defined in §§ 440.10 through 440.50, 440.70 …." 42 C.F.R. § 440.210(a)(1). Sections 440.10 through 440.50 and 440.70 describe the following services: inpatient hospital services; outpatient hospital and rural health clinic services; other laboratory and X-ray services; nursing facility services; physicians' services and medical and surgical services of a dentist; and home health services. 42 C.F.R. §§ 440.10 – 440.50, 440.70. The Amended Complaint appears to claim that any State plan deeming any service as non-covered violates the Medicaid Act's availability requirement, and it contains no allegation identifying under which regulation gender-affirming care allegedly falls. Because gender-affirming surgery is not a mandatory service under the Medicaid Act and its accompanying regulations, it is an optional service. "Any of the services defined in subpart A of this part that are not required under §§ 440.210 and 440.220 may be furnished under the State plan at the State's option." 42 C.F.R. § 440.225. Defendants have chosen to not furnish coverage for gender-affirming surgery to the State's beneficiaries as is permitted under the Medicaid Act and its accompanying regulations.

Thus, Plaintiffs' claim for alleged violation of the Medicaid Act's availability requirements fails as a matter of law because Plaintiffs have failed to demonstrate that gender-affirming care is a mandatory covered service. CMS does not require coverage for gender-affirming surgery. (Ex. 1 p. 140). Based upon the absence of any notification from CMS to the contrary, Medicaid understands that the policy which designates gender-confirming surgery as non-covered complies

---

[9] Section 440.220 applies to beneficiaries who are "medically needy" rather than "categorically needy" individuals. Plaintiffs Fain and Anderson are expansion members and both in the categorically needy coverage group; therefore, Defendants will only analyze the requirements under § 440.210.

with applicable laws, including the Medicaid Act's availability requirements. (Ex. 1 p. 143). Indeed, CMS has approved the State plan that lists gender-affirming surgery as a non-covered service. (Ex. 1 pp. 161-62). Therefore, Plaintiff's claim fails as a matter of law, and Defendants are entitled to summary judgment.

Even if gender-affirming care falls into one of the mandatory covered service categories, State plans are permitted to place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures. 42 C.F.R. § 440.230(d). The Supreme Court has described the availability requirements of the Medicaid Act as follows:

> But Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. Instead, the benefit provided through Medicaid is a particular package of health care services… That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered – not "adequate health care."
> The federal Medicaid Act makes this point clear. The Act gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in "the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

*Alexander v. Choate*, 469 U.S. 287, 303 (1985). Numerous courts, consistent with *Choate*, have held that states retain broad discretion to determine the extent of medical assistance offered in their Medicaid programs. *See Mennonite Gen. Hosp. v. Molina Healthcare of P. R.*, 319 F. Supp. 3d 587, 591 (D.P.R. 2018) ("The Medicaid Act 'confers broad discretion on the States to adopt standards for determining the extent of medical assistance' offered in their Medicaid programs. Medicaid regulations explicitly allow states to 'place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.'") (internal citations omitted); *DeSario v. Thomas*, 139 F.3d 80, 96 (2nd Cir. 1998) ("[W]e reject as baseless and unworkable the view … that a state must cover all medically necessary services.") (citations omitted).

In the instant case, Medicaid has exercised its discretion and chosen the proper mix of amount, scope, and duration limitations on coverage for gender-affirming care, which includes coverage for psychiatric diagnostic evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work as treatment related to gender-confirming care. Medicaid has determined that providing such coverage while maintaining gender-affirming surgery as a non-covered service is in the best interests of the recipients based, in part, on considerations such as medical necessity and on utilization management considerations such budgetary constraints. Medicaid does not, and cannot, cover everything that is medically necessary for its members, and Medicaid is unable to add gender-confirming surgery to its covered services due to budgetary constraints. Additionally, medical necessity of gender-affirming surgery is still being debated[10], is not settled science,[11] and the assumption of such carries significant risks.[12]

Therefore, the Medicaid Act's availability requirements do not mandate coverage for gender-affirming care. To the contrary, because the Medicaid Act does not mandate coverage, gender-affirming surgery is an optional service that may be provided to Medicaid recipients but is

---

[10] *See generally* Ex. 11; Ex. 18.

