# Exhibit B

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                    HUNTINGTON DIVISION

4    ----------------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7                    Plaintiffs,

8       vs.                      CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10                    Defendants.

11   ----------------------------------------------------------

12

13

14      REMOTE VIDEOTAPED DEPOSITION OF DR. STEPHEN LEVINE

15

16

17

18   DATE:   April 27, 2022

19   TIME:   8:00 a.m. CST

20   PLACE:  Veritext Virtual Videoconference

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5176996

Page 2

1                      APPEARANCES

2

3   On Behalf of the Plaintiffs (Via Videoconference):

4          TARA L. BORELLI, ESQ.

5          Lambda Legal Defense and Education Fund, Inc.

6          158 West Ponce De Leon Ave., Suite 105

7          Decatur, Georgia  30030

8          470.225.5341

9          tborelli@lambdalegal.org

10

11         AVATARA SMITH-CARRINGTON, ESQ.

12         NICHOLAS GUILLORY, ESQ.

13         Lambda Legal Defense and Education Fund, Inc.

14         3500 Oak Lawn Avenue, Suite 500

15         Dallas, Texas  75219

16         214.219.8585

17         asmithcarrington@lambdalegal.org

18         nguillory@lambdalegal.org

19

20         CARL CHARLES, ESQ.

21         Lambda Legal Defense and Education Fund, Inc.

22         158 West Ponce De Leon Avenue, Suite 105

23         Atlanta, Georgia  30030

24         212.809.8585

25         ccharles@lambdalegal.org

```
                                              Page  3

1        WALT AUVIL, ESQ.

2        The Employment Law Center, PLLC

3        1208 Market Street

4        Parkersburg, West Virginia  26101

5        304.485.3058

6        auvil@theemploymentlawcenter.com

7

8   On Behalf of Defendants William Crouch; Cynthia Beane;

9   and West Virginia Department of Health and Human

10  Resources, Bureau for Medical Services (Via

11  Videoconference):

12       KIMBERLY M. BANDY, ESQ.

13       LOU ANN S. CYRUS, ESQ.

14       CALEB B. DAVID, ESQ.

15       Shuman McCuskey Slicer, PLLC

16       1411 Virginia Street East, Suite 200

17       Charleston, West Virginia  25301

18       304.345.1400

19       kbandy@shumanlaw.com

20       lcyrus@shumanlaw.com

21       cdavid@shumanlaw.com

22

23  ALSO PRESENT:  Kraig Hildahl, Videographer

24                      (Via Videoconference)

25
```

```
                                                    Page 4

 1                        INDEX

 2

 3

 4   WITNESS:  DR. STEPHEN LEVINE                        PAGE

 5

 6

 7

 8   EXAMINATION BY MR. CHARLES......................... 10

 9   AFTERNOON SESSION................................. 111

10   EXAMINATION BY MR. DAVID.......................... 229

11

12

13

14

15   OBJECTIONS... 14, 71, 73, 85, 86, 91, 92, 93, 94, 119,

16   133, 134, 163, 231, 232, 233, 235, 238, 239, 240

17

18

19

20

21   EXHIBITS MARKED AND REFERRED TO:

22

23   Exhibit 1    Expert Disclosure Report of Dr.

24                Stephen B. Levine, M.D................. 18

25
```

Page 5

1    Exhibit 2     Curriculum Vitae...................... 20

2

3    Exhibit 3     BPJ vs. West Virginia State Board of

4                  Education, et al Deposition of

5                  Stephen Levine, Volume I, 3/30/22...... 53

6

7    Exhibit 4     Special Programs...................... 64

8

9    Exhibit 5     Kadel vs. Folwell, et al Deposition of

10                 Stephen B. Levine, M.D., 9/10/21....... 76

11

12   Exhibit 6     Case Western Health Care Coverage for

13                 Staff and Students.................... 88

14

15   Exhibit 7     Considering Sex as a Biological Variable

16                 in Basic and Clinical Studies: An

17                 Endocrine Society Scientific Statement.  97

18

19   Exhibit 8     Reflections on the Clinician's Role with

20                 Individuals Who Self-identify as

21                 Transgender Paper..................... 100

22

23   Exhibit 9     One Year Since Finland Broke with WPATH

24                 Standards of Care, 7/2/21............. 105

25

Page 6

1   Exhibit 10   International Clinical Practice Guidelines
2                for Gender Minority/Trans People:
3                Systematic Review and Quality Assessment
4                Article................................ 113
5

6   Exhibit 11   Dear Colleagues, Clients and Friends,
7                by Marci Bowers, M.D................... 125
8

9   Exhibit 12   Gender Dysphoria and Gender
10               Reassignment Surgery Article.......... 131
11

12  Exhibit 13   Canadian Gender Report................ 140
13

14  Exhibit 14   Detransition-Related Needs and Support: A
15               Cross-Sectional Online Survey Article.. 155
16

17  Exhibit 15   Individuals Treated for Gender Dysphoria
18               with Medical and/or Surgical Transition
19               Who Subsequently Detransitioned: A
20               Survey of 100 Detransitioners.......... 161
21

22  Exhibit 16   Endocrine Treatment of
23               Gender-Dysphoric/Gender-Incongruent
24               Persons: An Endocrine Society Clinical
25               Practice Guideline.................... 163

Page 7

1    Exhibit 17    Pediatric Obesity—Assessment, Treatment,

2                  and Prevention: An Endocrine Society

3                  Clinical Practice Guideline........... 177

4

5    Exhibit 18    26 Swedish Review Unavailable......... 189

6

7    Exhibit 19    Finnish Article...................... 189

8

9    Exhibit 20    Gender-Affirming Hormone in Children

10                 and Adolescents Blog Screen Shot....... 193

11

12   Exhibit 21    Gender-Affirming Hormone in Children

13                 and Adolescents Article, 2/25/19....... 194

14

15   Exhibit 22    Fain vs. Crouch, et al Deposition

16                 Transcript of Cynthia Beane, 3/29/22... 217

17

18   Exhibit 23    Transgender and Gender Diverse Children

19                 and Adolescents: Fact-Checking of AAP

20                 Policy................................ 221

21

22   Exhibit 24    A Follow-Up Study of Boys with Gender

23                 Identity Disorder Article............. 224

24

25

1   Exhibit 25    Gender Dysphoria in Childhood Article.. 227

2

3

4   (Original exhibits attached to original transcript.

5   Copies attached to transcript copies.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 26

1    of your career, right?

2        A.  Yes.

3        Q.  Okay.  You listed 23 separate pharmaceutical

4    company grants to study various pro-sexual medications,

5    right?

