# Exhibit C



Deposition of:

## Stephen B. Levine , MD

*September 10, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com  |

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

                ~~~~~~~~~~~~~~~~~~~~

3

    MAXWELL KADEL, et al.,

4

5                    Plaintiffs,

6

            vs.          Case No. 1:19-cv-272-LCB-LPA

7

8    DALE FOLWELL, in his official
     capacity as State Treasurer of

9    North Carolina, et al.,

10

                    Defendants.

11

12                ~~~~~~~~~~~~~~~~~~~~

13                Video Deposition of
                 STEPHEN B. LEVINE, M.D.

14

15                September 10, 2021
                     9:05 a.m.

16

17                   Taken at:
               Veritext Legal Solutions

18               1100 Superior Avenue
                  Cleveland, Ohio

19

20               Tracy Morse, RPR

21

22

23

24

25

```
                                              Page 2
 1      APPEARANCES:
 2           On behalf of the Plaintiff:
 3                Lambda Legal, by
                  CARL S. CHARLES, ESQ.
 4                120 Wall Street, 19th Floor
                  New York, New York  10005-3919
 5                ccharles@lambdalegal.org
 6                TARA BORELLI, ESQ.
                  730 Peachtree Street, N.E.
 7                Suite 640
                  Atlanta, Georgia  30308-1210
 8                tborelli@lambdalegal.org
 9                     and
10                McDermott Will & Emery, by
                  MICHAEL M. WEAVER, ESQ.
11                444 West Lake Street, Suite 4000
                  Chicago, Illinois  60606-0029
12                mweaver@mwe.com
13
           On behalf of the Defendants Dale Folwell,
14         Dee Jones, and the NC State Health Plan
           For Teachers and State Employees:
15
                  Law Office of John Knepper, LLC, by
16                JOHN KNEPPER, ESQ.
                  1720 Carey Avenue, Suite 590
17                Cheyenne, Wyoming  82001
                  john@knepperllc.com
18
19         On behalf of the Defendant State of North
           Carolina Department of Public Safety:
20
                  North Carolina Dpt. Of Justice, by
21                ALAN MCINNES, ESQ.
                  114 W. Edenton Street
22                Raleigh, North Carolina  27603
                  amcinnes@ncdoj.gov
23
                       ~ ~ ~ ~ ~
24      ALSO PRESENT:
25                Joseph Vandetta, Videographer
```

Page 3

1                      TRANSCRIPT INDEX

2

        APPEARANCES................................   2

3

4       INDEX OF EXHIBITS.........................   4

5

        EXAMINATION OF STEPHEN B. LEVINE, M.D.

6       By MR. CHARLES............................   7

        By MR. KNEPPER...........................  227

7       By MR. CHARLES...........................  244

8

        REPORTER'S CERTIFICATE...................  249

9

10      EXHIBIT CUSTODY

        EXHIBITS RETAINED BY COURT REPORTER, 1-21

11      (No Exhibit 16)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                    INDEX OF EXHIBITS
 2       NUMBER           DESCRIPTION           MARKED
 3       Exhibit 1        4/28/2021 Declaration.... 14
                          of Stephen B. Levine,
 4                        M.D. With Attachment
         Exhibit 2        12/21/2020 Zoom.......... 56
 5                        Deposition of Stephen
                          Levine, M.D.
 6       Exhibit 3        Typewritten Three-Page... 62
                          Document Entitled,
 7                        "Special Programs,"
         Exhibit 4        1/1/2019-12/31/2019...... 78
 8                        North Carolina State
                          Health Plan Benefits
 9                        Booklet, Bates Numbers
                          PLAN DEF0001785-0001900
10       Exhibit 5        Lesbian Gay Bisexual..... 89
                          Transgender Center
11                        Document Entitled,
                          "Transgender Resources"
12       Exhibit 6        4/8/19 Soneeya v. Turco..104
                          Trial Transcript, Day 1
13       Exhibit 7        "Correction: Parent......116
                          Reports of adolescents
14                        And young adults
                          Perceived to show signs
15                        Of a rapid onset of
                          Gender dysphoria,"
16                        Article
         Exhibit 8        "Transgender Teens: Is...122
17                        The Tide Starting To
                          Turn?" Article
18       Exhibit 9        "Finland Issues Strict...139
                          Guidelines for Treating
19                        Gender Dysphoria,"
                          Article
20       Exhibit 10       "Recommendation of the...140
                          Council for Choices in
21                        Health Care in Finland
                          (PALKO/COHERE Finland),"
22                        Article
         Exhibit 11       "Stod och utredning vid..145
23                        konsinkongruens hos barn
                          Och ungdomar," Article
24
25
```

```
 1              INDEX OF EXHIBITS (Continued)
 2       NUMBER              DESCRIPTION          MARKED
 3       Exhibit 12       "Long-Term Follow-Up of..154
                          Transsexual Persons
 4                        Undergoing Sex
                          Reassignment Surgery:
 5                        Cohort Study in Sweden,"
                          Article
 6       Exhibit 13       2017 "On Gender..........156
                          Dysphoria," Booklet
 7                        From Department of
                          Clinical Neuroscience,
 8                        Karolinska Institutet
         Exhibit 14       "Long-Term Follow-Up of..161
 9                        Individuals Undergoing
                          Sex-Reassignment Surgery:
10                        Somatic Morbidity and
                          Cause of Death," Article
11       Exhibit 15       5/15/2017 Telephonic.....170
                          Deposition of Stephen
12                        Levine, M.D.
         Exhibit 17       "A Typology of Gender....196
13                        Detransition and Its
                          Implications for
14                        Healthcare Providers,"
                          Article
15       Exhibit 18       DSM-5: Frequently Asked..202
                          Questions
16       Exhibit 19       "Endocrine Treatment of..213
                          Gender-Dysphoric/Gender
17                        Incongruent Persons:
                          An Endocrine Society
18                        Clinical Practice
                          Guideline," Article
19       Exhibit 20       "Pediatric Obesity.......217
                          Assessment, Treatment,
20                        And Prevention: An
                          Endocrine Society
21                        Clinical Practice
                          Guideline," Article
22       Exhibit 21       "Practice Parameter on...223
                          Gay, Lesbian, or Bisexual
23                        Sexual Orientation,
                          Gender Nonconformity,
24                        and Gender Discordance
                          In Children and
25                        Adolescents," Article
```

Page 23

1          Q.    Okay.  And so then were there any
2    external grants to research and publish about
3    the treatment of children or adolescents --
4          A.    No.
5          Q.    -- with gender dysphoria?
6          Okay.  Is that a, "No," when I included
7    the, "Gender dysphoria," as well?
8          A.    That is a, no.
9          Q.    Okay.  Thank you.  Okay.  So on
10   page 3 of your report -- actually, I'm sorry.
11   It's going to be the bottom of page 4 and to
12   the top of page 5.  Your report lists your
13   experience as an expert witness, which we
14   talked about a little bit earlier.  I just --
15   I'm wondering if you would confirm this is not
16   an exhaustive list of your experience as an
17   expert witness either via deposition or report.
18         A.    I wouldn't want to testify that
19   this is absolutely complete, given the fact
20   that I don't keep a list compiled.  This is
21   kind of compiled retrospectively from memory
22   and documents.  And so this is the best I could
23   have done on April of 2021 --
24         Q.    Understood.  Thank you.  So --
25         A.    -- you might find something else.

Page 42

1          Q.     Was it --
2          A.      -- in a commercial building where
3    our clinic was.  It was just, you know, a
4    conference room in our clinic.
5          Q.     And that was within -- was that
6    within a business --
7          A.     It was --
8          Q.     -- a psychiatric practice?
9          A.     I'm sorry.  I interrupted you.
10          It was within The Center For Marital
11    Health, which was a business that I and two
12    other people started and owned and ran.  And in
13    that business, we continued the same kind of
14    work we did with the University minus the large
15    number of trainees.
16          Q.     You mentioned that after '93, you
17    were not being paid by the University.  Were
18    you providing your clinical psychiatric
19    professorship gratuitously?
20          A.     Meaning without pay?  Yes.
21          Q.     Okay.  Do you know if, after you
22    moved the clinic away from Case Western
23    Reserve, if Case Western Reserve University
24    Medical School created a separate gender
25    identity clinic?

Page 43

