## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

CHRISTOPHER FAIN,
SHAUNTAE ANDERSON,
individually and on behalf of all others similarly situated,

        Plaintiffs,

v.                                 CIVIL ACTION NO.   3:20-0740

WILLIAM CROUCH, in his official capacity as
Cabinet Secretary of the West Virginia
Department of Health and Human Resources;
CYNTHIA BEANE, in her official capacity as
Commissioner for the West Virginia Bureau for
Medical Services;
WEST VIRGINIA DEPARTMENTOF HEALTH AND
HUMAN RESOURCES, BUREAU FOR MEDICAL SERVICES,

        Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are cross motions for summary judgment filed by Plaintiffs (transgender individuals who receive healthcare through the West Virginia Medicaid Program) and Defendants (the State actors and agencies responsible for administering the Medicaid Program). ECF Nos. 250, 252. This case challenges the constitutionality of the West Virginia Medicaid Program's exclusion of the surgical treatment of gender dysphoria.

As it currently stands, the West Virginia State Medicaid Program does not afford coverage for gender-conforming surgical care as treatment for gender dysphoria. Ultimately, the exclusion in the healthcare plan precludes coverage for these surgical treatments when a person is diagnosed with gender dysphoria. However, the same or similar surgical treatments are available to persons when the diagnosis requiring that treatment is not gender dysphoria. It is undisputed that the criteria

determining whether or not such treatment is covered under the Medicaid Program hinges on a diagnosis—but when treatment is precluded for a diagnosis based on one's gender identity, such exclusion invidiously discriminates on the basis of sex and transgender status. Thus, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 250) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 252).

## BACKGROUND

The Plaintiffs in this case are transgender West Virginian Medicaid participants. Plaintiff Christopher Fain is a 46-year-old transgender man enrolled in West Virginia Medicaid. He receives hormone therapy for his gender dysphoria diagnosis. Because of this diagnosis, he seeks a bilateral mastectomy. Two physician letters recommend this treatment. *Fain Tr.*, ECF No. 252-5, at 22. However, he has not formally sought coverage for this surgical procedure or received a denial letter. *Id.* at 23. He felt such an exercise would be futile, knowing that the surgery is excluded under his insurance policy. *Id.*

Plaintiff Shauntae Anderson is a 45-year-old transgender woman enrolled in West Virginia Medicaid. She also receives hormone therapy for her gender dysphoria diagnosis. She seeks vaginoplasty and breast reconstruction surgery to relieve her gender dysphoria. *Anderson Tr.*, ECF No. 250-11, at 11–12. Plaintiff Anderson noted that she has not spoken with a doctor about these procedures because it is known such surgeries are not covered and speaking about the unavailable treatment would cause her distress. *Anderson Tr.*, ECF No. 252-4, at 43.

Medicaid is a federal-state program providing health insurance for eligible persons. 42 U.S.C. § 1396–1396w-5. West Virginia has participated in the Medicaid program since its inception in 1965. The purpose of the program is to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42

U.S.C. § 1396-1. Medicaid for West Virginia has an annual budget of between $4.5 and $5.1 billion. *Manning Tr.*, ECF No. 250-16, at 13. CMS subsidizes 74% to 81% of the state's program. *Beane Tr.*, Ex. 250-13, at 31, 40.

Mountain Health Trust is West Virginia's Medicaid Program. Eligible Medicaid participants may choose a primary health provider and select one of three managed care organizations (MCOs). Each plan provides participants with Medicaid-covered health services. While 85% of Medicaid participants receive coverage through Mountain Health Trust, the remaining 15% receive care through a fee for service model where Medicaid pays providers directly.

Defendants maintain a comprehensive state plan for medical assistance which is detailed in a Medicaid Policy Manual. *Beane Tr.*, ECF No. 250-13, at 28. The Policy Manual provides a blanket exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6. Additionally, BMS's contract with each of the three MCOs has an explicit exclusion of coverage for "transsexual surgery." *See Aetna Contract*, ECF No. 250-33; *see UniCare Contract*, ECF No. 250-34; *see The Health Plan Contract*, ECF No. 250-35. The exclusion for "transsexual surgery" was adopted around 2004 and has been maintained since without review. *See Becker Tr.*, ECF No. 250-14, at 11–12; *Beane Tr.*, ECF No. 250-13, at 43–44.

Defendant West Virginia Department of Health and Human Resources, Bureau for Medical Services (BMS) is a bureau of the West Virginia Department of Health and Human Resources (DHHR) and is the agency responsible for administering the Medicaid program in West Virginia. BMS receives funding from the U.S. Department of Health and Human Services—federal funds. Defendant Bill Crouch is the Cabinet Secretary of DHHR and is responsible for ensuring that BMS

meets the federal requirements. He is also responsible for developing a managed care system to monitor the services provided by the Medicaid program. *See* W. Va. Code § 9-2-9(a)(1). Defendant Cynthia Beane is the Commissioner of BMS. She is responsible for administering the state Medicaid plan and ensuring that it complies with the Affordable Care Act (ACA) and Medicaid Act.

## STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## DISCUSSION

Plaintiffs bring the following claims against Defendants:

-4-

1. Denial of Equal Protection under the Fourteenth Amendment

2. Violation of the Affordable Care Act

3. Violation of the Comparability Requirement of the Medicaid Act

4. Violation of the Availability Requirement of the Medicaid Act

The Court will address each claim.

1. Equal Protection under the Fourteenth Amendment

Plaintiffs assert that the exclusion for the surgical treatment of gender dysphoria violates their rights under the Equal Protection clause of the Fourteenth Amendment. The Equal Protection Clause provides that "[n]o State shall… deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). A claim for an equal protection violation requires a plaintiff to show that they have "been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Once this demonstration is made, next the court must "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 43 U.S. 432, 440 (1985).

a. Resolution of facts related to Equal Protection analysis

Important to the Court's review of the Equal Protection claim are some key factual findings.

i. *Policy exclusion and covered services*

The exclusion at issue here is the exclusion for "transsexual surgery," stating that such a service is not covered "regardless of medical necessity." *Ex. 23*, ECF No. 250-27, at 5–6.