[11] R. Branstrom & J.E. Pachankis, "Correction to Branstrom and Pachankis," *Am. J. Psychiatry*, 177:8, August 2020 ("Upon request, the authors reanalyzed the data to compare outcomes between individuals diagnosed with gender incongruence who had received gender-affirming surgical treatments and those diagnosed with gender incongruence who had not. … the results demonstrated no advantage of surgery …."); CMS Decision Memo, Gender Dysphoria and Gender Reassignment Surgery, Aug. 30, 2016 ("While we are not issuing a [national coverage decision], CMS encourages robust clinical studies that will fill the evidence gaps and help inform which patients are most likely to achieve improved health outcomes with gender reassignment surgery, which types of surgery are most appropriate, and what types of physician criteria and care setting(s) are needed to ensure that patients achieve improved health outcomes.").

[12] L. Littman, "Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners," *Archives of Sexual Behavior* 50:3353-3369, Oct. 2021 ("The majority (55.0%) felt that they did not receive an adequate evaluation from a doctor or mental health professional before starting transition and only 24.0% of respondents informed their clinicians that they had detransitioned. There are many different reasons and experiences leading to detransition. More research is needed to understand this population, determine the prevalence of detransition as an outcome of transition, meet the medical and psychological needs of this population, and better inform the process of evaluation and counseling prior to transition.").

not required. To the extent gender-affirming care falls into a category of mandatory coverage, Defendants have permissibly exercised their discretion and chosen the proper mix of amount, scope, and duration limitations on coverage for gender-affirming care in the best interests of the recipients based, in part, on considerations such as medical necessity and on utilization management considerations such budgetary constraints. Therefore, Plaintiffs' claim fails as a matter of law, and Defendants are entitled to summary judgment.

**D.      Defendants Have Not Violated the Medicaid Act's Comparability Requirements.**

Count IV seeks declaratory and injunctive relief against Defendants Crouch and Beane for violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B). Plaintiffs allege that the "categorical Exclusions maintained and enforced by Defendants Crouch and Beane, and the denial of medically necessary services and treatments to Plaintiffs Fain, Anderson, and members of the proposed Medicaid Class, while the same or similar services and treatments are covered for cisgender Medicaid beneficiaries, violates the comparability requirement, 42 U.S.C. § 1396a(a)(10)(B) …." Am. Compl. ¶ 195. Plaintiffs' claim for violation of the Medicaid Act's comparability requirement fails as a matter of law.

The Medicaid Act states, in relevant part,

> [a] State plan for medical assistance must … (10) provide … (B) that the medical assistance made available to any individual described in subparagraph (A)—
>> (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
>> (ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A)[.]

42 U.S.C. § 1396a(a)(10)(B). Like the availability requirements, the comparability requirements of the Medicaid Act also have accompanying regulations:

> Except as limited in § 440.250—

> (a) The plan must provide that the services available to any categorically needy beneficiary under the plan are not less in amount, duration, and scope than those services available to a medically needy beneficiary; and
>
> (b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all beneficiaries within the group:
>
> > (1) The categorically needy.
> >
> > (2) A covered medically needy group.

42 C.F.R. § 440.240. Thus, the plain language of the regulations prohibits three types of discrimination: (1) against the categorically needy, (2) among the categorically needy, and (3) among the medically needy. *See Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) ("Under the Act, states must provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted).").

Here, Plaintiffs allege that Defendants violate the comparability requirements, presumably by discriminating among the categorically needy, because Defendants do not provide coverage for gender-affirming surgery "while the same or similar services and treatments are covered for cisgender Medicaid beneficiaries." Defendants do not cover gender-affirming surgeries for cisgender Medicaid beneficiaries; thus, Defendants assume that Plaintiffs are alleging that, because Defendants do provide coverage for mastectomy for patients with breast cancer, Medicaid is required to provide coverage for mastectomy for any and all diagnoses, including gender dysphoria. This allegation is not discrimination among categorically needy beneficiaries. Indeed, Plaintiffs have provided no evidence that mastectomy for breast cancer has been denied to any transgender individual. Rather, in Plaintiffs' view, any treatment that is reimbursable for one diagnosis must be a reimbursable treatment for a different diagnosis if it were deemed by the patient's doctor to be a medical necessity.