6        A.  Yes.

7        Q.  Were any of these 23 grants related to the

8    treatment of gender dysphoria in transgender people?

9        A.  No.

10       Q.  And were any of the grants related to the

11   treatment, any kind of treatment of prepubertal children

12   with gender dysphoria?

13       A.  No.

14       Q.  Or adolescents with gender dysphoria?

15       A.  No.

16       Q.  You also list in that same section in your

17   report, Dr. Levine, that you received a U.S. National

18   Institute of Health grant for the study of sexual

19   consequences of systemic lupus erythematosus and that

20   you were a co-principle investigator.  Does that ring a

21   bell, is that accurate?

22       A.  It is accurate.

23       Q.  Okay.  And did this grant have to do with the

24   study of anything related to gender dysphoria?

25       A.  No.

Page 28

1      A.   Only to the extent that the grant helped us to

2   set up the Center For Marital & Sexual Health.   The

3   Center For Marital & Sexual Health had a program called

4   the Case Western Reserve Gender Identity Clinic, and so

5   this was, this was not a grant for research, this was a

6   grant for the establishment, the administrative

7   establishment of our center that dealt with many sexual,

8   all sexual things including trans phenomenon.   We didn't

9   in those days call it so much trans phenomenon, but we

10  called it gender identity problems.

11     Q.   Right.   So one of the grants was used to start

12  the Center for Marital & Sexual Health, but those five

13  separate grants were not for the study or, or direct

14  treatment under the Sihler Mental Health Foundation?

15     A.   That's correct.

16     Q.   Okay.   But the Center For Marital & Sexual

17  Health, as a clinician there you saw a wide range of

18  patients there, right?

19     A.   Yes.

20     Q.   With a variety of problems related to sexuality

21  or sexual well-being?

22     A.   Yes.

23     Q.   Okay.   And did you treat any children with

24  gender dysphoria at the Center For Marital & Sexual

25  Health?

1      A.   If I can clarify your question, by you do you

2    mean me personally or do you mean under me as the

3    supervisor of people who did that?

4      Q.   Let's start with you personally.

5      A.   Yes, I have only on a rare occasion personally

6    treated or directly or indirectly treated a child.  My

7    center, however, over the years has, has seen children

8    and, and I've been involved in the, the treatment as a

9    supervisor of those children.

10     Q.   Okay.  So you've reviewed their cases by way of

11   your supervision of clinicians at the center, but not

12   individually?

13     A.   That's right.

14     Q.   Okay.  And is that the same for any adolescents

15   with gender dysphoria who were seen at the center?  In

16   the early years I'm talking about now, not in recent

17   times.

18     A.   Well, in the early years I occasionally saw

19   personally an older teenager, older adolescent, but in

20   the early years you must understand most of the patients

21   were adults.

22     Q.   Okay.  So to your knowledge, Dr. Levine, have

23   you received any grants to study the treatment -- I'm

24   sorry, excuse me.  Have you received any grants to study

25   treatment for adults with gender dysphoria?

Page 51

1    April 27, 2022.  We're going back on the record at

2    10:36 a.m.

3    BY MR. CHARLES:

4       Q.   Okay.  Dr. Levine, talking about your writing

5    credentials, you've testified previously that you were

6    involved in drafting portions of the WPATH standards of

7    care Version 5, right?

8       A.   Yes, I was the chairman of that group.

9       Q.   And besides that, have you developed -- let me

10   back up.  Have you helped to develop treatment

11   guidelines for the treatment of children or adolescents

12   with gender identity issues?

13      A.   If you mean have I been part of a national or

14   international group that tried to, to publish, that

15   published guidelines about the treatment of these

16   individuals, the answer is no.  But in my November of

17   2021 article I gave, I offered my opinions about what

18   the evaluation of adolescents and children ought to

19   consist of.  In that sense I'm hoping that would

20   influence the guidelines of those committees who might

21   function in the future.

22      Q.   I see.  When we spoke in September of 2021 for

23   the Kadel vs. Folwell deposition, you said that you were

24   working with SEGM to develop some treatment guidelines.

25   What, what happened to those?

1     Q.  Yes, Exhibit 01.

2     A.  Would you give me the pages again.

3     Q.  Sure, Page 2, Paragraph 3, so that will be the

4  top of Page 2, the paragraph does begin on Page 1.

5     A.  Yeah.

6     Q.  Okay.  So in that paragraph your report states

7  that, "During this era an occasional child was seen."

8  By this era do you mean from around 1974 to 1993?

9     A.  Yes.

10     Q.  Okay.  And by occasional do you mean infrequent?

11     A.  Infrequent is a good word.

12     Q.  So is it fair to say during that period your

13  clinic did not see many children with gender dysphoria?

14     A.  It's fair to say that.

15     Q.  And in your deposition on March 30th you

16  estimated that over the course of your career you've

17  probably only seen regularly six prepubertal children,

18  right?

19     A.  It's an estimate, yes.

20     Q.  And around 50 adolescents, give or take?

21     A.  Give or take an unknown number, yeah, ten, 12,

22  five.

23     Q.  Sorry, so you --

24     A.  I've had extensive experience talking to

25  adolescents over the course of my career, adolescents

Page 74

1   should do about the whole problem of insuring people

2   with this condition, I think it's beyond my expertise.

3          Given my medical knowledge and given my, what I

4   would like to say my knowledge of the literature, given

5   my knowledge of the patient, I recognize that there are

6   lots of possibilities and I think it would be a shame

7   for some people not to have access to that care and I

8   think even though it's a shame, it poses new

9   developmental challenges for the patient which they may,

10  may very well rise to the occasion and find some other

11  solution to their dilemma.

12     Q.  Okay.  So, so you're not offering an expert

13  opinion about what insurance should or should not cover

14  here?

15     A.  Yeah, I believe that that's the policy level

16  done at government level and insurance company level

17  having to do with all sorts of decisions that no doctor,

18  including Dr. Levine, has adequate background

19  information to make that determination.

20     Q.  But generally would it be fair to say you want

21  what is best for your patients?

22     A.  Yes, I do.

23     Q.  Even if they're not wealthy or affluent, right?

24     A.  Even if they're not wealthy or affluent or

25  insurance covered.

1      A.  I got it.

2      Q.  Oh, you can see it?

3      A.  I got it now.

4           MR. CHARLES:  So for the record, this is

5   Exhibit SL05, deposition of Stephen B. Levine on

6   September 10th, 2021 in the matter of Kadel, et al. vs.

7   Folwell.

8      Q.  And you, you said earlier today, Dr. Levine, you

9   remember giving this deposition last year?