```
 1            A.    Years later they did --
 2            Q.    Oh, sorry.
 3            A.    -- I would say, they created a
 4     separate clinic perhaps in 2017, 2016.
 5            Q.    Do you know the name of that
 6     clinic?
 7            A.    I don't think it's in the
 8     department of psychiatry.  I think it's in the
 9     department of pediatrics.  And the answer to
10     your question is, no.
11            Q.    Does The LGBTQ and Gender Care
12     Program sound familiar?
13            A.    No.
14            Q.    But have you -- sorry.  Have you
15     evaluated any patients through that separate
16     clinic that Case Western Reserve has?
17            A.    No.  Much to my dismay, that clinic
18     was formed and maintained without any input
19     from me, who I thought was one of the experts
20     in the field.
21            Q.    Do you know if they have
22     psychiatrists, within that clinic?
23            A.    I -- I'm not knowledgeable about
24     the composition of that clinic.  There is a
25     very strong liaison between our department of
```

Page 47

```
 1        What do you mean by, "This era"?
 2              A.    Before 1993.
 3              Q.    Okay.  And what do you mean by,
 4        "Occasional"?
 5              A.    I would say that 95 percent of the
 6        patients that we saw were 16 and 17, 18 and up.
 7        We could debate what the word, "Child," means,
 8        but to me an 11-year-old is a child, even
 9        a 13-year-old is a child, especially when my
10        children were 13.  And so we -- in the first
11        twenty years, transgender issues were primarily
12        an older teenager and adult, mostly adult
13        issues.  In recent years, I would say, 12, 15
14        years, the number of adolescents appearing in
15        gender clinics at our place and everywhere as
16        far as I can see has increased exponentially,
17        especially the number of teenage girls who are
18        declaring themselves trans boys.
19              Q.    So how many -- sorry.  So the first
20        twenty or so years, you said approximately 5
21        percent of all patients were children.
22              A.    Were younger -- on the younger end
23        of the spectrum --
24              Q.    Right.
25              A.    -- yes.
```

Page 51

1    it, you see?  But at this moment -- this week,
2    I have one patient that I see weekly, who is a
3    transgender teen.  My staff -- if I can be
4    presumptuous to call them, "My staff" -- our
5    staff sees more.
6         Q.    And thinking about the last year,
7    approximately how many adult patients did you
8    see -- and let's use your framing of,
9    "Regular."  So that could be one, for one
10   followup visit or that could be for more -- how
11   many adult patients did you see for treatment
12   of gender dysphoria?
13        A.    Approximately six.
14        Q.    And using that same framing of,
15   "Regular," how many children, so under age 11?
16        A.    In the last year?
17        Q.    Yes, yes.  In the last year.
18        A.    Zero.
19        Q.    How many adolescents in regular
20   treatment for gender dysphoria would you
21   approximate you've seen in the last five years
22   individually, exclusive of your supervision of
23   other clinicians?
24        A.    If you ask me the question in the
25   last year, I would have told you five or six,

Page 52

1      but since you ask it as a five-year period, I'm

2      at a loss to tell you whether it's twelve or

3      fifteen.  I --

4           Q.    An approximate is fine.  Thank you.

5           A.    -- let's just say a dozen with an

6      asterisk, very approximate.

7           Q.    And jumping a little bit more in

8      terms of time.  How about the last ten years?

9           A.    Again, using the same asterisk, I

10     would say, double it.

11          Q.    Okay.  And you said zero people

12     under age 11, so children this last year.  What

13     about in the last five years?

14          A.    Oh, two years ago, we had this

15     charming little 6-year-old.  One of my

16     colleagues specializes in children and I get to

17     hear about these cases.  Occasionally I get to

18     meet the parents, but I personally have not

19     delivered a psychotherapeutic care or

20     evaluation directly of a child with the

21     exception of this one person that I was

22     involved with.

23          Q.    And that was this last year, you

24     said?

25          A.    That was -- I think it was probably

Page 53

1    two, two and a half years ago.

2         Q.    Oh, okay.  And what kind of

3    treatment -- I should say, have you referred

4    any of those adolescent patients for additional

5    treatment, besides psychotherapy, for the

6    treatment of gender dysphoria?

7         A.    Yes.

8         Q.    And what kinds of treatment have

9    you referred them for?

10        A.    For endocrine treatment.

11        Q.    Okay.  And approximately what

12   percentage of those adolescent patients have

13   you referred for endocrine treatment?

14        A.    Give me the timeframe of that

15   question, please.

16        Q.    Sure.  So you said a few moments

17   ago, in the last five years, you saw maybe,

18   asterisk, 12 to 15 adolescent individually

19   yourself.  Of those 12 to 15, what would be the

20   approximate percentage you referred for

21   endocrine treatment?

22        A.    I'm hesitating to answer the

23   question, because some of those children have

24   been taking testosterone or estrogen

25   surreptitiously from their parents.  And while

Page 54

1    I didn't refer them for the treatment, I was
2    seeing them while they were taking the
3    treatment.  So if we're only talking about
4    adolescent -- referrals of adolescents for
5    hormones, I would say a very small percentage
6    of those, say, I guess you would say 10
7    percent.
8          Q.    Fair enough.  Have you had yourself
9    individually as a clinician, have you had any
10   non-transgender children who you have made a
11   referral for endocrine treatments related to
12   other conditions?
13         A.    No.
14         Q.    Okay.  So then zooming out 30,000
15   foot view of your 48-year career now, would you
16   say overall, you have provided treatment --
17   that is, psychiatric treatment -- to mostly
18   adults experiencing gender dysphoria, gender
19   identity issues?
20               MR. KNEPPER:  Objection, form.
21         A.    I would say that throughout my
22   career, we should divide my career into the
23   first twenty years where mostly adults were
24   seen by our team and myself.  And then we ought
25   to talk about the last ten or fifteen years

1    where the number of adults has diminished and

2    the number of adolescents has increased

3    dramatically.

4         Q.   Okay.  Thank you.  So as a part of

5    your private practice, do you write letters of

6    authorization for endocrine treatments?

7         A.   Yes.

8         Q.   And do you write letters of

9    authorization for gender affirming surgeries?

10        A.   I have.  I have not recently,

11   because most of my patients are 13 or 15 or 16,

12   you know.

13        Q.   Okay.  And I'm sorry.  Just by,

14   "Recent," when was the last time you wrote a

15   letter of authorization for a gender affirming

16   surgery for an adult?

17        A.   Probably twelve months ago.

18        Q.   Okay.  And over the course of your

19   career focusing on your treatment of adults

20   experiencing gender identity issues, for what

21   percentage of those patients would you estimate

22   you wrote a letter of authorization for gender

23   affirming surgery for?

24             MR. KNEPPER:  Objection, form.

25        A.   Again, I would like to put an

1      asterisk to whatever I answer this question as.

2      I have not kept track of those figures.  I have

3      written -- I've written or cosigned letters for

4      hormone treatments and for gender confirming

5      surgeries for many people.  There were more