Nonetheless, the policy does cover other treatments related to transgender healthcare. The policy covers psychiatric diagnosis evaluation, psychotherapy, psychological evaluation, counseling, office visits, hormones, and lab work when medically necessary even if the treatments are related to gender-confirming care. *Tr. of Proceedings*, ECF No. 269, at 32–33; *see Beane Tr.*, ECF No. 250-13, at 5, 50. Transgender individuals are covered for the same care as cisgender individuals when such treatment is not the surgical treatment for gender dysphoria.

The West Virginia Medicaid Program uses a utilization management vendor called Kepro to determine whether a service is covered. *See Sarah Young Dep.*, ECF No. 250-18, at 23. Kepro is a screening tool that determines the medical necessity of a treatment, and this system uses nationally accredited criteria established by InterQual. *Id.* at 24. The criteria are derived from a systematic and continuous review of current, evidence-based literature, and also include input from an independent panel of clinical experts. *Id.* at 26. InterQual relies on guidelines promulgated by the World Professional Association of Transgender Health (WPATH) and the Endocrine Society that provide guidance on transgender health treatments. *See generally InterQual Composite*, ECF No. 250-30. Due to the exclusion, Medicaid does not follow the InterQual/Kepro guidance for surgical care to treat gender dysphoria.

      ii.     *Material differences between surgery for gender-confirming and surgeries for non-gender-confirming treatments*

Defendants assert that the surgical procedures provided to treat gender dysphoria are distinct from those provided to cisgender and transgender patients for non-gender-confirming purposes. To support this position, Defendants point to the InterQual guidelines for gender-affirming care, which are utilized by Kepro. Defendants argue that, because InterQual has guidelines that are specific to gender-affirming surgical services, they are distinct from the

guidelines that relate to the surgeries covered by Medicaid. To Defendants, the fact that there are these separate and distinct InterQual guidelines relating to gender-affirming surgical services proves that the procedures are different. But this argument lacks merit. InterQual's guidelines to determine the medical necessity of surgery to treat gender dysphoria are based on the diagnosis of gender dysphoria; thus, the criteria to determine the medical necessity of surgery to treat a different diagnosis would be based on that different diagnosis. That does not make the actual surgical treatments materially different.

In fact, Defendants' assertion that the surgical services provided for gender dysphoria are fundamentally different from those provided for cisgender and transgender patients is unsupported by the expert and other evidence in the record. In his expert report, Dr. Loren Schechter explains that the same surgical treatments can be performed to address several different diagnoses. *Dr. Schechter Expert Report*, ECF No. 250-23, at 17–18. For example, a vaginoplasty can be performed for a transgender patient to treat gender dysphoria or for a non-transgender woman as a treatment for congenital absence of the vagina. *Id.* at 18. When documenting and billing for these surgical treatments, health care providers utilize Current Procedural Terminology (CPT) codes developed and maintained by the American Medical Association. *Id.* at 17–18. The same CPT codes are used to document and bill the same surgical treatment when performed for a transgender patient with gender dysphoria and for any patient for a different diagnosis.

Defendants also assert that the techniques used to perform gender-affirming surgeries and those used to perform non-gender-confirming surgeries are different, supporting their argument that the procedures are distinct. But, to support this claim, Defendants offer no evidence themselves and instead mischaracterize Plaintiffs' expert testimony. It is true that there are many techniques used for the same kind of surgeries, and the specific technique used by a surgeon will

"depend upon the specific situation" or would depend on "the clinical conditions" of the individual patient *Dr. Schechter Dep.*, ECF No. 252-15, at 40–41. For example, there "is a wide range of indications or techniques used to perform mastectomy, whether for gender-affirming mastectomy or for a mastectomy pertaining to oncologic reasons or for risk reduction mastectomies, meaning removing a breast that is not cancerous but may have an increased predilection or risk of breast [cancer.]" *Id.* at 40. However, the "technical act of a mastectomy" can be performed to treat both a non-gender dysphoria related diagnosis and a gender dysphoria related diagnosis. *Id.* Based on the expert opinion of Dr. Schechter, this Court finds that a surgery, such as a mastectomy, for a gender dysphoria diagnosis and the same surgery for a non-gender dysphoria diagnosis, are not materially different

> iii.    Costs associated with the surgeries

In their memoranda, Defendants put forth cost considerations as a legitimate governmental interest to support the exclusion. Defendants assert that Medicaid is projecting a budget deficit within two years. *Beane Dep.*, ECF No. 252-3, at 46. Thus, their argument goes, if the program were to include coverage for surgical care for gender dysphoria, the program would have to "cut existing services or receive additional appropriations from the [L]egislature." *Id.* Defendants also note the Legislature's hesitancy to increase the Medicaid budget. *Id.*

But Defendant's cost-related argument is unsupported by the record. First, the Court notes that, puzzlingly, Defendants stipulated to the fact that there are "no documents of which they are aware that were considered in adopting and/or maintaining the Exclusion" in the Medicaid Program.[1] *Corrected Stipulation of Pls. and Defs.*, ECF No. 258. It is curious as to how, in the face of this stipulation, Defendants can assert that the exclusion was adopted with cost

---

[1] Defendants admit that there is no known reason as to why this Exclusion was ever adopted in the first place. *See Beane Dep.*, ECF No. 250-13, at 42–43.

considerations in mind. Cost information could have been ascertained by Defendants, but it appears that there has been no direct cost analysis regarding surgical care to treat gender dysphoria at all.[2]