This argument was advanced and rejected in *Rodriguez v. City of New York*, 197 F.3d 611, 615-16 (2nd Cir. 1999). There, the plaintiffs brought suit against Medicaid providers on the grounds that the providers reimbursed certain in-home personal care services but did not reimburse safety monitoring for individuals who suffered from mental disabilities. *Id.* at 613-14. The Court described the plaintiffs' argument as follows:

> [T]hey claim that, because safety monitoring is "comparable" to the … services already provided … the failure to provide such monitoring violates Section 1396a(a)(10)(B). [They] attempt to graft a new requirement on this Section: If two different benefits are "comparable" and one is provided, the other must be as well.

*Id.* at 615-16 (internal citation omitted). Rejecting the plaintiffs' argument, the Court stated,

> However, **Section 1396a(a)(10)(B) does not require a state to fund a benefit that it currently provides to no one. Its only proper application is in situations where the same benefit is funded for some recipients but not others.** A holding to the contrary would both substantially narrow the "broad discretion" the Medicaid Act confers "on the States to adopt standards for determining the extent of medical assistance," and create a disincentive for states to provide services optional under federal law lest a court deem other services "comparable" to those provided -- an elastic concept -- thereby increasing the costs of the optional services. The Act therefore "requires only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." Appellants' decision to distinguish between safety monitoring and other tasks thus does not implicate Section 1396a(a)(10)(B).

*Id.* at 616 (internal citations omitted). This same reasoning was later applied to gender-affirming surgeries in *Casillas v. Daines*, 580 F. Supp. 2d 235 (S.D.N.Y. 2008). There, the plaintiff argued that, "because a mastectomy is an indicated and reimbursable treatment for breast cancer, then a female-to-male transsexual with a diagnosis of [gender identity disorder] would be entitled to reimbursement for the same treatment." *Id.* at 244. Rejecting the plaintiff's argument and adopting *Rodriguez*, the Court stated,

> The *Rodriguez* Court went on to describe the "comparable" concept urged by the plaintiff in that case as "an elastic concept" that would provide a disincentive to providing optional services that later may be found "comparable" with some other service. A similar disincentive would be created by the rule urged in this case because the state would have to consider other possible diagnoses for which the

treatment might be prescribed before deciding whether to make it available for any single condition.

If Congress had intended to compel a state to provide a treatment for all diagnoses if the treatment were provided for any diagnosis, one would have expected it to have done so in clear language.

*Id.* at 245 (internal citation omitted).

In the instant case, taken to its logical conclusion, acceptance of Plaintiffs' argument would mean that, if Medicaid covers mastectomy for a diagnosis of breast cancer, then it must cover any type of mastectomy for any member for any reason. This clearly is not what is meant by the comparability requirement, and it would be impossible for Medicaid to differentiate between any type of mastectomy without facing a potential claim. As Plaintiffs' expert has testified, there is a wide range of indications and techniques for mastectomy. (Ex. 15 pp. 155-156). Coverage for one indication does not require coverage for another. Rather, the comparability requirements prohibit the provision of an identical service to one group to the exclusion of another. Plaintiffs have provided no evidence that any transgender individual, including and especially Plaintiffs, has been denied coverage for an identical service provided to a cisgender beneficiary. Therefore, Plaintiffs' claim fails as a matter of law, and Defendants are entitled to summary judgment.