10     A.  I did, I do.

11     Q.  Okay.  And if you'll just scroll to Page 2

12  there.  Actually, no, that's okay, Doctor, just leave it

13  open for a minute for me, if you would.  The page

14  numbers on this document are in the upper right-hand

15  corner.

16     A.  I see.

17     Q.  Okay.  So if you could please scroll to Page 51.

18     A.  Getting close, 50, 51, I'm there.

19     Q.  Okay.  So then down at line 14, it's about

20  halfway down the page, do you see that?  The page, I'm

21  sorry, the line numbers are on the left-hand side of the

22  page.

23     A.  I see it.

24     Q.  Okay.  So the question was, "And using that same

25  framing of regular, how many children, so under age 11?

Page 78

1    Answer, in the last year?  Question, yes, yes, in the

2    last year.  Answer, zero."  So I just wanted to refresh

3    your recollection of your testimony there and ask, have

4    you seen, like has that number changed in the last seven

5    months since you provided this testimony?

6        A.  No.

7        Q.  Okay.  Let's see.  And then on that same page,

8    Dr. Levine, at line 19, it begins, "How many

9    adolescents," do you see that?

10       A.  Yes.

11       Q.  Okay.  It says, "How many adolescents in regular

12   treatment for gender dysphoria would you approximate

13   you've seen in the last five years individually,

14   exclusive of your supervision of other clinicians?"  At

15   line 24, "Answer, if you ask me the question in the last

16   year, I would have told you five or six, but since

17   you've asked it as a five-year period, I'm at a loss to

18   tell you whether it's 12 or 15."  That's on the top of

19   Page 52, do you see that, Dr. Levine?

20       A.  I see it.

21       Q.  Okay.  So then has that -- so let me start

22   first, in September of '21 you said in the last year you

23   had seen about five or six adolescents, would that, has

24   that number changed in the last seven months?

25       A.  A little bit, yeah.

1      A.  Page 51.

2      Q.  Okay.  Can you please scroll to Page 55.

3      A.  I'm there.

4      Q.  Okay.  So at line 13 on Page 55, "Question,

5   okay, and I'm sorry, just by recent, when was the last

6   time you wrote a letter of authorization for a gender

7   affirming surgery for an adult?  Answer, probably

8   12 months ago."  So have you written a letter of

9   authorization for a gender affirming surgery in the last

10  seven months, Dr. Levine?

11     A.  I think the last letter -- you, I need to, I

12  need to help you qualify your question.  I have in the

13  last seven months given my, my approval to several

14  letters for bilateral mastectomies for members in Mass

15  at Framingham, the correctional institution in

16  Massachusetts.  I don't know if that would number two or

17  three, but since September the 10th I believe at least

18  two and possibly three letters.  I haven't personally

19  written the letter, but I am the consultant to a group

20  of team that approves such surgeries, and so the answer

21  to the question is yes.

22     Q.  Okay.  Thank you.  And to your recollection,

23  any, any such letter outside the, outside of that

24  context?

25     A.  Since September the 10th?

Page 85

1      Q.  That's correct, yes.

2      A.  Yes, I think the answer is that, no, but I

3  believe at our center someone else has written one

4  letter for bilateral mastectomies.

5      Q.  Okay.  Thank you.  Dr. Levine, are you familiar

6  with the, the exclusion for gender affirming surgical

7  care in the West Virginia Medicaid Program that's at

8  issue in this case?

9           MR. DAVID:  Objection to form.

10     Q.  You can answer.

11     A.  I'm vaguely familiar that surgical care is

12  excluded currently, but endocrine care is not excluded.

13     Q.  Have you reviewed any documents that, that show

14  that exclusion or was that information just communicated

15  to you by counsel?

16     A.  Verbally communicated.

17     Q.  Okay.  And so you're aware that there are

18  categorical exclusions, which means that the exclusions

19  prohibit surgical care related to the treatment of

20  gender dysphoria regardless of a West Virginia Medicaid

21  member's need for it or appropriateness for such

22  intervention?

23           MR. DAVID:  Objection to form.

24     Q.  Let me simplify my question.

25     A.  Thank you.

Page 86

1     Q.   The categorical, the exclusion does not

2   investigate or contemplate whether someone receiving

3   West Virginia Medicaid needs or is an appropriate

4   candidate for such intervention, it just prohibits it,

5   period?

6              MR. DAVID:   Objection to form.

7     A.   The categorical exclusion would include surgery

8   for teenagers and surgery for adults, so it would cover

9   removing the breasts or removing the scrotum of a

10  15-year-old who feels like --

11    Q.   Not my question, Dr. Levine.  Let me, let me

12  rephrase again.  The, the West Virginia Medicaid Program

13  and the exclusion it maintains, which excludes surgical

14  care for members for whom it is appropriate, it, it just

15  excludes it, you're, you're aware it just excludes it,

16  there's no, there's no conditional considerations or any

17  investigation done into the member's health at all, it

18  just, there's no coverage for that care, you understand

19  that?

20    A.   I, I --

21              MR. DAVID:   Objection to form.

22    A.   I think that's what categorical means, so I

23  think the answer is I understand that at the moment,

24  yes.

25    Q.   Okay.  But you don't view your testimony here in

Page 87

1    your expert report as being in support of that exclusion

2    or whether it should exist, right?

3        A.  Yeah, it's my understanding that, that the

4    lawyers who hired me wanted me to testify to the state

5    of science in this field, and, and so I have not been

6    involved with the legal questions, per se, or giving an

7    opinion about those matters.  As I sort of indicated to

8    you before, I don't really feel that the, my expertise

9    extends to how the insurance industry works and how

10   governments and legislatives works and so forth.  So I,

11   I think the answer to the question is that I'm not

12   considering myself to be expert on the question that

13   you're asking me.

14       Q.  Right.  So you're, you, you are an expert about

15   what your testimony is about though, right, and you're

16   saying your testimony is not about whether or not that

17   exclusion should exist?

18       A.  Yes, I'm not offering an opinion about pro or

19   con about that question.

20       Q.  I see.  Because you're, you're, as you say,

21   you're not a politician or a law maker?

22       A.  Or an insurance expert.

23       Q.  Right.  Or a public health expert, right?

24       A.  Well, I'm a little more ambivalent about public

25   health matters, yeah.  I'm not as, I'm not, I really

Page 88

1   think that public health is the issue here and so I, I

2   don't want to say I'm not an expert.  I'm not an expert

3   in public health, but I do have opinions about the

4   long-term public health of people who are prematurely

5   having their bodies changed because I do think this has

6   public health implications for the future of each of

7   these, these adolescence children and young adults.