6      people in the '70s and '80s than in recent

7      decades.  In part as a reflection of my own

8      evolution of understanding of these problems

9      and in part it's a reflection of the demography

10     of patients who are coming to see me.  I really

11     would not like to answer that question, only

12     because I don't know if the word, "Fifteen," or

13     the word, "Twenty-five," or the word,

14     "Thirty-five," is more accurate --

15             Q.    Understood.

16             A.    -- but I can tell you, I have

17     written letters, especially in the early years,

18     for the things that you're making reference to.

19                          -  -  -  -  -

20                   (Thereupon, Deposition Exhibit 2,

21                   12/21/2020 Zoom Deposition of

22                   Stephen B. Levine, M.D., was marked

23                   for purposes of identification.)

24                          -  -  -  -  -

25             Q.    Okay.  For the record, I'm showing

Page 66

1        Q.    Do you think as a general matter
2    that it's good for patients who come to DELR
3    for services related to gender dysphoria to be
4    able to have insurance coverage of that care?
5              MR. KNEPPER:  Objection, form.
6    Beyond the scope.
7        A.    Well, the people who come to DELR
8    are generally coming for evaluation and
9    psychotherapy services.  And I believe it's
10   very important that people have access to
11   mental health care and that mental health care
12   for many of our patients are not wealthy,
13   affluent people.  And the fees that even
14   masters prepared people charge can become
15   prohibitive.  And so I think it's a very nice
16   idea, the psychiatric services, mental health
17   services evaluation and ongoing treatments,
18   with or without medication, it would be nice to
19   be able to cover those things, yes.  I think
20   that's a long answer, yes.
21       Q.    Understood.  And thinking about the
22   treatment that you refer patients out for, the
23   endocrine treatments in particular, do you
24   think it is generally good if you provide
25   authorization for that treatment that the

Page 67

1    patient be able to afford it?

2                MR. KNEPPER:  Objection, form.

3         A.    May I say, of course?

4         Q.    You may.  You may say anything you

5    would like.

6         A.    Of course.

7         Q.    Thank you.  Well, anything you

8    would like within reason.

9         If you make a letter of authorization for

10   a patient for the treatment of gender dysphoria

11   specifically related to a surgical treatment,

12   do you think it is good that they be able to

13   access that treatment that you've authorized?

14               MR. KNEPPER:  Objection, form.

15        A.    Not to be cagey, I want to talk

16   about one word you just used in that sentence.

17   I need you to understand that historically in

18   our clinic for those 47 years, our clinics

19   for 47 years, we are not in the business and we

20   have never been in the business of recommending

21   surgery or recommending hormones.  We recommend

22   a continued evaluation so that we -- the person

23   can make up their mind how to proceed.

24        It is not our knowledge base to know

25   who's going to do better and who's going to do

Page 68

1    worse and who is not going to have any

2    difference at all with hormones or with

3    surgery.  So what we do is we say, we will

4    write a letter of support for endocrine

5    treatment or for hormones if this is what you

6    want.  And we say what our concerns are.  We

7    tell the endocrinologist and we tell the

8    surgeon what our concerns are and that we

9    see -- we have reservations about this, and

10   these are our reservations, but the patient has

11   decided this is what he or she wants to do.

12        And so we write a letter of support, but

13   I don't -- every time you use the word,

14   "Recommendation," there's part of me that wants

15   to say, no, we do not recommend.  We have never

16   recommended.  We have not had the knowledge

17   base.  We have not had the clinical experience

18   and the knowledge base to say, I'm a doctor.  I

19   know this field.  This is what I recommend to

20   make you better.  We do not talk that way.  We

21   do not think that way.  And so I may want to

22   always put an asterisk to any sentence that you

23   use the word, "Recommend."  I need you to

24   understand that that's where I'm coming from.

25                  MR. CHARLES:  Thank you,

Page 69

1    Dr. Levine.

2            Excuse me just a moment.  Can you read

3    back my question.  I don't recall if I used,

4    "Recommend."  I thought I used,

5    "Authorization."  I just want to make sure.

6                    (Record was read.)

7                    MR. CHARLES:  If we could just go

8    off the record for a second.

9                    VIDEOGRAPHER: Off the record 10:52.

10           (Discussion held off the record.)

11                   VIDEOGRAPHER: On the record 10:53.

12   BY MR. CHARLES:

13           Q.    Okay.  Thank you for that

14   clarification, Dr. Levine.  I'll be more

15   careful about using terminology more close to,

16   "Authorization," rather than, "Recommendation,"

17   and I understand your distinction in your

18   practice.  So do you, though, think it's good,

19   if you are authorizing a treatment, a patient

20   has said, This is the treatment I would like,

21   and you have done an evaluation and determined

22   that you will write, as you said, a letter of

23   support, do you then, as a practitioner, think

24   it's good that they can access it, that they

25   can afford it?

Page 73

1      concept of agency and being a doctor, I think

2      is different than the implication of your

3      question.

4              Q.    Is the worrisomeness for a

5      patient's future health, is that a reason to

6      deny all medical care for gender dysphoria?

7              A.    Absolutely not.

8              Q.    Dr. Levine, I'd like to return back

9      to, I believe it's Exhibit 2, the Claire

10     deposition.  And please, if you would turn to

11     page 156.

12             A.    I'm sorry.  150 what?

13             Q.    Page 156.  And beginning at line 10

14     on page 156, Dr. Levine, I'll read it, if

15     you'll just follow along, please.

16             Question:  "Are you aware that this case

17     concerns an insurance exclusion that is

18     categorical at preventing" --

19             Skipping to line 15.

20             "-- hormones and surgery as a treatment

21     for gender dysphoria?"

22             Answer:  "I am aware that your plaintiffs

23     are suing to get coverage for -- that is not

24     provided by their particular insurance.  I am

25     aware of that."

Page 84

1      demonstrate their efficacy.  This is the

2      problem.

3            This is the essence of the problem.  This

4      is, I think the essence of my testimony with

5      you today.  It's not whether I personally as a

6      doctor would like this patient to have

7      insurance to cover their hormones.  It's about,

8      is this the right thing to do for this person

9      and can I help the person see clearly what the

10     dangers are and what the benefits are.  That's

11     the issue for a doctor, for Stephen Levine as a

12     doctor.  I hope that's a cogent answer --

13           Q.    It is --

14           A.    -- to your question.

15           Q.    -- it is cogent.  Thank you.

16           Given all of that, is that -- so you just

17     explained, testified that there are

18     complications, some lack of -- and I'm

19     summarizing here, so I will confirm that this

20     is an accurate summary of what you just shared,

21     but I can't possibly repeat all of that.  Given

22     all of those concerns that you have, is that a

23     reason to deny all medical interventions to

24     people with gender dysphoria?

25                 MR. KNEPPER:  Objection, form.

Page 85