Beyond Defendants' failure to rely on any cost-related documents in consideration of the exclusion, the information in the record that does pertain to costs shows that the cost of providing this coverage is not burdensome. There are a relatively small number of people affected by the exclusion. *See Dr. Karasic's Dep.*, ECF No. 252-8, at 4–5 (noting that around one person in 200 identifies as transgender, while around one in 1,000 is in clinical care for gender dysphoria); *Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 594 (4th Cir. 2020) (noting that only "approximately 0.6% of the United States adult population" identifies as transgender). In fact, Defendants provided that, through September of 2021, there were 686 West Virginia Medicaid participants who have submitted one or more claims with a diagnosis code for gender dysphoria or gender incongruence. *Defs.' Resp. to Pls.' Second Set of Interrogs.*, ECF No. 250-6, at 5. Further, there is no evidence in the record to show that surgeries to treat gender dysphoria are any more or less costly than those similar surgeries to treat other diagnoses. *See Dr. Karasic's Expert Report*, ECF No. 252-8, at 65–66 ("[W]hen a form of treatment is covered for cisgender people under an insurance plan, it is generally not disproportionately costly to cover the same treatment for transgender people simply because it is provided to treat gender dysphoria."). As discussed above, such surgeries are in all relevant aspects the same, so it logically flows that a surgery to treat gender dysphoria will not be significantly more expensive than one for a different diagnosis. Given the fact that very few individuals will seek such treatment, the Court is unpersuaded that

---

[2] Information about how other states apply policies regarding the coverage of surgical treatment for gender dysphoria could have been ascertained. *See Becker Tr.*, ECF No. 250-14, at 18 (discussing documents reviewed by Becker).

providing coverage for this treatment would be too burdensome of a cost.

Further, this assertion flies in the face of unrefuted expert testimony. Dr. Schechter's expert report discusses research of the cost-effectiveness of gender confirmation surgeries. *Dr. Schechter Expert Report*, ECF No. 250-23, at 17–18. Citing to research done at the John Hopkins Bloomberg School of Public Health, the Commonwealth of Massachusetts Group Insurance Commission, and the University of Colorado, Dr. Schechter opines that gender confirmation surgeries typically result in a "significant reduction of gender dysphoria," while those suffering from gender dysphoria without access to these surgeries tend to "have higher rates of negative health outcomes such as depression, HIV, drug abuse, and suicidality." *Id.* at 18. The research shows that "the one-time costs of gender confirmation surgeries coupled with standard post-operative care, primary and maintenance care, were overall less expensive at 5- and 10-year marks as compared to the long-term treatment of the negative health outcomes associated with the lack of insurance and resulting healthcare access." *Id.* at 18–19. Thus, overall, Dr. Schechter notes that these surgeries are both affordable and a "nominal percentage of the care offered through group health plans." *Id.* at 19.

Defendants can point to no evidence in the record to support the assertion that providing coverage for surgical treatment of gender dysphoria is too costly. In fact, Defendants concede that they have not conducted or ever obtained any cost analysis information to rebut Plaintiffs' claims. The only evidence in the record points to the contrary—that the surgical treatment of gender dysphoria is ultimately cost-effective and comparable to surgery for other diagnoses.

b.  The exclusion discriminates based on transgender status

"In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons." *Grimm*, 972 F.3d at 607 (citing

*United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, (1938)). The classifications in most state policies are generally held to be valid when those classifications drawn are "rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. However, "[t]his general rule 'gives way'... when the policy discriminates based on membership in certain suspect classes." *Kadel v. Folwell*, 1:19-cv-272, 2022 WL 2106270, *18 (M.D.N.C. June 10, 2022) (citing *Cleburne*, 473 U.S. at 440). The Fourth Circuit has determined that policies that discriminate on sex or transgender status are reviewed under a heightened scrutiny. *Grimm*, 972 F.3d at 608–10.[3,4] Policies that classify based on a quasi-suspect classification are found to be unconstitutional unless they are "substantially related to a sufficiently important governmental interest." *Cleburne*, 473 U.S. at 441.

Plaintiffs' Equal Protection claim is grounded in the assertion that transgender West

---

[3] When considering whether a certain group constitutes a quasi-suspect class, the Fourth Circuit analyzed four factors:

- Whether the class historically has been subject to discrimination
- Whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society
- Whether the class may be defined as a discrete group by obvious, immutable, or distinguishing characteristics
- Whether the class lacks political power.

*Grimm v. Gloucester Cty. School Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020) (internal citations omitted).[3] The *Grimm* court discussed the history of discrimination of transgender peoples in education, employment, housing, healthcare access, and military service, in addition to the history of violence and harassment of transgender peoples. The court then opined that one's transgender status "bears no... relation" to one's ability to "perform or contribute to society." *Id.* at 612 (internal quotation omitted). Moving on, the court discussed that a person's gender identity is "as natural and immutable as being cisgender," and that transgender people constitute a minority lacking political power, as only 0.6% of the United States population identify as transgender.

Many courts have held that discrimination against transgender persons is sex-based discrimination for Equal Protection purposes because such policies punish transgender persons for gender non-conformity, thus relying on sex stereotypes. *Id.* at 608. Thus, this Court follows *Grimm* and finds that the Plaintiffs in this case fall within a quasi-suspect class, necessitating the application of heightened scrutiny.

[4] At the outset, the Court notes that Defendants have argued that *Grimm* should not apply to this analysis. Defendants argue that the matter before this Court is a case of first impression, entirely novel from the *Grimm* case, where the Fourth Circuit considered a challenge to a policy requiring students to use bathrooms based on their biological, or birth-assigned, sex. Here, in contrast, the Court is grappling with a Medicaid benefits case. But the context of the cases is immaterial to the application of the applicable level of scrutiny. Regardless of the specific set of facts under which each case arises, the Court must use the appropriate level of scrutiny to analyze each of the policies. The four-factor test enumerated in *Grimm* aids this Court's determination of whether a suspect class exists here.