**E.      Plaintiffs Have No Standing.**

In order to establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *South Carolina v. U.S.*, 912 F.3d 720, 726 (4th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Alleged injury must be "palpable and imminent," otherwise, it is too speculative. *Id.* (citing *Beck v. McDonald*, 848 F.3d 262, 271 (4th

Cir. 2017)) (citation omitted). Here, Plaintiffs have failed to establish standing because neither has suffered an injury in fact. Neither has submitted a claim for and been denied gender-affirming care by Medicaid. Neither has submitted a claim for gender-affirming surgery. Mr. Fain testified that he is not willing to undergo surgery until he has kicked his smoking habit, which has not yet occurred. Ms. Anderson has never had a treating physician find that she requires gender-affirming surgery to treat her gender dysphoria. Thus, neither Plaintiff has established a concrete and particularized injury that is actual or imminent. Therefore, both Plaintiffs lack standing, and Defendants are entitled to summary judgment.

## IV. CONCLUSION

Because Plaintiffs have failed to prove that Defendants have engaged in discrimination against them, or violated either the ACA or the Medicaid Act, and because all of the genuine material facts in the light most favorable to the Plaintiffs cannot support Plaintiffs' case, Defendants request judgment in their favor as a matter of law.

<div style="margin-left: 40%;">

**WILLIAM CROUCH, CYNTHIA BEANE, and
WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,
BUREAU FOR MEDICAL SERVICES,
By counsel**

</div>

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**CHRISTOPHER FAIN** and **SHAUNTAE ANDERSON;** individually and on behalf of all others similarly situated,

<div style="margin-left: 2em;">*Plaintiffs,*</div>

v.

**WILLIAM CROUCH,** in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; **CYNTHIA BEANE,** in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; and **WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,**

<div style="margin-left: 2em;">*Defendants.*</div>

**Civil Action No. 3:20-cv-00740**
**Hon. Robert C. Chambers, Judge**

## <u>CERTIFICATE OF SERVICE</u>

Now come Defendants William Crouch, Cynthia Beane and West Virginia Department of Health and Human Resources Bureau for Medical Services, by counsel, and do hereby certify that on the 31st day of May, 2022, a true and exact copy of **"MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT"** was served on counsel via electronic means as follows:

Walt Auvil (WVSB#190)
*Counsel for Plaintiffs*
The Employment Law Center, PLLC
1208 Market Street
Parkersburg, WV 26101-4323
(304) 485-3058
(304) 485-6344 (fax)
auvil@theemploymentlawcenter.com

Tara L. Borelli, Visiting Attorney
*Counsel for Plaintiffs*
Lambda Legal Defense and Education Fund, Inc.
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
tborelli@lambdalegal.org

Sasha Buchert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund, Inc.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
(202) 429-9574 (fax)
sbuchert@lambdalegal.org

Avatara Smith-Carrington, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund, Inc.
3500 Oak Lawn Avenue, Suite 500
Dallas Texas 75219-6722
(214) 219-8585
(214) 219-4455 (fax)
asmithcarrington@lambdalegal.org

Nora Huppert, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund, Inc.
65 E. Wacker Pl, Suite 2000
Chicago, IL 60601
(312) 663-4413
(312) 663-4307
nhuppert@lambdalegal.org

Carl. S. Charles, Visiting Attorney
***Counsel for Plaintiffs***
Lambda Legal Defense and Education Fund, Inc.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308
(470) 225-5341
(404) 897-1884 (fax)
ccharles@lamdalegal.org

Anna P. Prakash, Visiting Attorney
Nicole J. Schladt, Visiting Attorney
***Counsel for Plaintiffs***
Nichols Kaster, PLLP
IDS Center, 80 South 8th Street
Suite 4600
Minneapolis, MN 55402
(612) 256-3200
(612) 338-4878 (fax)
aprakash@nka.com
nschladt@nka.com

/s/ Kimberly M. Bandy
Lou Ann S. Cyrus, Esquire (WVSB #6558)
Roberta F. Green, Esquire (WVSB #6598)
Caleb B. David, Esquire (WVSB #12732)
Kimberly M. Bandy, Esquire (WVSB #10081)
***Counsel for William Crouch, Cynthia Beane, and West Virginia Department of Health and Human Resources, Bureau for Medical Services***
Shuman McCuskey Slicer PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
lcyrus@shumanlaw.com
rgreen@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com