8       Q.  Understood.

9       A.  And adults as well.

10      Q.  And you, generally speaking, don't advocate to

11  deny all forms of medical intervention to people with

12  gender dysphoria though, right?

13      A.  That's right.

14      Q.  Okay.  I'm going to introduce another exhibit,

15  Dr. Levine, give me just a moment.

16              (Exhibit 6 marked for identification.)

17      Q.  Okay.  It should be now or shortly visible, you

18  might need to refresh.

19      A.  I now have Exhibit 6 here.

20      Q.  Okay.

21              MR. CHARLES:  So I'm showing Dr. Levine

22  what has been marked as SL06.

23      Q.  Dr. Levine, this is a short document, please

24  just take a minute and scroll through it.

25      A.  Okay, I, I've scrolled.

Page 106

1                    (A break was taken at 11:33 a.m.)

2                    VIDEO TECHNICIAN:  We're going back on the

3        record at 12:34 p.m.

4                    MR. CHARLES:  Okay.  So I'm showing Dr.

5        Levine what has been marked as SL09, an article from

6        Society for Evidence Based Gender Medicine entitled,

7        "One year since Finland broke with WPATH standards of

8        care."

9        BY MR. CHARLES:

10           Q.  Dr. Levine, do you see the date of publication

11       in the left corner of that first page?

12           A.  July 2nd.

13           Q.  And, and the year is 2021, right?

14           A.  Yes.

15           Q.  So looking at the first paragraph there, I'm

16       just going to read that, "A year ago the Finnish Health

17       Authority (PALKO/COHERE) deviated from WPATH standards

18       of care 7 by issuing new guidelines that state that

19       psychotherapy rather than puberty blockers and cross sex

20       hormones should be a first line treatment for gender

21       dysphoric youth.  This change occurred following a

22       systematic evidence review which found a body of

23       evidence for pediatric transition inconclusive."

24                    And then the next paragraph, the first sentence,

25       "Although pediatric medical transition is still allowed

1    in Finland, the guidelines urge caution given the

2    unclear nature of the benefits and the interventions,

3    largely reserving puberty blockers and cross sex

4    hormones for minors with early onset gender dysphoria

5    and no co-occurring mental health conditions."  Did I

6    read that correctly?

7         A.   Yes, you did.

8         Q.   Okay.  So as this article states, medical

9    interventions are still available in Finland for youth

10   experiencing gender dysphoria, right?

11        A.   On a case-by-case basis I think.

12        Q.   And --

13        A.   I should say on a case-by-case basis and two

14   research centers as opposed to in any practitioner's

15   office throughout the country.

16        Q.   Right.  But it's, it's not been completely

17   prohibited is what I'm asking?

18        A.   Oh, it's been, it's been, the brakes have been

19   put on.

20        Q.   But it's not been completely prohibited is what

21   I'm asking?

22        A.   That's what you and I have agreed on, yes.

23        Q.   So it's not been completely prohibited, right?

24        A.   Right.

25        Q.   So then in the third paragraph beginning with,

1    "The qualifying criteria for gender reassignment of

2    youth articulated in the 2020 Finnish treatment

3    guidelines are consistent with the original Dutch

4    protocol, but represent a significant tightening of the

5    more recent practices promoted by WPATH."  So the

6    article describes it as a tightening of the standards

7    which WPATH allows for, right?

8        A.  Yes.

9        Q.  So you, you've talked about in your report an

10   idea of rapid affirmation treatment where you allege

11   that diagnoses of gender dysphoria are being made in an

12   hour and then, and then prescriptions provided for

13   medical interventions, right?

14       A.  Yes.

15       Q.  Do you have, or I should say, your evidence for

16   that is anecdotal in nature, right?

17       A.  My evidence for that is what has been told to me

18   by parents, what has been told to me by patients and

19   what this, what the third paragraph of this document

20   says.

21       Q.  Right.  So --

22       A.  So I don't really think the answer is simply

23   anecdotal, it's based upon a considerable consistent

24   range of, of experiences, both of my personal

25   experiences, of my patient's personal experiences, and

1    paragraph -- actually, hang on a second.  Dr. Levine,

2    let's go ahead and go to Page 26 of your report,

3    Exhibit 1.

4         A.  Okay.  Let me, I have to scroll back.  Did you

5    say page or Paragraph 26?

6         Q.  That would be Page 26.

7         A.  Okay, I'm on Page 26.

8         Q.  Okay.  Okay.  So, Dr. Levine, you've testified

9    previously that you generally provide care along some of

10   the same guidelines as WPATH, right?

11        A.  In a general way, sure.

12        Q.  And the difference from your view is that you

13   require psychotherapy for some not necessarily

14   predetermined length of time for patients that you see

15   before you will authorize any kind of like medical

16   intervention, right?

17        A.  I don't want to answer that question right or

18   wrong because embedded in the question is the word

19   psychotherapy and I don't know what you understand by

20   psychotherapy, I mean, you're a lawyer and I'm a

21   practitioner of psychotherapy.  And I think when a

22   lawyer uses psychotherapy it is a certain concept about

23   I'm trying to achieve a certain aim, you see.  And in

24   the context of the question that you've asked, you could

25   substitute an extended period of time with the patient

Page 139

1    working with patients.
2        Q.  Okay.  So back to my question.  On some, on some
3    level that that is, that universe of care that you are
4    providing, which again, I think I'm still going to call
5    it psychotherapy, but I understand your explanation that
6    it is, that encompasses a lot that you do in your, in
7    your clinical practice, but again, the difference for
8    you between the Levine way, if we can shorthand, and
9    WPATH is that you cultivate, you engage in that process
10   as a requirement before you will authorize any kind of
11   medical intervention for a patient for the treatment of
12   gender dysphoria?
13       A.  That's true.
14       Q.  Okay.  Thank you.  But even still as a part of
15   your practice as we discussed earlier, you still
16   occasionally write letters of authorization for medical
17   interventions, like endocrine treatments or surgical
18   interventions?
19       A.  Yes.
20       Q.  Okay.  Okay.  Let's go back to your report,
21   please, to Page 35.
22       A.  I am there.
23       Q.  Okay.  And looking at Paragraph 70, let's start
24   with Paragraph 70.  I take that back, let's go with
25   Paragraph 71 at the bottom of the page, "In recent years

Page 140

1    WPATH has fully adopted some mix of the medical and

2    rights paradigm discussed above.  It has downgraded the

3    role of counseling or psychotherapy as a requirement for

4    these life-changing processes.  WPATH no longer

5    considers pre-operative psychotherapy to be a

6    requirement.  It is important to WPATH if the person has

7    gender dysphoria, the pathway to the true, the

8    development of this state is not.  Cited Levine,

9    Reflections, at 240.  Two separate evaluations, one from

10   Canada and one from the UK reviewed WPATH's guidelines

11   and found them untrustworthy."