```
 1          A.    No, but that's not -- that's a
 2     separate question about insurance.
 3          Q.    Yes, it is a separate question.  So
 4     now I'm asking:  Are those concerns you raised
 5     justifications in your mind for denying medical
 6     interventions to all people with gender
 7     dysphoria?
 8               MR. KNEPPER:  Objection, form.
 9          A.    You know, I'm not advocating
10     denying endocrine treatment or surgical
11     treatment.  I'm just saying that we as a
12     medical profession need to walk the walk that
13     we talk.  We say as a principle of ethics that
14     our interventions should be based upon the best
15     current knowledge, it should be based on
16     science.  It should not be based on politics.
17     It should not be based on fashion.  It should
18     not be based on civil rights considerations.
19     They should be based on the kinds of studies
20     that I just described to you with predetermined
21     outcome majors that are agreed upon --
22          Q.    Sorry?
23          A.    -- period.
24          Q.    I was --
25          A.    I forgot to put the period.
```

Page 86

1          Q.    That's okay.  Did you just say,

2     Dr. Levine, you're not an expert in health

3     insurance?

4          A.    I am not an expert in health

5     insurance.

6          Q.    Okay.  Or what insurance should or

7     should not cover?

8          A.    Yes.

9          Q.    Do you recall what the insurance

10    billing code typically is for psychotherapy for

11    gender dysphoria?  I know it's been a long time

12    since you've accepted commercial insurance, so

13    I'm not sure if the billing codes are the same,

14    but do you recall --

15         A.    The billing code is 90837.

16         Q.    Okay.  Is there a code that you're

17    familiar with that is F64.0?

18         A.    That's not a billing -- that's

19    diagnostic code --

20         Q.    Thank you.

21         A.    -- there's a separate code for

22    diagnosis and a separate code for procedure.

23         Q.    I see.  So F64.0 is a diagnostic

24    code?

25         A.    Yes.

Page 91

1                    VIDEOGRAPHER: Off the record 11:26.

2                         (Recess taken.)

3                    VIDEOGRAPHER: On the record 11:31.

4          BY MR. CHARLES:

5               Q.    Okay.  Dr. Levine, in your report,

6          you stated that you had not met with any of the

7          plaintiffs in this case, correct?

8               A.    Yes.

9               Q.    Okay.  And you have not interviewed

10         any of the plaintiffs in this case, correct?

11              A.    Correct.

12              Q.    And so you are not offering any

13         opinions about the plaintiffs in this case,

14         correct?

15              A.    Correct.

16              Q.    Okay.  And that would include the

17         veracity of their experiences of gender

18         dysphoria, correct?

19              A.    Yes, correct.

20              Q.    And that would not include the

21         accuracy of their gender dysphoria diagnoses,

22         correct?

23              A.    Correct.

24              Q.    Okay.  You're not offering any

25         opinions about their mental health histories?

Page 92

1              A.      Correct.

2              Q.      Nor any of the affects of the

3       gender affirming treatment they may have

4       received?

5              A.      Correct.

6              Q.      Okay.  Thank you.  Let's return to

7       your report.  I don't know if you have that --

8              A.      My report?

9              Q.      Yes.  You can put away that

10      document in your hand.

11             So if you would, please, turn to page 6

12      of your report.

13             Okay.  So on page 6, paragraph a. at the

14      bottom of the page there, Dr. Levine.  The

15      report states that this is one of the opinions

16      you're offering, which is, "Sex as defined by

17      biology and reproductive function cannot be

18      changed.  While hormonal and surgical

19      procedures may enable some individuals to

20      'pass' as the opposite gender during some or

21      all of their lives, such procedures carry with

22      them physical, psychological, and social risks,

23      and no procedures can enable an individual to

24      perform the reproductive role of the opposite

25      sex."  Did I read that correctly?

Page 109

1    methodology and are capable of critically

2    reviewing the literature.  So your statement is

3    true on the most superficial level, but is

4    totally incorrect when it comes to scientific

5    standards of care for issuing guidelines for

6    the medical profession.  So I don't know how to

7    answer the question.  On the surface, the

8    answer is, yes.  And underneath the surface,

9    the answer is, no.

10           Q.    So the International Journal For

11   Transgender Health is still a peer-reviewed

12   source, though, right?

13           A.    It's peer reviewed by people who

14   make their living supporting transgender care.

15           Q.    But it's still peer reviewed,

16   right?

17           A.    It's peer reviewed --

18           Q.    And as for your --

19           A.    -- I think it's peer reviewed.

20           Q.    Okay.  Understood.  And as for your

21   more conservative approach, can you cite to any

22   studies or research that resulted in better

23   outcomes than people who adhere strictly to the

24   WPATH standards of care version 7?

25           A.    No.  This is part of the problem in

1    evaluation leading to a therapeutic process, it

2    seems prudent, given the fact that we are

3    changing people's bodies, especially teenagers'

4    bodies, and they are not of developmental

5    sophistication yet that court systems or at

6    least one court system thinks they're certainly

7    too young to make these life-altering

8    decisions.  So people in SEGM are biased in the

9    direction of being conservative and providing

10   psychotherapeutic evaluations of the child, of

11   the teenager and of their parents, of their

12   family systems to see if we can find a way to

13   help them be informed about what is going --

14   what they think they want to do in their

15   future.

16           Q.   And so when you provide letters of

17   authorization for hormones or for surgery, do

18   you do so in accordance with the WPATH

19   standards of care?

20           A.   Yes.  That is the standard, to

21   provide a letter of recommendation.

22           Q.   Okay.  So turning back to your

23   report, Dr. Levine.  You can go ahead and put

24   away the trial transcript there.

25           A.   I'm sorry.  Did you say, "Turning

Page 114

1          Q.    Okay.  So is a, "Hypothesis," an
2      idea about why something happens, but doesn't
3      provide evidence for why something is
4      happening?
5                MR. KNEPPER:  Objection, form.
6          A.    A, "Hypothesis," generates the
7      pursuit of evidence.
8          Q.    Has social contagion as an
9      explanation for increased cases of gender
10     dysphoria been scientifically proven yet?
11         A.    No.  But when you seek -- when you
12     see -- actually see patients and talk to them
13     about their friends and hear about the
14     influence of the Internet and the gurus on the
15     Internet who tell 13 and 12-year-old children
16     who are concerned about menses or concerned
17     about breast development or concerned about
18     their bodies changing and then they're told
19     that they're transsexual by somebody that
20     they've never met that they talked to on the
21     Internet, that would be social contagion or
22     social education.
23            Or when you hear about a friend who
24     declares themselves trans and then your patient
25     six months later declares themselves trans, you

Page 115

1    wonder about the -- the interpersonal,
2    psychological link between best friends in
3    young puberty, young years of puberty and how
4    one can identify with one's friends and that
5    would be a social contagion.  Those are 3the
6    kinds of ideas that people like me get when we
7    sit with people week after week talking about
8    their lives.  You see, that's not science.
9         But that is clinician and this is the
10   kind of thing that leads to intuition, clinical
11   intuition and that's the source of the
12   generation of the hypothesis.  But we think as
13   clinicians, when we hear -- I mean, I don't
14   think I've ever seen a teenager trans person
15   who hasn't been heavily involved and influenced
16   by the Internet, for example, but I have not
17   done studies to document that in a way that
18   would be scientifically acceptable.  There are
19   other people who have.
20        And I doubt very much if you'll ever find
21   a clinician on any side of this issue, you see,
22   who would say, oh, no most of my patients have
23   never talked to anyone on the Internet about
24   transgender.  The Internet is just part of life
25   today and -- but transgender teenagers spend

1    hours and hours of their time getting counseled

2    or participating with the virtual trans

3    community.  That's a hypothesis.

4         Q.    So no scientific citation?

5         A.    When we use the word, "Scientific,"

6    in the best sense, yes, the answer to your

7    question is, no scientific.

8         Q.    Okay.  No studies of citations you

9    can point to today to support that hypothesis?

10        A.    Oh, I think Lisa Littman's studies

11   are in the literature and/or in press that

12   documents this.

13                  -  -  -  -  -

14             (Thereupon, Deposition Exhibit 7,

15             "Correction: Parent reports of

16             adolescents and young adults

17             perceived to show signs of a rapid

18             onset of gender dysphoria," Article,

19             was marked for purposes of

20             identification.)

21                  -  -  -  -  -

22        Q.    Okay.  For the record, please note

23   I'm showing to Dr. Levine what has been marked

24   as Exhibit 7.  "Correction: Parent reports of

25   adolescents and young adults perceived to show

Page 117