Virginia Medicaid participants are denied the medically necessary surgeries that participants receiving those same surgeries for non-gender dysphoria related treatments are allowed—thus, the classification is based on transgender status. Defendants refute this assertion, claiming that the exclusion does not take into consideration gender status, but instead is based on diagnosis, i.e., surgeries are excluded for the diagnosis of "gender dysphoria," not excluded for transgender people. Further, Defendants say that transgender Medicaid participants are not denied any coverage that similarly situated persons have. According to Defendants, the persons affected by the exclusion, transgender people suffering from gender dysphoria seeking surgery, are similarly situated only to other transgender people suffering from gender dysphoria seeking surgery—thus, there is no disparate treatment, as surgery for gender dysphoria is not covered for anyone. Defendants assert that Plaintiffs cannot seek comparison with cisgender persons who seek surgeries for reasons for other than gender-confirmation, because those procedures sought by cisgender persons are not gender-confirmation procedures, making the groups not "in all relevant aspects alike." Defendants further assert that, because other gender-confirming treatments are made available under the West Virginia Medicaid Program, and that only a subgroup of transgender people will ever seek surgery, Defendants are not discriminating against transgender people.

The Court is not persuaded by Defendant's arguments. First, inherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender. *See Kadel*, 2022 WL 2106270, at *20 ("even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria, it would still receive intermediate scrutiny. Discrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status. As with the

Plan's exclusions, one cannot explain gender dysphoria 'without referencing sex' or a synonym." (quoting *Grimm*, 972 F.3d at 608)). Transgender people have access to the same surgeries for other diagnosis—the exclusion is aimed specifically at a gender change procedure. Thus, the exclusion targets transgender people because they are transgender.

Second, the Court turns to the argument that transgender individuals with gender dysphoria seeking gender-confirmation surgery are not similarly situated to individuals seeking the same surgeries for reasons other than gender-confirmation. Defendant supports this position by relying on a report and recommendation out of the Eastern District of Louisiana, where a pro se prisoner filed a § 1983 action alleging that defendants were deliberately indifferent to her need for medical treatment for gender dysphoria and violated her right to equal protection. *Williams v. Kelly*, No. 17-12993, 2018 WL 4403381, at *1 (E.D. La. Aug. 27, 2018). The report found that plaintiff was not similarly situated to cisgender patients seeking vaginal surgeries, so her Equal Protection claim failed. *Id.* at *12. This Court is neither bound nor persuaded by this report. The *Williams* court was not bound by *Grimm*'s sex discrimination analysis and decided that case before *Bostock*'s guidance for analyzing sex discrimination against transgender people. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020). Further, the majority of cases support this Court's analysis.[5]

The Court disagrees with Defendants' position. The exclusion at issue here denies coverage to transgender people with a gender dysphoria diagnosis seeking medically necessary surgeries. "Similarly situated persons in all relevant aspects alike" cannot refer only to people from the same exact group—the legal standard simply asks the Court to look to persons "in all *relevant* respects alike." *Morrison*, 239 F.3d at 654 (emphasis added). The *Grimm* court agreed, rejecting a similar argument where the school board contended that the plaintiff, a transgender boy, was not similarly

---

[5] *See Grimm*, 972 F.3d at 609–10; *see Kadel v. Folwell*, 1:19-cv-272, 2022 WL 2106270, *21 (M.D.N.C. June 10, 2022); *see Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020).

situation to cisgender boys, but only to biological girls. *Grimm*, 972 F.3d at 609–10. The Fourth Circuit opined that embedded in this argument is the bias that gender identity is a choice, and that adopting this framing of the issue would give in to stereotyping. *Id.* at 610.

The relevant comparison here is to persons who seek the same, medically necessary surgeries for non-gender dysphoria related treatments. The West Virginia Medicaid Program provides, for example, medically necessary mastectomies for non-gender dysphoria related diagnoses. The only difference between this scenario and the Plaintiffs' circumstances is that Plaintiffs seek these surgeries to treat gender dysphoria—thus, a distinction hinging on their transgender identity. There are InterQual standards, which are evidence-based standards, that determine the medical necessity of a procedure—these standards exist for both gender dysphoria treatment surgeries and non-gender-affirming surgeries, providing objective basis for determining when such treatments will be covered. Additionally, the surgeries for both gender-affirming and non-gender-affirming reasons utilize the same CPT codes in documenting and billing. The only difference, which results in the preclusion of coverage for Plaintiffs, is that their diagnosis is for gender dysphoria, arising from their identity as transgender.

Lastly, the Court disagrees with Defendants' assertion that, because West Virginia Medicaid provides coverage for some treatments of gender dysphoria, excluding coverage for surgical treatments for gender dysphoria is not discriminatory, as only a subset of transgender individuals will seek this treatment. Defendant relies on *Toomey v. Arizona*, a report and recommendation that found that a policy exclusion which "discriminates against some natal females but not all...is not, on its face, discrimination on the basis of sex." No. CV-19-0035-TUC-RM, 2020 WL 8459367, *4 (D. Ariz. Nov. 30, 2020).[6] This is an out-of-district case and is non-

---

[6] The Court notes that this report and recommendation was denied in part by the District Court. *Toomey v. Arizona*, 19-cv-00035, 2021 WL 753721 (D. Ariz. Feb 26, 2021).

binding on this Court. The District Judge in this matter did not discuss the magistrate's report and recommendation regarding this analysis in detail, but rather, found that 1) plaintiffs had not met the heightened standard for such relief and 2) the preliminary injunctive relief sought by plaintiffs was the same as the ultimate relief sought in the case, and without a showing of extraordinary circumstances, such relief could not be granted at the preliminary injunction phase. *Toomey v. Arizona*, 19-cv-00035, 2021 WL 753721 *5–*6 (D. Ariz. Feb 26, 2021). The report was adopted only to the extent that it recommended denying the Motion for Preliminary Injunction on the grounds that Plaintiff had not met the heightened standard. *Id.* at *6. The rest of the report was rejected by the District Court. *Id.* Thus, this report and recommendation is not persuasive to this Court's analysis.