12           So for that footnote 113 you've cited the Dahlen

13   study which we talked about and then there's also a

14   citation here that says, "See also," and then there's a,

15   a Web address, do you see that, the very last line?

16       A.  Yeah, yeah, right.

17       Q.  It says, "Gender report, CA"?

18       A.  Yeah.

19              (Exhibit 13 marked for identification.)

20       Q.  Okay.  There should be another exhibit there for

21   you, Exhibit 13.  Just let me know when you can see

22   that.

23       A.  Okay.  Okay.

24       Q.  Okay.

25       A.  Yeah, okay.

Page 141

1      Q.  Have you, have you seen this article before

2  either on the Internet or printed out perhaps?

3      A.  The reason I cited it is that I had read it

4  before.

5      Q.  Okay.  And this is not a peer reviewed journal,

6  is it?

7      A.  This is a journalist, but if you look very

8  carefully at the, its length and its content, it's very

9  impressive.

10      Q.  Okay.  Is this the review from Canada that you

11  were talking about in that sentence --

12      A.  Yes, yes, it is.

13      Q.  Okay.  But it's, it's not a systematic review

14  like the one from the UK?

15      A.  It's not systematic in that it wasn't done by a

16  community of scientists, a committee of scientists.

17      Q.  Okay.  And the --

18      A.  It is systematic and it is a review, but it's

19  one person's review.

20      Q.  Right.  So it's more, we were discussing the

21  difference between systematic reviews earlier today,

22  it's a, it's, it's not a scientific committee that's

23  done in a, in a formal way that we were discussing, it's

24  more akin to that latter one person reviewing things

25  kind of --

Page 142

1       A.  It's an investigative report by a journalist.

2       Q.  Right.  And you see in the first page, Dr.

3   Levine, it says, "The following investigative report was

4   developed by @LisaMacRichards (a pseudonym)"?

5       A.  Yeah, okay, right.

6       Q.  Okay.

7       A.  I see I'm wrong, she wasn't the journalist.

8       Q.  So we, you don't know who this author is, right?

9       A.  Well, her real identity?

10      Q.  Correct, yeah.

11      A.  No, I don't know who Lisa Mac Richards really

12  is.

13      Q.  Okay.  So it's hard to know if she's an actual

14  person?

15      A.  If she's an actual person, is that what you

16  said?

17      Q.  What I mean to say is, because she's using a

18  pseudonym, you can't confirm her identity is what she

19  represents it is, right?

20      A.  Well, she says it's a pseudonym, so I presume

21  the rest of the paragraph is correct, that she works at

22  a Canadian hospital and holds a master's of science

23  degree and, yeah.

24      Q.  But what I mean is there's no way to confirm

25  that because we don't know what her name is?

1    A.  It could be written by a man, I don't know, it

2  could be written by a committee, I have no idea.

3    Q.  Okay.  Okay.  So going back to what we were

4  talking about just a few minutes ago, Dr. Levine, about

5  your approach versus WPATH.  You, you've said before,

6  not, not necessarily today, but you've testified in

7  other depositions that your approach has the limitation

8  that there's not any scientific evidence or long-term

9  studies to support it, right?

10    A.  I think in particular what I said is that, that

11  the status of the outcome, the outcome status and the

12  methodologic status of psychotherapy as a first line

13  approach to the trans adolescent has, does not have a

14  firm evidence base just as trans affirmative care does

15  not have a firm evidence base.

16        So oftentimes that's, that's, I get a question

17  just like you ask, you just posed sort of implying that

18  there's no evidence that my, my recommendations have a

19  scientific proven basis to it.  And that is correct,

20  except that all other psychiatric difficulties are

21  treated with, in our society both European and American

22  and Asian societies by a psychotherapeutic extended

23  evaluation and treatment approach before, with or

24  without psychiatric medications, you see.

25        And so we are trying to make a, you, some people

1  centers have cropped up that are providing affirming

2  care in one hour, again, we talked about the 35 parents

3  you had talked to, you've mentioned a couple of patients

4  you've talked to, but you don't have, or I should say

5  what evidence can you provide me today that is, is

6  scientific peer reviewed published data showing that

7  this is actually what's happening in these clinics?

8      A.  Well, if I look at Exhibit 6.  Do you know what

9  the, the first name for this center was and the name of

10  so many of the 50 or so centers are?  And it has the

11  term gender affirming care, the clinic, you see.  If you

12  look at all of the materials in Exhibit 6, it's about

13  support and affirmation, it's not about investigation,

14  it's not about psychotherapy.  And, and you see, gender

15  affirming care has been taken over, it's been taking

16  over the world's sensibilities without any scientific,

17  first demonstrating its efficacy with scientifically

18  respectable methods.

19      Q.  I understand that, Dr. Levine, but that's not my

20  question.  My question is, what evidence can you point

21  to that these kinds of interactions are happening in

22  clinics?  Is your basis that the, are you basing that on

23  the way these centers are named?

24      A.  I'm basing it on what they're named and I'm

25  looking at the document that you are, are talking about.

1  friendly especially designed specialty clinic.  Those

2  clinics exist to take care of trans people, to give them

3  hormones and to get them surgery, that exists.

4      Q.  But what you're describing --

5      A.  It exists to do psychotherapy.

6      Q.  Okay.  And what you described, Dr. Levine, is

7  the basis for your, for this opinion, right?

8      A.  The basis for my opinion is my collective

9  experience of dealing, watching, participating in the

10  evolution of the study of transsexual care over, over

11  since 1974.

12      Q.  Okay.  So your report states that you were

13  involved with WPATH before it was called WPATH, when it

14  was called the Harry Benjamin --

15      A.  Can I help you?

16      Q.  Yes.  Harry Benjamin?

17      A.  International Gender Dysphoria Association.

18      Q.  Thank you.  And you were involved around 1999

19  when the 6th version of the standards of care was

20  released, right, we talked about that?

21      A.  Yes.

22      Q.  Okay.  And it's, it's true that you helped to

23  draft portions of that version, right?

24      A.  Actually, my report misstates me as the

25  co-chair.  If I remember correctly, I was the chairman.

Page 148

1      Q.   The chairman of that committee, okay.   Thank

2    you.

3      A.   And most, with very little exception I had a

4    significant editorial role in creating every sentence in

5    that 21-page document.