```
1       signs of a rapid onset of gender dysphoria," by
2       Lisa Littman published March 19, 2019.  Have
3       you seen this material before, Dr. Levine?
4            A.    I've seen of it.  I don't think
5       I've read it.
6            Q.    Okay.  Were you aware that the Lisa
7       Littman article had to be withdrawn, corrected
8       and republished?
9            A.    Yes.
10           Q.    Okay.  And were you aware that the
11      initial article was based on a survey of
12      parents --
13           A.    Yes.
14           Q.    -- of purportedly transgender
15      children and the parents were recorded -- I'm
16      sorry.  Let me start over.  Were you aware that
17      the Littman article was based on a survey of
18      parents who were recruited through some parent
19      groups?
20                 MR. KNEPPER:  Objection, form.
21           A.    I knew it was a survey of parents.
22           Q.    Okay.  And did you know there were
23      no report-outs from the young adults of those
24      parents in the article?
25           A.    It was a report of parents'
```

Page 122

1    transitioning.  However, it is...important to
2    note that there are other survey items where
3    the parent would have direct access to
4    information about their child and that those
5    answers reflect items that can be directly
6    observed."  Did I read that correctly?
7         A.    Yes, you did.
8         Q.    All right.  Your report also cites
9    as support for the social contagion hypothesis
10   to an article from Medscape.com written by
11   Becky Mccall and Lisa Nainggolan as support for
12   the social contagion theory.  Is that correct?
13   I'm sorry.  It's not going to be on this
14   article, Doctor.
15        A.    I don't know that article.
16        Q.    Okay.
17        A.    You haven't asked me a question
18   about this.  Did I misunderstand something?
19        Q.    No, no.  Sorry.  We're just --
20        A.    You haven't asked my opinions about
21   that, yeah.
22                    -   -   -   -   -
23                (Thereupon, Deposition Exhibit 8,
24                "Transgender Teens: Is the Tide
25                Starting To Turn?" Article, was

Page 123

1          marked for purposes of

2          identification.)

3                  -  -  -  -  -

4      Q.    Yeah.  So, for the record, I'm

5    showing Dr. Levine what has been marked as

6    Exhibit 8.  "Transgender Teens:  Is the Tide

7    Starting To Turn?" by Becky McCall and Lisa

8    Nainggolan, April 26, 2021.  Dr. Levine, you

9    said you have not reviewed this article before?

10     A.    Which one are you referring to?

11     Q.    I'm sorry.  That one to your left.

12     A.    This?

13     Q.    Yes.  Take your time.

14     A.    Have I reviewed it, no.  You know,

15   I've seen the picture of Keira Bell.  I've seen

16   news reports of this in the past, but they were

17   just news reports, yeah.

18     Q.    Do you know if either of the

19   authors of this article is a scientist?

20     A.    I have no idea.

21     Q.    Okay.  Or a psychiatrist?

22     A.    (Indicating.)

23     Q.    I'm sorry.  Could you make your

24   responses verbal?  I'm forgetting.

25     A.    I have no idea.

Page 124

1          Q.    Okay.  Thank you.  Have either of

2     them ever treated transgender children or

3     adolescents?

4          A.    I would have no idea.

5          Q.    Okay.  To your knowledge, is the

6     information provided on Medscape.CA subject to

7     peer review?

8          A.    I don't know how Medscape works.

9     I've heard there have been retractions, but I

10    don't know how their peer reviewed is made.

11    Perhaps people write in that, This is

12    ridiculous what you've been teaching or what

13    you've been saying, but whether they're peer

14    reviewed or not, I have no idea.

15         Q.    So you probably -- I'm sorry.  So

16    do you know if this article has been published

17    in a peer-reviewed journal to your knowledge?

18         A.    "Transgender teens:  Is the

19    Tides" -- that article?

20         Q.    Yes.

21         A.    I don't know.  I don't know this

22    article.  I don't know where it's from.

23         Q.    Okay.  So your report includes a

24    quotation from this article.  "The vast

25    majority of youth now presenting with gender

Page 128