Further, the Supreme Court has made clear that it "does [not] matter if an employer discriminates against only a subset of men or women." *Bostock*, 140 S. Ct. at 1775; *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (finding that, even though only some women will become pregnant or have children, the refusal to hire women with preschool-aged children was facial sex discrimination). The exclusion here denies surgical care to all transgender people who may seek surgery to treat gender dysphoria—that subset of transgender people is equally protected against discrimination. Further, the narrow question addressed by this Court is the exclusion of surgical care. Simply because the West Virginia Medicaid Program does not discriminate in all aspects does not permit it to discriminate narrowly against transgender surgical care.

    c.  <u>The exclusion discriminates on its face</u>

Generally, a plaintiff must show that a policy based on sex or transgender status had discriminatory intent. But such a showing is unnecessary when the policy tends to discriminate on

-15-

its face. *Kadel*, 2022 WL 2106270, at *18 (citing *Shaw v. Reno*, 509 U.S. 630, 642 (1993)). The Court looks to the language of the policy to determine whether it is facially neutral or whether it explicitly references gendered or sex-related terms. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982).

In *Grimm*, the Fourth Circuit found that a bathroom policy that required students to use bathrooms according to their "biological genders" discriminated on the basis of sex. *Grimm*, 972 F.3d at 608–10. The court reasoned that the policy "necessarily rests on a sex classification" and "cannot be stated without referencing sex." *Id.* at 608. Further, the court found that the bathroom policy propagated sex stereotyping, as the transgender plaintiff was viewed as "failing to conform" to sex stereotypes. *Id.* The *Grimm* court also found that the policy further discriminated on the plaintiff's status as a transgender boy, noting that "[m]any courts…have held that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Id.*

Looking to the language of the exclusion, it is clear that the exclusion discriminates on its face. The exclusion denies coverage for "transsexual surgery." This language refers explicitly to sex—one seeking a "transsexual surgery" seeks to change from their sex assigned at birth to the sex that more accurately reflects their gender identify. Only individuals who identify as transgender would seek "transsexual surgery," and as the Supreme Court reasoned in *Bostock v. Clayton County, Georgia*, one cannot consider the term "transgender" without considering sex. *Bostock*, 140 S. Ct. at 1746 ("[T]ry writing out instructions for who should check the [transgender] box [on a job application] without using the words man, woman, or sex (or some synonym). It can't be done."). Following this reasoning, the Court finds that the exclusion references sex on its

-16-

face. *See Kadel*, 2022 WL 2106270, at *19 (finding that the health plan's exclusions for sex changes or modifications and related care facially discriminate); *see also Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) ("In sum, defendant's policy of excluding coverage for medically necessary surgery such as vaginoplasty and mammoplasty for employees, such a[s] plaintiff, whose natal sex is male while providing coverage for such medically necessary surgery for employees whose natal sex is female is discriminatory on its face and is direct evidence of sex discrimination.").

Defendants point to *Geduldig v. Aiello* to support their argument that the exclusion is facially neutral. 417 U.S. 484 (1974). In *Geduldig*, the Court found that a disability insurance program which exempted from coverage any work loss resulting from pregnancy did not discriminate based on sex. *Id.* at 494. The Court reasoned that pregnancy was a physical condition divorced from gender, and while only women can get pregnant, the group of members who were not pregnant included both men and women. *Id.* at 496. Here, the nonsuspect class—those not seeking surgical treatment for gender dysphoria—are treated more favorably, as their materially same surgeries are covered. This is unlike *Geduldig*, where men were not treated more favorably under the challenged policy. And, as the *Kadel* court found, the exclusion precludes a specific treatment that is connected to a person's sex and gender identity—not just a single "objectively identifiable physical condition with unique characteristics." *Kadel*, 2022 WL 2106270, at *21.

Thus, it is the opinion of the Court that the exclusion at issue here facially discriminates on the basis of sex and transgender status. Thus, there is no need for Plaintiffs to show discriminatory intent or purpose.

> d.  Heightened Scrutiny Analysis

Finding that the exclusion does discriminate on the basis of sex and transgender status, the

Court must determine whether the exclusion survives heightened scrutiny. It does not.

Classifications based on sex and transgender status "fail[ ] unless [they are] substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (citing *Cleburne*, 473 U.S. at 441). The governmental interests that Defendants put forward to support the exclusion are unsupported by the evidence in the record.

### 1. Cost

Defendants assert cost considerations as a reason to justify the exclusion. However, as previously discussed, Defendant has not supported with any evidence in the record its concern about the costs of providing coverage for surgical treatments of gender dysphoria. In fact, Defendant stipulated to having not considered any documents, let alone any documents considering costs, in adopting this exclusion. *See* ECF No. 258. Further, all the evidence in the record point to the long-term cost-efficiency of providing this coverage, contradicting Defendants' assertion. Thus, cost considerations have not been established as an important governmental purpose that justifies the discrimination.

### 2. Consistency with CMS policy

Next, Defendants claim that providing coverage consistent with what is required by the Centers for Medicare and Medicaid Services (CMS) is an important governmental purpose for the exclusion. CMS oversees Medicaid by maintaining the Medicaid regulations and approving state plans and state plan amendments. *See Sarah Young Dep.*, ECF No 252-1, at 42–43. The Medicaid Program bases "all of [its] policies and procedures within the confines of the federal regulation, the state code, state laws, and [it] ensure[s] that the covered services are available to members." *Id.* at 20. CMS communicates with the Medicaid Program to dictate changes to the program or clarify a policy. *Id.* at 21. Further, CMS generally has an active role in reviewing and approving

of changes to Medicaid coverage. *Id.* at 17. CMS neither mandates nor prohibits coverage for the surgical care of gender dysphoria—this decision is left up to the individual states. *See id.* at 42.

Defendants assert that Secretary Crouch and Commissioner Beane have relied on guidance from CMS and the Department of Human Health Services (HHS) to determine required coverages. Since surgical treatment of gender dysphoria is not a mandated coverage dictated by CMS, Defendants assert that excluding this coverage is simply following CMS guidance and is an important governmental interest. Further, Defendants note that CMS has never notified the West Virginia Medicaid program that excluding this coverage is in violation of any law, thus, they argue, the Exclusion is not unlawful. *Id.* at 37.