6      Q.   Okay.   And you've testified in other depositions

7    that even though the, there have been changes made to

8    the standards of care in subsequent versions, you still

9    continue to see your work reflected in those versions,

10   right?

11     A.   Yes, my language.

12     Q.   Yes, mm-hmm.

13     A.   Yeah, my language, right.   In fact, the next

14   version which came out I think three years later or two

15   years later I think was pretty much word for word except

16   for a requirement for one letter for endocrine treatment

17   rather than two, which is what my committee of eight

18   people recommended.

19     Q.   Okay.   And you've testified before that even

20   Version 7, which is, you know, one more, obviously one

21   more removed from Version 6, that that, as you read it

22   much of the language you had actually still, it was

23   still reflecting your language in that version even,

24   even though it's a much longer document?

25     A.   Well, yeah, I think the introduction section

Page 149

1   about what guidelines were and, and the problems of

2   cross culture, cross country rules affecting the laws

3   are different and the, that we wanted this to be a

4   information guide for, for patients and parents and

5   wives and husbands and so forth.

6       I think, you know, once, once we got, I mean, I

7   don't have it in front of me and I'm not sure I could

8   recognize every sentence I wrote anyway, but, but they

9   did, they did continue to use some of my sentences, some

10  of my concepts.  It was my concept that there is a

11  difference between readiness criteria and eligibility

12  criteria, that was one of my contributions

13      Q.  Thank you.  And, and I think also you testified

14  in the Soneeya trial that you had asked to be involved

15  in helping to write standards of care 8 but were told

16  that you, in order to do so you had to be a WPATH

17  member, right?

18      A.  Yes.

19      Q.  And looking back at your report -- actually,

20  give me just a minute here.  Actually, Dr. Levine,

21  let's --

22          MR. CHARLES:  Sorry, Kelley and Kraig, can

23  we go off the record real quick.

24          VIDEO TECHNICIAN:  We're going off the

25  record at 2:26 p.m.

Page 151

1   be trans boys or trans males.

2          The historic pattern throughout most of the

3   world was 3.5 to 4 biologic males who wanted to be women

4   to biologic females who wanted to be men dominated

5   dramatically for decades in the '70s and the '80s and

6   the '90s and the early 2000s.  But since 2005 there's

7   been a growing incidence of request for services and

8   particularly request for services from girls assigned at

9   birth who wanted to be males.

10          Some of us have come to in recent years call

11  this delayed or pubertal or rapid onset of gender

12  dysphoria, meaning it's a pubertal phenomenon because

13  there was no evidence prior to that except in the

14  retrospective subjective histories given by these kids

15  that they had any indication, parents and themselves,

16  had no behavioral indications that they were trans

17  identified or even sort of leaning in that direction.

18      Q.  I understand that, Dr. Levine, and I'm not

19  talking necessarily about the, the increase in

20  referrals, I'm talking about this phenomenon that you

21  referenced called rapid onset gender dysphoria.  So not

22  just adolescent onset gender dysphoria, which I

23  understand you're saying has somewhat increased since

24  2005, but rapid onset gender dysphoria.  And I'm

25  specifically asking what peer reviewed studies, what

1    papers and what research would you refer me to or is

2    referenced in your report as evidence that this

3    hypothesis actually exists or that there's any

4    scientific study to support it?

5        A.  No. 1, this is not a hypothesis, this is a

6    demonstrated fact.

7        Q.  Okay.  Based on what, Dr. Levine, that's what

8    I'm asking, what are the peer reviewed studies?

9        A.  If you look up the presentations of Kenneth

10   Zucker, if you look at papers, I can't give you the

11   authors at the moment from Europe, this has been

12   documented by DiAngelo I believe in Australia, by

13   Clayton in Australia.

14           It seems to me there is no disagreements about

15   this except I've heard the cynical response that what

16   rapid onset gender dysphoria really means is that the

17   parents have suddenly discovered that their kids have

18   been transgender, meaning to deny the parental reports

19   that the children were not cross gender identified prior

20   to that, even though the kids say, well, I was never

21   comfortable with being a boy or a girl.

22       Q.  Okay.  So you, for this contention in your

23   report you cite one thing and that is Midgen A.

24   Hutchinson and her study is entitled, "In support of

25   research into rapid onset gender dysphoria."  So that

                                                   Page 153

1   was published in 2020 and I don't, I'm not seeing here

2   any of the other --

3       A.   One, one of the reasons you're not seeing it is

4   that I assume that everyone understands that this is

5   true.

6       Q.   Well, Dr. Levine, this is an expert report and

7   you have to include all of your expert opinions, and

8   you're also required under Rule 26 to disclose all of

9   the data and research that you considered for those

10  opinions.  That's the purpose of our deposition today is

11  for me to understand and to have you put on the record

12  what you relied on to establish your opinions, so that's

13  what I'm trying to get at.  And, and I understand what

14  you're saying that from your vantage point as a

15  clinician outside of the legal sphere that there are

16  things you think are givens, but we can't operate like

17  that unfortunately.  So I need to, I need to understand,

18  and all I see here is the Midgen A. Hutchinson study

19  that's asking for support of, that's offering that she

20  wants to support research into this phenomenon, not that

21  the phenomenon has been evidenced to exist.  Does that

22  make sense?

23      A.   Yes.  May I comment on that?

24      Q.   On Hutchinson, yeah.  Let me pull it up

25  actually.

Page 158

1    this care and then after they lived following the care

2    they decided that their problems have not been solved

3    and they decided to return to the gender expression --

4        Q.  I understand that, Dr. Levine, and I'm not

5    actually contesting the assertion in your, in your

6    report that detransition exists at all.

7        A.  All right.

8        Q.  What I'm asking about is your assertion in the

9    latter half of that sentence that says that there is a

10   growing number of young people who regret transition and

11   wish to reverse it.  Again, I'm just trying to

12   understand what you're saying here and on what basis you

13   are making those assertions.

14           So I'm not asserting whether or not

15   detransitioning exists, my question is, this study did

16   not look at how many detransitioners are there now as

17   opposed to any other time in history, it was not a

18   qualitative or quantitative analysis.  It was a study

19   according to the abstract here, and I'm just asking you

20   to confirm that, about the specific needs of

21   detransitioners, both psychological, medical, other

22   kinds of support, right?  So that's what I'm saying is

23   this study is not, the aim is not to quantify the number

24   of, whether the number of detransitioners is growing or

25   shrinking or staying the same, right?

Page 159

1      A.   Yes, I can answer to your question, correct.

2      Q.   Okay.

3      A.   But it doesn't mean that -- I think you're

4   missing the point.  And, and by, by having me say yes,

5   that it doesn't quantify the incidents of detransition,

6   it's missing the point.