```
 1     multi-continental set of observations from
 2     Europe, from Australia, from North America --
 3          Q.    Okay.
 4          A.    -- it almost doesn't even need
 5     citations it's so clinically apparent.
 6          Q.    Okay.  But there's no citation in
 7     your report?
 8          A.    In my report, yes.
 9          Q.    Okay.  So on page 18, going back to
10     your report, at the bottom of page 18, you use
11     a term, "Transgender Treatment Industry."  Is
12     this the first time you have used this term?
13          A.    In this report?
14          Q.    No.
15          A.    You mean, did I ever use it in
16     another report?
17          Q.    Yeah, yeah.
18          A.    I'm not sure.  If this is -- if
19     it's not the first, it might be the second.
20          Q.    And where did the term originate?
21          A.    I think it -- the term originated
22     from Dwight Eisenhower at the end of his --
23     when he was leaving the presidency in 1952, he
24     warned the people about the military industrial
25     complex and that there was a very comfortable
```

1      the methods we made reference to before, the

2      efficacy of the treatment and the downsides of

3      the treatment.  But because WPATH is an

4      advocacy organization and the scientific

5      establishment of the efficacy of their

6      treatments are not important to them, what they

7      are doing is teaching young mental health

8      professionals and medical professionals as a

9      whole what their ideology is.  They say it's

10     scientifically established.

11          I'm here to tell you to the extent that I

12     understand science, it is not scientifically

13     established.  In a sense, there is an industry

14     that has different elements that feed each

15     other; that's the transgender treatment

16     industry.  I think if we put our heads

17     together, we could find another term.

18          Q.    So did you coin that phrase then?

19          A.    No --

20          Q.    Okay.

21          A.    -- no.

22          Q.    Have you seen it used before in any

23     peer-reviewed articles?

24          A.    Not in a peer-reviewed article.

25     I've seen it used in these kind of expert

Page 132

1     opinion -- (Indicating.)

2          Q.     Okay.

3          A.     -- I would -- you know, if I had

4     time and I had a committee of people, I -- I

5     would probably find a different term for it.

6     But I don't mean it in a disparaging way.  I

7     mean that this is a group of compassionate

8     people trying to help other people who actually

9     believe that the science has established the

10    best practices when in fact they're not well

11    informed.

12         Q.     Do you need a sip of water after

13    that?

14         A.     No.  I'm just a long-winded guy.

15         I want to add, if I may, that we should

16    make a distinction between education and

17    indoctrination.  Education can be based on

18    science.  Indoctrination is based on preferred

19    beliefs that, if you allow me to use this term

20    again.  The transgender treatment industry is

21    heavy on indoctrination and has declared, if

22    you look at the standards of care, if you don't

23    believe these systems, you're not a

24    competent -- you're not competent to take care

25    of people.  That of course is the height of

1          A.    No.   Their gender dysphoria may be

2     a product, you see, of these other things.  For

3     example, if you have someone who has been

4     sexually abused by her stepfather and becomes a

5     trans person in adolescents, we want to talk

6     about the sexual abuse and the process between

7     that person and what fears for the present and

8     the future that has caused the child.  And

9     we're not attacking their trans identity.

10    We're trying to help them understand where they

11    came from and what they're coping with and why

12    they're so fearful or so distressed by their

13    body changing.

14          Q.    And their gender dysphoria could be

15    separate and apart from that traumatic

16    experience?

17          A.    Theoretically it could be, yes.

18          Q.    And if it persisted sufficiently

19    enough, you would consider a letter of

20    authorization for --

21          A.    Yes.

22          Q.    -- hormones?

23          A.    Yes.

24          MR. KNEPPER:  Objection, form.

25          Q.    Okay.  If you would, please, turn

Page 151

1              A.    That is correct.  And may I add
2      that it's very, very difficult to understand.
3      The natural question would be, how do you
4      compare the general population with the trans
5      people who did not have surgery with the trans
6      people who did have surgery.
7              Q.    Thank you, Dr. Levine.  That's not
8      my question, though.  I just wanted to confirm
9      that was not the control group.  You mentioned
10     this study later in your report, page 66
11     beginning at paragraph 74.  Do you see that?
12             A.    Um-hum.
13             Q.    Okay.  And basically that -- well,
14     here, let me point you exactly.  The sentence
15     starts with, "Similarly," about halfway down
16     the page, third sentence of that paragraph.
17             A.    Um-hum.
18             Q.    And, as you mentioned, you cite the
19     Dhejne study and I believe -- or I should ask:
20     Is the Denmark study you're referencing the
21     study directly after it --
22             A.    The Simonsen study.
23             Q.    -- the Simonsen study?
24             A.    Yes.
25             Q.    Okay.  So beginning with the Dhejne

Page 152

1      study, do you think because that study showed
2      that some people committed suicide after gender
3      affirming surgery that no patient should be
4      able to access gender affirming surgery?
5                     MR. KNEPPER:  Objection, form.
6           A.     That would be illogical.
7           Q.     Okay.  Dr. Levine, I understand you
8      said that would be illogical, but just to be
9      clear.  You're not recommending -- sorry.  I'm
10     not using that word.  You're not saying that
11     the fact that some people commit suicide
12     following gender affirming surgery means that
13     there should be a ban on access to that
14     surgery.  Is that right?
15          A.     Not for that reason, no.
16                    MR. KNEPPER:  Objection, form.
17          Q.     Not for that reason.  Okay.  Are
18     you recommending that there would be bans on
19     gender affirming surgery for any reason?
20          A.     I think there are -- you know, I
21     think most prudent people in this field, just
22     to use the example of what you read out loud
23     about the Finland study, a case-by-case basis.
24     That's how doctor need to decide things, but
25     there are many, many reasons to be cautious

Page 154

1       fashion and to be very hesitant about going

2       forward.

3              Q.    But you're not recommending total

4       bans on gender affirming surgery?

5              A.    I'm not recommending total bans.

6       I'm aware of the individual circumstances of

7       individual people's lives and their commitment

8       to transgender living.  And I don't want to be

9       draconian about this.  I want to be

10      compassionate about this.

11             Q.    I understand.  I appreciate that.

12      I just want to make sure I'm understanding you

13      correctly.

14                          -   -   -   -   -

15                     (Thereupon, Deposition Exhibit 12,

16                     "Long-Term Follow-Up of Transsexual

17                     Persons Undergoing Sex Reassignment

18                     Surgery: Cohort Study in Sweden,"

19                     Article, was marked for purposes of

20                     identification.)

21                          -   -   -   -   -

22             Q.    So for the record, I'm presenting

23      to Dr. Levine what has been marked as

24      Exhibit 12.  "Long-Term Follow-Up of

25      Transsexual Persons Undergoing Sex Reassignment

Page 156

1          For the 22nd time today, did I read that
2     correctly?
3          A.    It's the 23rd time.
4          Q.    Oh, okay.
5          A.    Yes.
6          Q.    I was hoping you weren't counting,
7     but, okay.  Did you testify earlier today that
8     the limitation of the Dhejne study is that the
9     controls were not transgender persons who had
10    not undergone gender affirming surgery?
11         A.    Yes.
12              MR. KNEPPER:  Objection, form.
13         Q.    Okay.  You can set that aside,
14    Dr. Levine.
15                   -   -   -   -   -
16              (Thereupon, Deposition Exhibit 13,
17              2017 "On Gender Dysphoria," Booklet
18              From Department of Clinical
19              Neuroscience, Karolinska Institutet,
20              Stockholm, Sweden, was marked for
21              purposes of identification.)
22                   -   -   -   -   -
23         Q.    For the record, Dr. Levine has an
24    exhibit that has been marked as Exhibit 13.
25    "On Gender Dysphoria," by Cecilia Dhejne from

1    ideation in transgender people.

2         A.    Well, you know about the

3    Branstrom-Pachankis study and the criticism of

4    the study --

5         Q.    But I'm not talking about the

6    study.

7         A.    -- and part of the study

8    demonstrated that it increased suicidal

9    ideation and attempts in the first two and a

10   half years after surgery, especially in the

11   first year --

12        Q.    Right.  Is your testimony --

13        A.    -- so I'm not testifying that.  I

14   thought you were asking me about this, which I

15   need to comment on, because this is not an

16   accurate depiction of my statement in the

17   reference.  (Indicating.)

18        Q.    Well, that's not what I'm asking

19   about, Dr. Levine.

20        A.    Well, you're reading this and I'm

21   misquoted here.  So I don't want you to imply

22   that she is accurately representing my views,

23   because I did not say that gender affirming

24   treatment in general should be stopped.  I've

25   never said that.  This is an article about

```
                                          Page 173

 1      at different times have reported that in the

 2      large majority of patients, absent a

 3      substantial intervention such as social

 4      transition and/or hormone therapy, gender

 5      dysphoria does not," continue, "through

 6      puberty."