Importantly, the lack of a mandate by CMS does not permit Defendants to ignore their obligations under the Constitution. CMS's lack of guidance on the matter does not give a green light for the states to enact discriminatory policies. Defendants' purported governmental interest in providing coverage consistent with what is required by CMS rings hollow in light of the fact that the West Virginia Medicaid Program covers other services which would be characterized as optional by CMS. *Tr. of Proceedings*, ECF No. 269, at 45.

Defendants also point to a 2016 study by HHS, discussed by Dr. Stephen Levine, where HHS refused to mandate coverage for transgender surgeries, leaving such decisions up to the individual states due to the lack of evidence regarding the long-term benefits of such surgeries. *Dr. Stephen Levine's Expert Report*, ECF No. 252-11, at 14. But this assertion regarding the long-term benefits is inconsistent with the body of literature on this topic. As Dr. Karasic points out in his rebuttal report, gender confirming surgery "has been studied extensively, with much evidence of the effectiveness of such treatment." *Dr. Karasic's Rebuttal Report*, ECF No. 250-21, at 16; *see also id.* at 14 (citing to a Cornell University study which found a "robust international consensus

-19-

in the peer-reviewed literature that gender transition, including medical treatments such as hormone therapy and surgeries, improves the overall well-being of transgender individuals.).[7] Further, the underlying HHS study to which Dr. Levine references followed the agency's decision to eliminate a categorical ban on gender-affirming surgery, like the ban found in the West Virginia Medicaid Program. *See Dr. Loren Schechter's Rebuttal Report*, ECF No. 250-24, at 5.

Thus, the Court does not find that the adherence to the required services as mandated by CMS to be a sincere or compelling governmental interest.

### 3. Question of medical necessity

Lastly, Defendants question the medical necessity of the surgical treatment of gender dysphoria. This assertion is without support in the record. Dr. Schechter directly addresses the medical necessity of surgical care to treat gender dysphoria. *See Dr. Schechter's Expert Report*, ECF No 250-23, at 12–13; *see Dr. Schechter's Rebuttal Report*, ECF No. 250-24, at 13. As Dr. Schechter points out, these procedures are "clinically indicated to treat the underlying medical condition of gender dysphoria." *Dr. Schechter's Expert Report*, ECF No. 250-23, at 13. Dr. Schechter discusses that the "prevailing consensus of the medical community recognizes "that procedures used to treat gender dysphoria are reconstructive, not experimental, and are medically necessary." *see Dr. Schechter's Rebuttal Report*, ECF No. 250-24, at 13. The techniques used to perform these surgeries are well-established and used to perform many different surgeries, not just gender confirming surgeries. *Id.* Gender confirming surgeries have been performed "for decades" and have demonstrated benefits. *Id.*

There are Standards of Care promulgated by the World Professional Association of

---

[7] Dr. Karasic also points out the potential bias in Dr. Levine's testimony, as recognized by the Judge Jon Tigard in the Northern District of California. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (where the court gave Dr. Levine's opinion very little weight due to his misrepresentations of the Standards of Care and illogical inferences).

Transgender Health (WPATH) that provide clinical criteria for the medical interventions to treat gender dysphoria. *Dr. Karasic's Expert Report*, ECF No. 250-20, at 8. These Standards of Care are recognized by a number of leading medical professional entities, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the Pediatric Endocrine Society, the American College of Obstetrics and Gynecology, the American College of Physicians, and the World Medical Association, among others. *Id*. Similarly, the Endocrine Society has published a clinical practice guideline providing protocols for the medically necessary treatment of gender dysphoria. Further, many of the major medical organizations have opposed the blanket denial of this medically necessary care. *Id.* at 10. The medical treatments for gender dysphoria have been studied extensively, and have been shown to improve "quality of life and measures of mental health" for patients. *Id.* at 11–12 (citing to the Cornell University study that supported gender affirming "hormone and surgical treatment improved the well-being of transgender individuals").

Further, InterQual has developed clinical standards of care to determine the medical necessity of surgical treatment for gender dysphoria. For example, the InterQual standards created for vaginoplasty for gender affirmation surgery note that "[d]elaying treatment for those with gender dysphoria is not a reasonable treatment option." *InterQual Composite*, ECF No. 250-30, at 36. These standards note that this procedure can be performed for medically necessary purposes and that the criteria found therein is intended to determine the medical appropriateness of the procedure. *Id.* at 38. The InterQual standards for the surgical care of gender dysphoria would be utilized by West Virginia Medicaid Program's Kepro system if the exclusion at issue here did not prohibit coverage of this treatment.

The argument that surgical treatment of gender dysphoria is not medically necessary is

wholly unsupported by the record, and importantly, is refuted by the majority of the medical community. Thus, the Court finds that concern for the medical necessity of this treatment is not a sufficiently important governmental interest.

e.   The exclusion does not survive heightened scrutiny, thus, violating Equal Protection

The Court has discussed Defendants' purported governmental interests that are upheld by the exclusion. None survive heightened scrutiny. Without a sufficiently important governmental interest, this exclusion must fail. Thus, the Court finds that the exclusion violates the Equal Protection Clause of the Fourteenth Amendment.

2.   Violation of the Affordable Care Act

The Affordable Care Act (ACA) "aims to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583 (2012). An important component of the ACA is the anti-discrimination mandate in section 1557. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Sup. 3d 1, 11 (D.D.C. 2020). This section provides that "[e]xcept as otherwise provided… an individual shall not, on the ground prohibited under title VI of the Civil Rights Act…[and] title IX…be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance…". 42 U.S.C. § 18116. Because the ACA explicitly incorporates Title VI and Title IX, and the Fourth circuit looks to Title VII to guide the evaluation of claims under Title IX, the test announced in *Bostock* is the appropriate test to determine whether a policy discriminates in violation of the ACA. *Kadel*, 2022 WL 2106270, at *29.

To prevail on a section 1557 claim, a plaintiff most show that:

    1. Defendant is a health program or activity that receives federal funds, and
    2. Plaintiff was subjected to discrimination in healthcare services on the basis of sex.