7      Q.   I understand that, Dr. Levine.  But if your

8   point was, if your point in your report was detransition

9   is a thing and here are the psychological supports that

10  these people need, that's what you should have written,

11  but that's not what you wrote.  You wrote that a growing

12  number of young people regret transition and wish to

13  reverse it.

14         So my question to you about the article you rely

15  on for that contention is, this article doesn't say

16  that, this article is not a study of the growing numbers

17  or small or diminishing numbers or staying the same

18  numbers of people who detransitioned.  That's what I'm

19  asking you to confirm.

20      A.   What I am confirming is that this particular

21  paper talks about 237 people who have detransitioned and

22  that WPATH has no serious discussion of detransition,

23  there's no chapter on this, on this phenomenon which is

24  extremely relevant to the care of transgender people,

25  especially transgender young people.

1        The reason I cited this is 237, and the reason,

2    the next thing, Littman is another additional 100

3    people.  And if you, if you read closely some of the

4    references in this particular article, there is

5    Exposito-Campos' article talking about subreddit and the

6    number of people who were discussing detransition.

7        So what I'm saying if WPATH is responsible for,

8    for providing a scientific basis for affirmative care,

9    they must talk about the error rate as represented by

10   detransitioned people.  And four years ago we had no

11   idea about the, the rate of detransitioned people and

12   today we have two studies that have been published from

13   the UK that begin to give us a rate of detransition.

14       And so to me you are making the wrong point and

15   that I have not been in error.  You just have

16   misunderstood the difference of why I cited these

17   particular papers.  These particular papers just

18   demonstrate that detransition is a real problem and, and

19   it is a moral and ethical and scientific problem.  And

20   that WPATH if it's going to deal with the science of

21   transition, it has to deal with the error rates and what

22   happens to people who detransition, you see.  And so I

23   don't, I don't have nothing more to say about that, I

24   just think your point is quite irrelevant.

25       Q.   Okay.  Well, I'm going to continue to ask you

Page 161

1   about evidence that you cite in your report that you use

2   as support for assertions you're making, so I'm just

3   going to flag that for you now.  And again, this --

4   let's actually, let me, let me just ask one more time.

5   This study does not speak to the numbers of people who

6   have detransitioned now as opposed to any other time in

7   history, right?

8      A.  As far as I remember this paper, the answer to

9   your question is right.

10     Q.  Sorry, the answer to my question is -- okay,

11  right, okay.  So let's actually now that you mention it,

12  let me just pull up really quickly the Littman study

13  that you mentioned.

14              (Exhibit 15 marked for identification.)

15     Q.  This will be Exhibit 15.

16     A.  Okay.

17     Q.  Okay.

18              MR. CHARLES:  So for the record, I'm

19  showing Dr. Levine what has been marked as SL15,

20  "Individuals treated for gender dysphoria with medical

21  and/or surgical transition who subsequently

22  detransitioned, a survey of 100 detransitioners by Lisa

23  Littman, received," well, published online 19 October

24  '21.

25     Q.  Okay.  So looking at the abstract again, the

Page 163

```
 1   whether or not the numbers of detransitioners are
 2   growing, right?
 3              MR. DAVID:  Objection to form.
 4        A.  You know, I, I don't know if I should just
 5   repeat what I said before.  Detransition is a
 6   phenomenon, science is only now beginning to get, we
 7   have two studies that were published within the last I
 8   think four months or five months.
 9        Q.  Okay.  So, Dr. Levine, are you refusing to
10   answer my question because --
11        A.  Not at all, I'm answering your question, I'm
12   answering.
13        Q.  No, you're not.
14        A.  Well, then ask me the question again.  I'm
15   sorry, I apologize.  You want to confine me to an answer
16   and so, so set me up for the answer you want, please.
17        Q.  Okay.  What I'm asking is, this sentence by the
18   admission of the author was not designed to assess the
19   prevalence of detransition?
20        A.  That's true.
21        Q.  Okay.  Instead the purpose of this study was to
22   identify detransition reasons and narratives in order to
23   inform clinical care and future research, right?
24        A.  Correct.
25        Q.  Okay.  Thank you.  Okay.  Let's, I'm going to
```

1   guidelines has confidence that persons who receive care

2   according to the strong recommendation will derive on

3   average more benefit than harm."  The following sentence

4   says, "Weak recommendations require more careful

5   consideration of the person's circumstances, values and

6   preferences to determine the best course of action."

7   That sentence does not say weak recommendations mean

8   that we're, mean that so and so is going to derive more

9   harm than benefit or so and so, we're not sure if

10  they're going to derive more harm than benefit.  It says

11  there, "Weak recommendations require more careful

12  consideration of the person's circumstances, values and

13  preferences to determine the best course of action."  So

14  my question is, where are you getting that weak

15  recommendations mean what you are saying it means in the

16  second to last sentence of your report?

17       A.   Because I interpret that sentence, which we

18  agree upon, you see.  What, what that sentence really

19  means to me, Mr. Charles, is that science cannot answer

20  the question because we haven't done the appropriate

21  studies and there is this issue of the long-term

22  consequences.  So reading our sentences, reading my

23  reports we should, we're not, we don't have, we don't

24  have to rest on science now, science can't help you,

25  what can help you is what the patient prefers, what the

Page 175

1   doctor's values are and what the patient's values are.

2        Q.   Okay.  So, Dr. Levine, that's your

3   editorializing, it's not based on what the, what the,

4   what the actual words of the guidelines are saying.

5        A.   Well, you know, every reader, especially every

6   professional reader integrates the scientific or these

7   consensus documents with his own values and personal

8   clinical experiences and what he knows in terms of other

9   data.  And so even though you say it's my personal

10   interpretation, I, I don't want that to be demeaned.

11   Lots of people --

12        Q.   I'm not, I'm not demeaning it at all, Dr.

13   Levine.  I'm just making sure that you and I are reading

14   the same words from the guidelines and that you aren't

15   quoting something that I'm not seeing from the

16   guidelines, that's what I mean, I'm not demeaning your

17   professional experience at all.

18        A.   Right.  Well, thank you for that.

19        Q.   So let me, let me ask one follow-up.  You said

20   that you thought some people read these recommendations,

21   some, some clinicians read them and said, oh, the

22   Endocrine Society is recommending hormones and without

23   any, without any nuance or, or without really say

24   understanding the various, in my view, pretty, pretty

25   nuanced things that this guideline says.  What evidence

Page 191

1      A.  This is --

2      Q.  Well, let me just ask you, Dr. Levine, you don't

3  speak Finnish, do you?