 7            So there are some children who persist in

 8      their asserted gender identity through puberty,

 9      correct?

10                  MR. KNEPPER:  Objection, form.

11            A.    Correct.

12            Q.    And some who persist in wanting to

13      transition via medical treatments?

14                  MR. KNEPPER:  Objection, form.

15            A.    Yes.  Some of the children have

16      learned about medical treatments somewhere

17      along the line and they feel instantly that

18      this is for them.

19            Q.    And then looking at paragraph 56,

20      which is on page 41, so just the very next page

21      on the bottom, the second sentence in that

22      paragraph.  "I observe an increasingly vocal

23      online community of young women who have

24      reclaimed a female identity after claiming a

25      male...identity at some point during their teen
```

1     transgender people is individual based, right?

2         A.    Well, it's both --

3               MR. KNEPPER:  Objection, form.

4         A.    -- yes, that's partially true.  And

5     ideally that's true, but it's obviously not

6     entirely true.  It's why we're here, is it's

7     categorically based.

8         Q.    Let me rephrase that.  You design

9     treatment for your patients based on what that

10    patient in front of you, what they need, what

11    they want, what you determine -- sorry.  Not

12    what you determine, but what you might

13    authorize?

14              MR. KNEPPER:  Objection, form.

15        A.    What the patient and I discern

16    together.

17        Q.    Thank you.  Okay.  Let's jump to,

18    again, still in your report, page 68.

19        A.    We've left 40 and 41?  68.

20        Q.    Okay.  Looking at the bottom of

21    page 68, Dr. Levine, paragraph 78.  It states,

22    "Similarly, the American Psychological

23    Association has stated because approach" --

24        A.    Sorry.

25        Q.    I apologize.

1    Gender Nonconforming People (2015)."

2         So is that lack of consensus that you

3    discuss a justification to categorically ban

4    social transition for children as a treatment

5    for gender dysphoria?

6              MR. KNEPPER:  Objection, form.

7         A.   By, "Children," you mean 6 and 7

8    year olds?

9         Q.   Those for whom medical intervention

10   is not indicated.

11        A.   Is that a reason to ban it?

12        Q.   Correct, social transition.

13             MR. KNEPPER:  Objection, form.

14        A.   The reason to -- so let me qualify

15   that.  There's a, yes, answer, there's a reason

16   to ban it.  And the reason to ban it is both a

17   developmental and an ethical reason.  There

18   have been eleven studies of these cross-gender

19   identity children who are not socially

20   transitioned and the vast majority of them

21   de-transition by the time they're mid

22   adolescents or older adolescents.  They become

23   homosexual individuals usually or bisexual

24   individuals, but they are cis gender.

25             So if we take a 6-year-old child and

Page 184

1     A.   -- nor you didn't ask me to comment
2  on that.
3     Q.   It was related to what you had said
4  before.  So this is related but not related to
5  what we just read.  So you can put that aside.
6     A.   Okay.  But your next question was
7  about puberty blocking hormones, which are not
8  being used for 6-year-old's and 7-year-old's --
9     Q.   Correct, yes, a separate group of
10  people.
11     A.   -- so we're on a different
12  category.
13     Q.   Yes.
14     A.   Okay.  So you asked me if I think
15  puberty blocking hormones should be used on a
16  case-by-case basis?
17     Q.   Correct, yes.
18     A.   I don't think so.
19     Q.   So that is to say, there are no
20  circumstances you would advocate for a total
21  ban on that intervention?
22         MR. KNEPPER:  Objection, form.
23     A.   Number one, I've never seen a child
24  where that has come up where I thought it was a
25  good idea.  In the cases I've seen, it was like

1    a treatment for the mother's pathology, not for

2    the child.  And it's like a warning sign, boy,

3    be careful.  You see, if you see one case like

4    that, you wonder -- and it's so conspicuous,

5    you wonder in the next case, if the same thing

6    is going on in a more subtle way.

7           Is the child acting out the ambitions of

8    the mother or the father?  I just think

9    prudence -- I think considering the child has

10   not gone through puberty or has not gone far

11   into puberty and puberty brings all kind of

12   psychological, physical and social changes to a

13   child and those changes lead to desistance in

14   many, many children, to put them into a state

15   where all their peers are developing physically

16   and they're going to be poirot (phonetic).

17          And then most of those children have

18   social anxiety problems and they avoid -- they

19   don't have friends, right.  And this is going

20   to make them even more different than their

21   peers and it's gone to deprive them of the

22   sexualization of their mind and the discovery

23   of masturbation and the discovery of sexual

24   desire for partners, you see.  This is only

25   going to increase the child's difference from

1    her peers or his peers and I don't think this

2    is a prudent idea.

3          And if you wanted me to suggest a ban on

4    anything, it would be a ban on using puberty

5    blocking hormones, especially when the

6    evaluation of those children are focused on the

7    gender dysphoria of the child and not on the

8    background of the child and not on what's going

9    on.  So I think that's an answer to your

10   question.

11         If we're going to use these drugs, if

12   we're going to use social transformation of

13   children, if we're going to use puberty

14   blocking hormones, it should only be used in a

15   carefully designed protocol.  And follow up has

16   to be guaranteed so in one year and in two

17   years and in three years and before we start

18   giving cross-gender hormones we have data --

19         Q.    Sorry.

20         A.    -- so the answer to your question

21   is, I would consider banning puberty blocking

22   hormones even for children who have been

23   cross-gender identified for four years to give

24   them a chance to desist, which is exactly what

25   the Dutch protocol did, by the way.

1          Q.    Sorry.  So you just said you would

2     ban -- you would recommend a ban on --

3          A.    If --

4                MR. KNEPPER:  Objection, form.

5          A.    -- look, I'm a doctor.  I'm not a

6     policy maker --

7          Q.    I understand, yes.

8          A.    -- if you ask me my political

9     opinion about, should we ban this, is that a

10    reasonable thing, I think there's a very strong

11    argument for banning puberty blocking hormones.

12         Q.    Okay.  And, right.  So you're here

13    as an expert offering an expert opinion.  So

14    are you separating that from -- like are you

15    saying your political views that you would

16    advocate for bans or are you saying your expert

17    opinion you're offering in this case is you

18    would recommend ban?

19                MR. KNEPPER:  Objection, form.

20         A.    I would recommend ban.  To what

21    extent it's from my politics or from my being a

22    parent or from my being a doctor, I don't know.

23    I would recommend we not use puberty blocking

24    hormones.

25         Q.    In Claire, in this case that we

1          Answer:  "Where we had a healthy mother

2      and father, an intact family who was

3      psychologically informed and who has -- where a

4      child has come out of toddlerhood acting

5      consistently in a gender atypical fashion, and

6      where the parents are not homophobic..."

7          Question:  "The parents are not what kind

8      of people?"

9          Answer:  "Homophobic."

10         For the 27th time, did I read that

11     correctly?  Did I read that correctly?

12         A.    Yes.

13             MR. CHARLES:  Okay.  All right.

14     Let's go ahead and take a break for a few

15     minutes.

16             VIDEOGRAPHER: Off the record 3:20.