*See id.*

BMS has already admitted that it is a "health program or activity" for purposes of Section 1557 analysis. *See Defs.' Answer to Am. Compl.*, ECF No 151, ¶ 15 ("These Defendants further admit that West Virginia Medicaid is jointly funded by the State of West Virginia and the federal government. These Defendants admit that BMS is a recipient of federal funds from the U.S. Department of Health and Human Services, including Medicaid funding."). Thus, the first element of the 1557 claim is met.

Pursuant to the Equal Protection analysis above, this Court has found that Plaintiffs were subjected to discrimination in healthcare services on the basis of sex. The exclusion precludes individuals who are seeking surgical treatment of gender dysphoria from coverage. As already noted by this Court, a transgender identity is inherent in an individual who suffers from gender dysphoria. Transgender status, and thus, this exclusion, cannot be understood without a reference to sex. *See Bostock*, 140 S. Ct. at 1746. Plaintiffs are subjected to discrimination on the basis of sex.

Defendants make the argument that, historically, the term "sex" has referred to the binary sexes of male and female. Gender identity, Defendants assert, is something entirely distinct from the sexes, and thus, for the purposes of the ACA, Defendants cannot be guilty of discrimination because transgender status does not implicate this binary categorization—*Bostock* rejects this limitation on the scope of discrimination.

Defendants also to *Hennessy-Waller v. Snyder* out of the District of Arizona to support their position. 529 F. Supp. 3d 1031 (D. Ariz. 2021). At the outset, the *Hennessy-Waller* court was deciding a motion for preliminary injunction, which requires a different standard than this Court deciding motions for summary judgment. In that case, the plaintiffs were transgender minors enrolled in the state Medicaid who were diagnosed with gender dysphoria. The Medicaid program covered other treatments for gender dysphoria but excluded coverage for gender reassignment surgeries. With respect to the plaintiffs' ACA claim, the court reasoned that the exclusion only precluded coverage for surgical treatment; other treatment was covered, so plaintiffs could not show that there was discrimination. *Id.* at 1045. Further, the District of Arizona also questioned the safety of these procedures for adolescents. *Id.* Defendants here made similar arguments. But as already discussed, this Court fundamentally disagrees with these positions. First, Defendants are not permitted to discriminate on one aspect of healthcare just because they do not discriminate across the board for all treatments. The issue here is narrow regarding the discrimination with respect to surgical care, and this Court found that the exclusion does discriminate. Second, the safety, effectiveness, and medical necessity have been clearly demonstrated by the expert evidence in the record and is confirmed by the many major health organizations supporting the safety and effectiveness of this treatment. The *Hennessy-Waller* court did not have the robust medical evidence in the record that this Court has before it; this case is unpersuasive here.

Thus, because this Court finds that Defendants are a "health program or activity" under the ACA, and that Plaintiffs have been subjected to discrimination on the basis of sex, Defendants have violated ACA section 1557.

3. <u>Violation of Medicaid</u>

Plaintiffs assert that the Exclusion violates the Availability and Comparability requirements of the Medicaid Act, because coverage for medically necessary treatments for gender dysphoria are excluded from coverage while the same treatments are covered for other medically necessary reasons.

The Medicaid Program is established in Title XIX of the Social Securities Act. 42 U.S.C. §§ 1396 *et seq*. The purpose of this act is to enable "each State, as far as practicable under the conditions in such state, to furnish… medical assistance [to individuals] whose income and resources are insufficient to meet the costs of necessary medical services." *Id.* § 1396-1. Participation in Medicaid is optional—however, once a state elects to participate in the Medicaid program, it is subject to federal laws and regulations. *See Antrican v. Odom*, 290 F.3d 178, 183 n.2 (4th Cir. 2002); *Flack v. Wisconsin Dep't of Health and Servs.*, 395 F. Supp. 3d 1001, 1015 (W.D. Wisc. 2019) (noting that a state Medicaid Program "must comply with all federal statutory and regulatory requirements").

Plaintiffs allege violations of both Medicaid's Availability and Comparability requirements. The Court will address each.

a. *Violation of Medicaid's availability requirement*

A state Medicaid Program "must… provide… for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17), (21), (28), (29), and (30) of section 1905(a)." 42 U.S.C. § 1396a(a)(10)(A). A state must provide coverage for mandatory categories of treatment and must cover services when they (1) fall within a category of mandatory medical services or optional medical services that the state has elected to provide; and (2) are "medically necessary" for a particular participant. *See Beal v. Doe*, 432 U.S. 438 (1977). The state "may place appropriate limits on a service based on such criteria as medical necessity or

on utilization control procedures." 42 C.F.R. § 440.230. "These limits must be 'reasonable' and 'consistent with the objectives of the [Medicaid] Act." *Flack*, 395 F. Supp. 3d at 1015 (quoting *Rush v. Parham*, 625 F.2d 1150, 1155 (5th Cir. 1980)).

Plaintiffs here assert that BMS has either mandated or chosen to cover the same surgical procedures for non-gender-dysphoria related treatment and that the unrebutted evidence in the record demonstrates the medical necessity of surgical care. This Court agrees. The surgical care precluded by the exclusion is made available and covered by Medicaid when the surgical care is to treat diagnoses other than gender dysphoria. Indeed, the same CPT codes are used to document the surgeries, whether performed for gender dysphoria treatment or for treatment of another diagnosis. And, there is ample evidence in the record to support the medical necessity of the treatments. *See Alvarez v. Betlach*, 572 F. App'x 519, 521 (9th Cir. 2014) (discussing that states are prohibited "from denying coverage of 'medically necessary' services that fall under a category covered in their Medicaid plans." (quoting *Beal v. Doe*, 432 U.S. 438, 444 (1977)); *see Bontrager v. Ind. Fam.  Soc. Servs. Admin*., 697 F.3d 604, 608 (7th Cir. 2012) ("[T]he State is required to provide Medicaid coverage for medically necessary in those service areas that the State opts to provide such coverage."); *see Beal*, 432 U.S. at 444 ("[S]erious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage…").