4      A.  I'm an American, which means I have one

5  language.

6      Q.  Okay.  Okay.

7      A.  I only speak English.

8      Q.  Okay.  Are you saying you have read a

9  translation of this document at some point?

10     A.  Yes.

11     Q.  And do you know if it was an official

12  translation, a certified official translation?

13     A.  I don't know if it was a certified one.  I think

14  I, I accessed it through SEGM.

15     Q.  Okay.  All right.  Let's go, let's go back to

16  your report, Exhibit 1.

17     A.  God, I'm having the same damn problem again.

18  All right.  Exhibit 1, I'm going to get there.  All

19  right, here I am.

20     Q.  Okay.  And you, you said earlier that the UK was

21  also changing some of their guidelines with regard to

22  medical interventions for the treatment of gender

23  dysphoria, right?

24     A.  Yes.

25     Q.  Give me just a second here.  But the UK has also

Page 192

1   not completely banned all medical interventions, right,

2   they're just adjusting them?

3       A.   That's correct, you're correct.

4       Q.   And then are you aware of the Cass review?

5       A.   Yes.

6       Q.   That the UK is doing?

7       A.   Yes.

8       Q.   Okay.  And, and as a part of that review you're

9   aware that the, that the national, what do they call it,

10  the National Health Service acknowledges that some

11  children do experience gender dysphoria and will need

12  clinical support and interventions?

13      A.   Yes.

14      Q.   Okay.

15      A.   That's the clinical perception around many

16  people, yeah.

17      Q.   Okay.  All right.  Let's take a look, hopefully

18  you still have it up, Page 51 of your report,

19  Paragraph 103.

20      A.   Getting there.  Okay, I'm here.

21      Q.   Okay.  So in Paragraph 103 you're talking about

22  a review by Professor, excuse me, Professor Carl

23  Heneghan, the editor of the British Medical Journal.

24  And the citation provided to that review is at the end

25  of the paragraph, do you see that, footnote 165?

1  list that those are between $6,000 and $4,000 per year

2  per child.  Do you, do you know, Dr. Levine, how cost

3  sharing works between West Virginia Medicaid Program and

4  the federal government?

5      A.   I presume that Medicaid patients who are insured

6  by Medicaid don't pay for their medications.

7      Q.   Okay.  But I guess what I'm asking is, do you

8  know what percentage or do you know what the cost is to

9  West Virginia Medicaid versus what the cost is to the

10  federal government, CMS, HHS that subsidizes the West

11  Virginia Medicaid Program?

12      A.   Oh, no.

13      Q.   Okay.  So you're not offering an opinion about

14  the cost of puberty blockers under the West Virginia

15  cost sharing plans, right?

16      A.   You mean to the insurance company?

17      Q.   Correct, yeah.

18      A.   Oh, yeah, no.  This is, this kind of information

19  is very kept, very carefully kept from physicians.

20      Q.   Okay.  So not, no, making no representations in

21  this report about the ultimate cost to the program or

22  even to the patient, right?

23      A.   No, we physicians don't know about things like

24  that.

25      Q.   Okay.  So then the, in the same paragraph at the

Page 211

1    bottom of Page 26, going into Page 27 you say, "The cost
2    of surgeries, reoperations and occasional requests to
3    reverse the surgeries for those who request the
4    interventions are in the tens to hundreds of thousands
5    of dollars with some cases reaching into the millions."
6    But again, you're not offering an expert opinion here
7    about the cost of surgical care for the treatment of
8    gender dysphoria under the West Virginia Medicaid
9    Program, right?
10        A.   No, I'm just saying that physicians like myself
11   have a hard time keeping up with our fields of expertise
12   and, and Dr. Karasic is probably no exception.  And when
13   he assures the world that this is cost-effective care, I
14   don't really think he has any basis for knowing that,
15   for the same reasons that you are, you know, pointing to
16   my deficiencies of knowledge.
17        Q.   Fair enough.  And, and you also don't represent
18   that you know how much the federal government subsidizes
19   surgeries that West Virginia excludes or doesn't exclude
20   from its coverage under the Medicaid program?
21        A.   I don't, I don't know at all.
22        Q.   Okay.  And you're not offering an opinion about
23   which members or how many West Virginia Medicaid
24   recipients might need surgery, right, for treatment of
25   gender dysphoria, let me be clear?

Page 212

1      A.  Well, I don't think West Virginia is an
2  exception to the international phenomenon of increasing
3  numbers of gender, cross gender identified adolescents.
4      Q.  Oh, no, but I'm, Dr. Levine, I'm asking about
5  surgery specifically.  You, you're not offering an
6  opinion about how many West Virginia Medicaid members
7  may need or be indicated for surgery for gender
8  dysphoria, that's not an opinion you're offering here?
9      A.  I still want to say that West Virginia is
10 probably no exception and if we increase the number of
11 people getting treatment and given, you know, some
12 professionals' concepts about how to ideally treat these
13 individuals, I wouldn't be surprised if more West
14 Virginia citizens would be requesting surgery.
15     Q.  But you don't know how many West Virginia
16 Medicaid member recipients may need surgery?
17     A.  Oh, no, I don't know that.
18     Q.  Okay.  And you can't, you can't then also know
19 like what particular surgeries any of those people might
20 need?
21     A.  Oh, yes, oh, yes, I do, I can.
22     Q.  No, no, I'm saying the individual people, you
23 can't know what, what they need because you don't --
24     A.  Oh, if I know if they're females --
25     Q.  Dr. Levine, I'm talking about you're not

1   representing that you know what individual members might

2   need as per their specific individual treatment?  I'm

3   not asking do you know the range of types of surgeries,

4   that's not my question.  My question is, you are not

5   offering an opinion that you know what individual West

6   Virginia Medicaid members, what kinds of surgery they

7   may or may not need?

8       A.  So if you tell me there's a person named Jane

9   Doe and John Doe in West Virginia and that they're

10  20 years old and they're persistent in their transgender

11  identity for eight years, I, you know, I can, as you

12  said, I could pretty much predict what the first surgery

13  would, that would be requested would be.  But I would, I

14  couldn't guarantee that I would be right because someone

15  may want a rhinoplasty when I think they want, they

16  would want an orchiectomy.  But, you know, but I don't

17  want to, you know, I mean, these, this is not rocket

18  science because there are only a limited range of

19  surgeries that could possibly be done.

20      Q.  Okay.  I guess what I mean is, treatment for

21  transgender people for the treatment of gender dysphoria

22  is individualized, so you're not saying I know what this

23  particular person needs because you haven't met with

24  them, right?

25      A.  Well, that's right.  But on the other hand --