17               (Recess taken.)

18             VIDEOGRAPHER: On the record 3:38.

19     BY MR. CHARLES:

20         Q.    So, Dr. Levine, before the break,

21     you were talking about 6 and 7 year olds and

22     you mentioned there were eleven studies.  Can

23     you identify which eleven studies from your

24     report you're referring to?

25         A.    Cantor, the reference Cantor lists

1    the eleven studies and these eleven studies

2    have been done over probably thirty years.

3         Q.    Okay.  So Cantor was one review of

4    eleven studies?

5         A.    Cantor was a review of the eleven

6    studies.  I can't list to you the eleven

7    individual studies.  The latest one is written

8    by Singh, S-i-n-g-h.  It was published in April

9    of 2021, in the Frontiers of Psychiatry.  And

10   that perhaps is the most comprehensive of them.

11   And that's the one that confirms -- that's a

12   study of boys and it confirmed that 12.2, I

13   think percentage of them persisted over a

14   thirteen-year period.

15        Q.    So that was one -- that was the

16   Singh study that came out.  Is that same study

17   mentioned in the Cantor review?

18        A.    (Nodding.)

19        Q.    Okay.  And you said that

20   established that 12.2 percent of prepubertal

21   boys persisted into adolescents?  Okay.

22        A.    Yes.  This harkens back to the

23   ethical issue that I talked about before.  You

24   know, if you know that 88 percent of them are

25   going to persist -- desist, why in the world

Page 196

1     identified 60,000 case reports world wide on

2     the Internet.  See Exposito-Campos..." --

3          A.    That is an error, by the way.

4          Q.    Sorry.  Which part of that is an

5     error?

6          A.    That, "60,000," is my error.  It

7     should say, "16,000."

8                     -  -  -  -  -

9                (Thereupon, Deposition Exhibit 17,

10               "A Typology of Gender Detransition

11               and Its Implications for Healthcare

12               Providers," Article, was marked for

13               purposes of identification.)

14                    -  -  -  -  -

15         Q.    Okay.  So for the record, I'm

16    showing Dr. Levine what has been marked as

17    Exhibit 17.  "A Typology of Gender Detransition

18    and Its Implications for Healthcare Providers,"

19    Pablo Exposito-Campos, 2021.  Okay.  Have you

20    seen this study before, Dr. Levine?

21         A.    Yes.

22         Q.    Okay.  So on page 1 of this report,

23    about halfway through the very first paragraph

24    in the introduction beginning with, "As a

25    consequence."  Do you see that there?

Page 200

1    important to note that this typology does not

2    suggest two clear-cut categories, for a

3    secondary detransition can lead to a primary

4    detransition" -- oh, sorry.  Let me start over.

5    Sorry.

6           Okay.  Let me start from a different

7    place, Dr. Levine.  The second sentence.

8    "In r/detrans" --

9           And there's an HTTP address --

10          A.    Okay.

11          Q.    Okay.  You see that.

12          -- "a subreddit for detransitioners to

13   share their experiences with more than 16,000

14   members, one can find several stories of people

15   who call their transgender status into question

16   after stopping transitioning due to medical

17   complications or feeling dissatisfied with

18   their treatment results"?

19          Do you know what a, "Subreddit," is,

20   Dr. Levine?

21          A.    I believe it's just a division of a

22   larger website where people, you know, with

23   similar interests.

24          Q.    Okay.  Do you understand this

25   sentence to be suggesting that all 16,000 of

Page 201

1     those members have offered a story of

2     detransition?

3               MR. KNEPPER:  Objection, form.

4          A.    I think -- I think it may be true

5     that either they have offered a personal story

6     or they're fascinated because of their own

7     considerations of that story.  They're thinking

8     about it themselves, which would be in keeping

9     with the idea that even people who have

10    transitioned begin to doubt whether they made a

11    wise decision and they're considering

12    detransition.  I'm not so sure it means that

13    all 16,000.  I would have no way of

14    ascertaining that.  You know, in my worry, I

15    would lean towards most of them are seriously

16    considering or have detransitioned.  And in my

17    skepticism, I would say I'm not sure whether

18    it's 15,000 or 12,000 or 8,000.

19         Q.    But you have no way to confirm

20    that --

21         A.    I have no way.

22         Q.    -- if it's all of them or a few of

23    them or three of them?

24         A.    You're absolutely right.  I have no

25    way of confirming that.

1    where hormones are safe and surgery is a good

2    thing to do.  If a person said that, you know,

3    skeptically, I think that would disappoint

4    certain patients, but how it was said and when

5    it was said in response to what would either

6    determine whether the person is engaged with

7    the mental health professional or leaves the

8    mental health professional.  You know, all

9    mental health professionals are not created

10   equal.

11        Q.   So it sounds like you're saying it

12   could do harm to that patient?

13            MR. KNEPPER:  Objection, form.

14        A.   No, I'm not saying that.  I'm

15   saying it could be disappointing to that

16   person.  What that person did with the

17   disappointment may prove harmful just because

18   of that person or it may prove in fact

19   beneficial.

20        Q.   Are you satisfied -- let's orient

21   this question around the patients you've seen

22   in the last 12 months.  Are you satisfied that

23   those patients -- actually, sorry.  Let me

24   start over.  Are you satisfied that the

25   patients you have seen historically for whom

Page 226

1    you provide letters of authorization for

2    hormones give sufficiently informed consent?

3                MR. KNEPPER:  Objection, form.

4         A.    From my point of view, I did what I

5    could to reach the standard of having the

6    person internalize and think about, digest,

7    dream about and come back and talk to me about

8    it.  That's all I can do.  I can't guarantee

9    that if I do what I do that it's going to

10   change your mind or help you steer your ship in

11   a slightly different angle --

12        Q.    So --

13        A.    -- so I would not write a letter of

14   recommendation if I didn't feel like I did my

15   part.  And if the person indicated that they

16   couldn't pay attention to me, I wouldn't write

17   the letter.

18                MR. CHARLES:  Understood.

19          Okay.  John, finished.

20                MR. KNEPPER:  You're finished?

21                MR. CHARLES:  I mean, barring --

22                MR. KNEPPER:  Barring --

23                MR. CHARLES:  We can't tell the

24   future.

25                MR. KNEPPER:  I wasn't ready for

Page 235

1    history and current psychiatric diagnosis, it's
2    more complicated than just the internet.
3         But we need to understand who these
4    children are and how they're different from
5    their peers and what we could possibly do to
6    help them to have a better life.  I know some
7    of the conversation today was, we'll help them
8    have a better life by giving them puberty
9    blocking hormones, but that doesn't address --
10   I think it has a risk of harming them further.
11   And it doesn't address the comorbid
12   developmental challenges that these children
13   face.
14        And I'm afraid -- and it's controversial,
15   because I don't have the answer.  I'm afraid
16   there's a possibility we're making these
17   children have a worse outcome.  And until you
18   can demonstrate to me in a very careful
19   controlled study that separates the autistic
20   from the non-autistic, you see?  That separates
21   the kids who come from a family that's intact
22   from a family where there's a single parent.
23   Where you can separate the kids who were
24   sexually abused from the kids who were not
25   sexually abused.  I'm not sure puberty blocking