Defendants point to *Casillas v. Daines* to support the contention that regulations permit a Medicaid Program to place limits on services, even when those services are required to be covered. 580 F. Supp. 2d 235, 245–46 (S.D.N.Y. 2008). Notably, *Casillas* is nonbinding on this Court, and was not even followed within the Southern District of New York. *See Cruz v. Zucker*, 116 F. Supp. 3d 334 (S.D.N.Y. 2015). And, while states are granted "discretion to choose the proper mix of amount, scope, and duration limitations on coverage," such choices must ensure that the "care and

services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)). The limitations must also be consistent with the Medicaid Act. *Id.* at 303 n.23. When a state Medicaid Program does choose to limit services, it cannot limit a service it has elected to cover based on diagnosis—this Court finds that such a limitation would not be "appropriate." *See e.g. Bontrager*, 697 F.3d at 609 (finding that a budgetary cap on coverage for medically necessary procedures was not a proper utilization control procedure). The exclusion violates the availability requirement.

### b. *Violation of Medicaid's comparability requirement*

The State Medicaid Program provides coverage for both the "categorically needy" and "medically needy" participants. "Categorically needy" individuals receive some form of public assistance, *see* 42 U.S.C. § 1396a(a)(10)(A), while "medically needy" individuals are those "whose incomes are too large to qualify as categorically needy," yet "lack the funds to pay for medical expenses." *Benjamin H. v. Ohl*, No. Civ. A. 3:99-0338, 1999 WL 34783552, *3 (S.D.W. Va. July 15, 1999) (citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981)).

The Medicaid statute provides that:

> The medical assistance made available to…any individual described in subparagraph (A)—
> (i)     Shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual and
> (ii)    Shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A);

42 U.S.C. § 1396a(a)(10)(B). Further, the regulations promulgated pursuant to the Medicaid Act provide that:

> (a) The plan must provide that the services available to any categorically needy recipient under the plan are not less in amount, duration, and scope than those services available to a medically needy recipient; and
> (b) The plan must provide that the services available to any

individual in the following groups are equal in amount, duration,
and scope for all recipients within the group:
a.  The categorically needy
b.  A covered medically needy group

42 C.F.R. § 440.240. The regulations also provide that "[t]he agency may place appropriate limits

on a service based on such criteria as medical necessity or on utilization control procedures." 42

U.S.C. § 440.230.

Plaintiffs assert that Defendants violate the comparability requirement of the Medicaid Act

by providing particular services to some Medicaid participants but not others based solely on

diagnosis. This Court has found that the surgeries, such as mastectomies, which are covered to

treat non-gender dysphoria diagnoses are materially the same as the surgeries provided to treat

gender dysphoria. Thus, the difference in treatment clearly violates the comparability requirement,

which requires that all persons within a specific category be treated equally. *See White v. Beal*,

555 F.2d 1146, 1151 (3d Cir. 1977) ("We find nothing in the federal statute that permits

discrimination based upon etiology rather than need for the services.").

Defendants rely on *Rodriguez v. City of New York* to support their argument that, since

surgical treatment for gender dysphoria is not covered for any Medicaid participant, there is no

violation of the comparability requirement. 197 F.3d 611 (2d Cir. 1999). But their reliance on

*Rodriguez* is misplaced. In *Rodriguez*, plaintiffs challenged the failure of New York City to

provide personal-care services to Medicaid recipients. A key distinction in *Rodriguez* is that the

benefit sought by Plaintiffs was provided to no one. *Id.* at 616. Here, the surgeries sought by

Plaintiffs are materially the same to covered procedures that treat other diagnoses. The exclusion

essentially denies services to some categorically needy persons while the same services are

provided for other persons with similar needs. *See Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016)

(discussing that an analysis under the comparability requirement must "entail some independent

judicial assessment of whether a state has made its services available to all categorically needy individuals with equivalent medical needs").

The exclusion "fails to make covered treatments available in sufficient amount, duration and scope" and discriminates on the basis of diagnosis. *Flack*, 395 F. Supp. 3d at 1019 (internal quotation omitted). Thus, it violates the comparability requirement of the Medicaid Act.

4. Standing

Lastly, Defendants argue that Plaintiffs lack the standing to bring this case because neither has suffered an injury in fact. To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). Defendants argue that, because Plaintiffs have not submitted a claim for and been denied gender-affirming care by Medicaid, they cannot show injury in fact, and thus, lack standing.

However, Defendants enacted a clear policy excluding coverage for surgical care of gender dysphoria with no exceptions. This caused an actual, concrete injury to Plaintiffs by essentially constructing a discriminatory barrier between them and health insurance coverage. This is not a hypothetical injury. Plaintiffs requesting coverage would have been futile due to the exceptionless exclusion, and the law does not require Plaintiffs to take such futile acts. *Townes v. Jarvis*, 577 F.3d 543, 547 n.1 (4th Cir. 2009). "In the context of applications for government benefits... [the] threshold requirement... may be excused... where a plaintiff makes a substantial showing that the application for the benefit... would have been futile." *Safari Club Int'l v. Jewell*, 842 F.3d 1280,

1286 (D.C. Cir. 2016) (internal quotations omitted). Defendants' policy was clear—a request for coverage would have been denied under the exclusion. Thus, Plaintiffs have standing.

## CONCLUSION

The West Virginia Medicaid Program exclusion denying coverage for the surgical care for gender dysphoria invidiously discriminates on the basis of sex and transgender status. Such exclusion violates the Equal Protection clause of the Fourteenth Amendment, the Affordable Care Act, and the Medicaid Act. Defendants are enjoined from enforcing or applying the exclusion.

Thus, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 250) and **DENIES** Defendants' Motion for Summary Judgment (ECF No. 252).

The Court also **DENIES as MOOT** the Motion to Exclude Expert Testimony of Stephen B. Levine, M.D. ECF No. 254. Resolving the Motion for Summary Judgment in favor of Plaintiffs moots this Motion.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        August 2, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE